**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:20-cv-10032-DPW |
| ACADEMY EXPRESS, LLC, | ) | |
| Defendant. | ) | |

**CONSERVATION LAW FOUNDATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF STANDING**

# Table of Contents

**INTRODUCTION** .......... 6

**STANDARD OF REVIEW** .......... 7

**ARGUMENT** .......... 7

**I. SUMMARY JUDGMENT IS PREMATURE BECAUSE THE PARTIES HAVE NOT ENGAGED IN EXPERT DISCOVERY** .......... 7

**II. PLAINTIFF HAS MET THE STANDARD FOR ASSOCIATIONAL STANDING** .......... 9

**A. CLF's Members Have Suffered and Continue to Suffer Injuries-in-Fact** .......... 10

**B. CLF Members' Injuries Are Fairly Traceable to the Defendant's Unlawful Emissions** .......... 17

**III. CLF MEMBERS HAVE STANDING IN REGARDS TO THE DEFENDANT'S VIOLATIONS AT ALL LOCATIONS ALLEGED IN THE COMPLAINT, INCLUDING THE BRAINTREE LOT, THE NEWTON GO BUS STOP, THE BRIDGEPORT LOT, AND THE AGGANIS WAY STOP** .......... 23

**IV. CLF SATISFIED THE CLEAN AIR ACT'S NOTICE REQUIREMENT** .......... 25

**CONCLUSION** .......... 27

# **Table of Authorities**

Cases

310 CMR 7 .................................................. 11
*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986) .................................................. 5, 6, 8
*Around Murphy v. Murphy Oil USA, Inc.*,
686 F.Supp.2d 663 (E.D. La. 2010) .................................................. 11, 16
*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................................................. 6
*Cherkaoui v. City of Quincy*,
877 F.3d 14 (1st Cir. 2017) .................................................. 5
*Clean Water Action v. Searles Auto Recycling, Corp.*,
268 F.Supp.3d 276 (D. Mass. 2017) .................................................. 16
*Clean Wisconsin v. EPA*,
964 F.3d 1145 (D.C.C. 2020) .................................................. 9, 10
*Communities For A Better Env't v. Cenco Ref. Co.*,
180 F.Supp.2d 1062 (C.D. Cal. 2001) .................................................. 9, 24
*Conservation Law Found., Inc. v. Am. Recycled Materials, Inc.*,
2017 WL 2622737 (D. Mass. June 16, 2017) .................................................. 10, 16, 17
*Env't Texas Citizen Lobby v. Exxonmobil Corp.*,
968 F.3d 357 (5th Cir. 2020) .................................................. 18, 19, 20, 25
*Nat. Res. Def. Council v. EPA*,
755 F.3d 1010 (D.C.C. 2014) .................................................. 9, 10
*Estate of Rahim by Rahim v. United States*,
2020 WL 7055971 (D. Mass. Dec. 2, 2020) .................................................. 6, 8
*Friends of the Earth v. Carey*,
535 F.2d 165 (2d Cir. 1976) .................................................. 24
*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .................................................. 10, 15
*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
900 F.Supp. 67 (E.D.Tex.1995) .................................................. 17
*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
204 F.3d 149 (4th Cir. 2000) .................................................. 15, 17
*Garcia v. Cecos Int'l, Inc.*,
762 F.2d 76 (1st Cir. 1985) .................................................. 23
*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .................................................. 6
*Hall v. Norton*,
266 F.3d 969 (9th Cir. 2001) .................................................. 11
*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
399 F.3d 248 (3d Cir. 2005) .................................................. 16
*Kelley v. LaForce*,
288 F.3d 1 (1st Cir. 2002) .................................................. 6
*Leahy v. Raytheon Co.*,
315 F.3d 11 (1st Cir. 2002) .................................................. 6

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 8, 9, 24
*Maine People's Alliance v. Holtrachem Mfg. Co., LLC.*,
211 F.Supp.2d 237 (D. Me. 2002) .......... 16, 18
*Maine People's Alliance v. Mallinckrodt, Inc.*,
471 F.3d 277 (1st Cir. 2006) .......... 8, 9
*Massachusetts v. EPA*,
549 U.S. 497 .......... 9, 20
*Newman–Green, Inc. v. Alfonzo–Larrain*,
490 U.S. 826 (1989) .......... 24
*Nw. Env't. Def. Ctr. v. Owens Corning Corp.*,
434 F. Supp. 2d 957 (D. Or. 2006) .......... 17
*Pub. Interest Res. Group of N.J., Inc. v. Powell Duffryn Terminals, Inc.*,
913 F.2d 64 (3rd Cir. 1990) .......... 16, 20
*Rivera-Rivera v. Medina & Medina, Inc.*,
898 F.3d 77 (1st Cir. 2018) .......... 5, 6
*Sierra Club v. Morton*,
405 U.S. 727 (1972) .......... 10
*Sierra Club v. TVA*,
430 F.3d 1337 (11th Cir. 2005) .......... 11
*Sierra Club v. United States EPA*,
762 F.3d 971 (9th Cir. 2014) .......... 11
*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*,
73 F.3d 546 (5th Cir. 1996) .......... 10, 17, 20
*Texans United for a Safe Econ. Educ. Fund. v. Crown Cent. Petrol. Corp.*,
207 F.3d 789 (5th Cir. 2000) .......... 10, 15, 22
*U.S. E.P.A. ex rel. McKeown v. Port Auth. of New York & New Jersey*,
162 F. Supp. 2d 173 (S.D.N.Y.) .......... 21
*United States EPA*,
507 F.2d 905 (9th Cir. 1974) .......... 9
*Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*,
374 F.Supp.3d 1124 (D. Utah 2019) .......... 13, 19, 20, 23, 24
*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
429 U.S. 252 (1977) .......... 15
*Village of Elk Grove Village v. Evans*,
997 F.2d 328 (C.A.7 1993) .......... 9
*Washington Envtl. Council v. Bellon*,
732 F.3d 1131 (9th Cir. 2013) .......... 19
*WildEarth Guardians v. Colorado Springs Utilities Bd.*,
2018 WL 317469 (D. Colo. Jan. 8, 2018) .......... 15

Statutes

42 U.S.C. § 7410 .......... 11

Rules

Fed. R. Civ. P. 56(a) .......... 5
Fed. R. Civ. P. Rule 56(d).......... 6

Regulations

Regs. Conn. State Agencies § 22a-174-18(b)(3)(C) .......... 12

Plaintiff Conservation Law Foundation ("CLF") submits this memorandum in opposition to the Defendant's Motion for Summary Judgment on the Issue of Standing (ECF No. 41) and its accompanying Memorandum of Law (ECF No. 42) ("Def. Mem. of Law").

## INTRODUCTION

CLF brought this citizen enforcement suit on behalf of its individual members to redress and prevent the Defendant's violations of the Clean Air Act ("CAA"), and the Massachusetts and Connecticut State Implementation Plans ("MA SIP" and "CT SIP," respectively). As stated in the Complaint and First Amended Complaint (the "Complaints"), the Defendant has repeatedly violated, and continues to violate, the motor vehicle idling limits under the federally enforceable Massachusetts and Connecticut SIPs. Indeed, such violations are established by documentary evidence produced by CLF, including video recordings and investigator reports, that show the Defendant's vehicles unlawfully idle far in excess of the five and three minutes permitted by the MA and CT SIPs, respectively. Unlawfully idling vehicles operated by the Defendant emit toxic air pollutants, including fine particulate matter, nitrogen oxides, sulfur dioxide, benzene, and formaldehyde. As demonstrated in CLF's member declarations, deposition testimony, and expert declarations, the Defendant's actions have significantly harmed, and continue to harm, the health and lives of CLF members.

The Defendant now moves for summary judgment solely on the issue of standing. First, summary judgment is premature due to the environmental and scientific issues affecting this case. The Court's decision on the Defendant's motion should be either deferred or denied because the parties have not engaged in expert discovery and CLF has not had "the opportunity to discover information that is essential to its opposition." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 n.5 (1986).

Should the Court find summary judgment is not premature, the Defendant's motion should be denied due to its misrepresentation of both the facts of this case and the applicable law. As set forth below, CLF members have suffered injuries-in-fact that are traceable to the Defendant's excessive idling. Additionally, CLF has complied with the notice requirements of the CAA. Therefore, there are genuine issues of material fact in dispute and the Defendant should not be granted summary judgment on the issue of standing.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the factfinder "could resolve the point in the favor of the non-moving party." *Rivera-Rivera v. Medina & Medina, Inc*., 898 F.3d 77, 87 (1st Cir. 2018) (quoting *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017)). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law.'" *Id*. At summary judgment "disputed issues of fact are resolved against the moving party." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997). The Court must ask "whether the factfinder's decision is inevitable even when all the evidence is marshaled in the objecting party's favor and all reasonable inferences therefrom are shaped to fit that party's theory of the case." *Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002). "Where a genuine dispute of material facts exists, such a dispute must 'be resolved by a trier of fact,' not by a court on summary judgment." *Rivera-Rivera*, 898 F.3d at 87 (quoting *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002)).

## ARGUMENT

### I. SUMMARY JUDGMENT IS PREMATURE BECAUSE THE PARTIES HAVE NOT ENGAGED IN EXPERT DISCOVERY.

The requirement that a party opposing summary judgment set forth specific facts showing that there is a genuine issue for trial is necessarily qualified by Fed. R. Civ. P. Rule 56(d)'s provision that “summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.” *Anderson*, 477 U.S at 250 n.5; Fed. R. Civ. P. Rule 56(d) (where “a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it”). For this reason, parties typically move for summary judgment after discovery is completed. *Estate of Rahim by Rahim v. United States*, No. 1:18-CV-11152-IT, 2020 WL 7055971, at *2 (D. Mass. Dec. 2, 2020) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Here, the Defendant argues that CLF lacks standing because CLF has not demonstrated that its members have suffered injuries-in-fact traceable to the Defendant’s violations. The issues of injury-in-fact and traceability depend, in part, on facts that will be provided by the parties’ expert witnesses. Expert deposition testimony and expert reports will provide the Court with the information needed to make assessments on air pollution injury and traceability. But the parties have not yet engaged in expert discovery and CLF’s deadline to provide its expert reports is not until May 28, 2021.

CLF’s experts will establish that CLF members have suffered harms that are traceable to the Defendant’s unlawful idling. *See* Ex. 1 (Durant Decl.)[1]; Ex. 2 (Rice Decl.); and Ex. 3 (St. Denis Decl.). For example, Dr. John L. Durant, a professor of civil and environmental engineering at Tufts University, and an air pollution dispersion expert, will testify that it is likely that air pollution from the Defendant’s tailpipe emissions “contributes to concentrations of

[1] Citations to “Ex. _” refer to the exhibits to the Declaration of Heather Govern filed herewith.

particulate matter ($PM_{2.5}$) and precursors of ozone ($O_3$)" at the Defendant's bus stops and lots and beyond, Ex. 1 (Durant Decl.) ¶¶ 10-11, and that this air pollution is "likely to enter the lungs of CLF's members." Ex. 1 (Durant Decl.) ¶ 12. Dr. Mary Rice, an assistant professor of medicine, and a pulmonary and critical care physician at Beth Israel Deaconess Medical Center in Boston, will "provide explanation for the fact that exposure to exhaust pollution can cause humans to experience various symptoms, including respiratory symptoms," Ex. 2 (Rice Decl.) ¶ 10, and that "pollutants in vehicle exhaust, including oxides of nitrogen ($NO_x$) and particulate matter (PM), are well documented to cause health effects." Ex. 2 (Rice Decl.) ¶ 12. Finally, Dr. Michael J. St. Denis, an engineer and expert in vehicle emissions, will opine that "it is likely that Defendant's vehicles emit $NO_x$ and PM," "which are documented to cause health effects," and that "the Defendant has a pattern and practice of excessively idling, which increases the concentrations and accumulation of $NO_x$ and PM in the ambient environment near the idling vehicles and overall in the atmosphere." Ex. 3 (St. Denis Decl.) ¶¶ 11-13.

Until the parties have completed expert discovery, CLF is unable to present facts "essential to justify its opposition." *Anderson*, 477 U.S at 250 n.5. Therefore, summary judgment is premature and the Court must either deny or defer the Defendant's motion. *Estate of Rahim by Rahim*, 2020 WL 7055971, *1 (denying summary judgment where "Defendants attempt[ed] to litigate this case through factual accounts that Plaintiff ha[d] not been permitted to test in discovery"). Moreover, CLF's expert declarations, attached herein, demonstrate that there are issues of material fact in genuine dispute and that the Defendant's motion must be denied.

## II. PLAINTIFF HAS MET THE STANDARD FOR ASSOCIATIONAL STANDING.

An organization or association has standing to bring suit on behalf of its members when 1) its members would have standing to sue in their own right; 2) the interests it seeks to protect

are germane to the organization's purpose; and 3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[2] *See Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 283 (1st Cir. 2006) (articulating standard for associational standing). The Defendant does not dispute that CLF has met the second and third elements of standing. The question at issue is whether CLF's members have standing to sue in their own right. To meet this standard, CLF must show that its members have injuries, traceable to the Defendant's challenged conduct, that will be redressed by a favorable decision.[3] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

As discussed below, CLF's members have suffered, and continue to suffer, injuries that are directly attributable to the Defendant's excessive and unlawful idling.

**A. CLF's Members Have Suffered and Continue to Suffer Injuries-in-Fact.**

To demonstrate an injury-in-fact, the plaintiff must prove that it has suffered "an invasion of a legally protected interest which is [(1)] concrete and particularized; and [(2)] actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotations omitted). For an injury to be "particularized," it must "affect the plaintiff in a personal and individual way." *Id.* The requirement of imminent injury is satisfied not only when a plaintiff has sustained an actual injury, but also when a plaintiff is *threatened* with injury and "there is a substantial probability that harm will occur." *Mallinckrodt*, 471 F.3d at 284 (members have standing where they forgo recreation due to a "realistic threat" of mercury contamination and its attendant health risks); *see also Clean Wisconsin v. EPA*, 964 F.3d 1145, 1156 (D.C.C. 2020) (citing *Nat. Res.*

[2] The Defendant uses the terms "organizational standing" and "associational standing" interchangeably throughout its Memorandum of Law. To clarify, CLF is asserting associational or representational standing to bring this suit on behalf of its members. CLF is not asserting injury to itself.
[3] The Defendant notes the redressability requirement in a footnote in its Memorandum of Law, but makes no argument that redressability is not met.

*Def. Council v. EPA*, 755 F.3d 1010, 1016-17 (D.C.C. 2014) ("Adverse health effects likewise constitute Article III injuries, even if a petitioner merely asserts realistic health concerns instead of providing medical evidence"). "[E]ven a small probability of injury is sufficient to create a case or controversy. . . . provided of course that the relief sought would, if granted, reduce the probability." *Massachusetts v. EPA*, 549 U.S. 497, 525 n. 23 (2007) (quoting *Village of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (C.A.7 1993)).

When addressing the injury-in-fact requirement in CAA cases, courts have specifically held that breathing slightly polluted air is sufficient to meet the harm standard. *See Nat. Res. Def. Council* v. *United States EPA*, 507 F.2d 905, 910 (9th Cir. 1974) (holding that the plaintiff would undoubtedly "suffer injury if compelled to breathe air less pure than that mandated by the Clean Air Act").; *see also Communities For A Better Env't v. Cenco Ref. Co.*, 180 F.Supp.2d 1062, 1075 (C.D. Cal. 2001) (finding that members who lived, worked, recreated and engaged in other activities in the vicinity of a refinery suffered injuries-in-fact as a direct result of the defendants' failures to comply with the law and that the harm was not "merely to aesthetic or recreational interests; breathing even slightly polluted air entails a health risk").

Additionally, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened by' the challenged activity." *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). *See also Conservation Law Found., Inc. v. Am. Recycled Materials, Inc.*, No. CV 16-12451-RGS, 2017 WL 2622737, at *3 (D. Mass. June 16, 2017), citing *Morton*, 405 U.S. at 735 ("It has long been established that harms to aesthetic and recreational interests are injuries in fact for standing purposes and rise above a mere speculative prospect of harm."). *See e.g., Clean*

*Wisconsin*, 964 F.3d at 1156 (citing *Nat. Res. Def. Council*, 755 F.3d at 1016-17) (finding standing based on declarations of members "who are concerned about the [challenged EPA action's] effects on their health and, in some cases, spend less time outdoors on that account").

The Court of Appeals for the Fifth Circuit recently provided further clarification for when injury-in-fact is established for CAA violations. *See Env't Texas Citizen Lobby v. Exxonmobil Corp.*, 968 F.3d 357, 368 (5th Cir. 2020). The Court held that members easily and sufficiently demonstrated that they were injured when they "[1] regularly saw flares, smoke, and haze coming from the complex; [2] smelled chemical odors; [3] suffered from allergy-like or respiratory problems; [4] feared for their health; [5] refrained from outdoor activities; or [6] moved away." *Id.* at 368. *See also Texans United for a Safe Econ. Educ. Fund. v. Crown Cent. Petrol. Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) ("breathing and smelling" polluted air constitutes Article III injury); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 557 (5th Cir. 1996) (unpleasant sights and smells of pollution constitutes Article III injury); and *Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*, 374 F.Supp.3d 1124, 1132-33 (D. Utah 2019) (adverse health effects, from air pollution and exposure to diesel exhaust, and deterrence from engaging in outdoor recreational activities constitutes Article III injury).

Indeed, a reasonable concern about the health effects of pollution has been held to be a concrete injury that constitutes injury in fact. *Sierra Club v. TVA*, 430 F.3d 1337, 1345 (11th Cir. 2005); *Sierra Club v. United States EPA*, 762 F.3d 971, 977 (9th Cir. 2014), quoting *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001) ("credible threat to the plaintiff's physical well-being from airborne pollutants" constitutes Article III injury); *Around Murphy v. Murphy Oil USA, Inc.*, 686 F.Supp.2d 663, 671 (E.D. La. 2010).

Of note, the Massachusetts Department of Environmental Protection ("DEP") makes very clear that protecting public health is the purpose of the anti-idling regulation, 310 CMR 7.11(1)(b), (also part of the federally enforceable state implementation plan approved by the Environmental Protection Agency ("EPA") under the Clean Air Act section 110, 42 U.S.C. § 7410):

> Exhaust from motor vehicles is a key component of ground-level ozone or smog, a contributor to global warming and can cause serious health effects. In addition, very fine particles emitted from diesel and gas engines are lung irritants and can trigger asthma attacks and more serious health conditions. All of these contaminants are produced when motor vehicles idle. The anti-idling law and MassDEP's anti-idling regulation are designed to decrease these harmful gases by reducing unnecessary idling.

Bureau of Air & Waste, *Fact Sheet – Engine Idling: Impacts on Your Health & the Environment*, MA. DEPT. OF ENVT. PROTECTION (Oct. 2012), https://www.mass.gov/doc/massdep-fact-sheet-engine-idling-impacts-on-your-health-the-environment/download.

As does the Connecticut Department of Energy and Environmental Protection ("DEEP") in reference to their three minute idling limit (Regs. Conn. State Agencies § 22a-174-18(b)(3)(C)):

> An idling vehicle spews air toxics, chemicals, gases and particulate matter ("soot") into the air, contributing to regional haze, acid rain and global climate change… Breathing in exhaust can aggravate asthma, allergies, and cardiovascular disease… Exhaust emissions increase school absences, ER visits, and even premature deaths… Emissions are still present and harmful, even when you can't see the exhaust.

*Anti-Idling Efforts in Connecticut*, CT. DEPT. OF ENERGY AND ENV'T PROTECTION (Jan. 23, 2020), https://portal.ct.gov/DEEP/Air/Mobile-Sources/Anti-Idling/Anti-Idling---Home.

Massachusetts DEP and Connecticut DEEP came up with a numerical limit for idling to protect public health. The Defendant consistently violates that limit.[4] CLF's members are exactly the people that these regulations seek to protect.

Given the serious adverse health outcomes associated with exposure to pollutants in vehicle exhaust, there is "substantial risk" that CLF's members will suffer from additional, long-term harms in the future because of the Defendant's unlawful idling. As stated in the pleadings, the Defendant's idling vehicles emit pollutants, including fine particulates, nitrogen oxides ($NO_x$), sulfur dioxide ($SO_2$), benzene, and formaldehyde. *See* ECF No. 29 (Amended Complaint) at 58. These contaminants are linked to numerous adverse health outcomes, including impaired lung function and respiratory illnesses. *Id.* at 58-71; *see also* Ex. 12 (ATSDR Fact Sheets) and Ex. 13 (EPA, Particulate Matter). Dr. Mary Rice, a pulmonologist, will testify that "exposure to exhaust pollution can cause humans to experience various symptoms, including respiratory symptoms," and that "pollutants in vehicle exhaust, including $NO_x$ and particulate matter (PM), are well documented to cause health effects." Ex. 2 (Rice Decl.) ¶¶ 11, 13. Additionally, Dr. Rice will testify that "responses to air pollution vary greatly in people. Some individuals are highly sensitive to exposure to air pollution and may experience symptoms or illness while others may not." *Id.*, at ¶ 12.

CLF meets the injury-in-fact standard because the health, well-being, quality of life, and enjoyment of CLF members are harmed by the Defendant's excessive and unlawful idling. Defendant's assertions to the contrary misrepresent the facts of this case. Through declarations and direct testimony, CLF's members describe injuries to their physical and mental health and

[4] As will be discussed in Section II.B, the Defendant has a "pattern and practice" of excessively idling every day it operates its buses, thereby increasing the risk that CLF members will be harmed by the Defendant's unlawful idling.

harms to their recreational interests, including breathing and smelling polluted air, suffering from allergy-like or respiratory problems, fearing for their health, and refraining from recreational activities:

**Breathing and smelling polluted air:** Ex. 4 (Andrews Decl.) ¶ 18 ("I hate exercising in exhaust fumes; when I exercise, it feels like I breathe in more fumes"); Ex. 5 (Becker Decl.) ¶ 14 ("I don't like breathing in exhaust fumes; they are stinky . . . Breathing in exhaust fumes makes me feel lightheaded"); Ex. 6 (Kendall Decl.) ¶ 22 ("In the city, the air always seems to smell like something, and it doesn't make you want to take deep breaths"); Ex. 7 (Ly Decl.) ¶ 19 ("When I do breathe in exhaust, I start coughing a bit, because it feels synthetic, not natural, and not clean. I have a heavy feeling when I breathe it in"); Ex. 8 (Wagner Decl.) ¶ 15 ("I notice the air pollution because my mouth is a little drier than normal, and I experience a scratchy feeling in my throat if I'm running or breathing heavily");

**Allergy-like or respiratory problems:** Ex. 6 (Kendall Decl.) ¶ 27 ("I have a lot of problems with allergies and with sleep apnea, and I worry that air pollutants could be making these respiratory issues worse"); Ex. 7 (Ly Decl.) ¶ 23 ("I also get out of breath really easily when I run, and I sometimes have tasted blood while running"); Ex. 8 (Wagner Decl.) ¶ 26 ("I also suffer from allergies all year, which makes me wheeze and can make outdoor physical activities more difficult");

**Fear of harm to health:** Ex. 9 (Bolduc Decl.) ¶ 10 ("I am very worried that my health has been harmed because I have been exposed to the polluted air near the Boston University shuttle stop. In fact, I often smelled exhaust in the vicinity of my gym"); Ex. 7 (Ly Decl.) ¶ 23 ("I worry about my asthma getting worse, and I worry that breathing in

vehicle exhaust could worsen it"); Ex. 10 (Morelli Decl.) ¶ 24 ("I worry about the health impacts from running or spending time outside near the Riverside Green Line station and breathing in pollutants emitted by idling Academy Express vehicles"); Ex. 8 (Wagner Decl.) ¶ 27 ("Because of my allergies and my history with asthma and nasal infections, I worry about my lungs and how they could be affected by air pollution, including exhaust from Academy's vehicles");

**Recreational harm and refraining from outdoor activities**: Ex. 4 (Andrews Decl.) ¶ 18 ("I avoid biking on Commonwealth Avenue when I can because there is so much traffic and exhaust there"); Ex. 10 (Morelli Decl.) ¶ 27 ("If Academy Express stopped idling its buses and there was consequently less air pollution near the Riverside Green Line station and near the Bridgeport Lot, I would go running more, and I would walk more and drive less"); Ex. 8 (Wagner Decl.) ¶ 24 ("If the air quality around my home were better, I would definitely run more"); Ex. 8 (Wagner Decl.) ¶ 31 ("There have been times when I've decided not to spend time in an open community space with friends or family after smelling fumes there").

"The [Article III] standing inquiry ensures that a plaintiff has a sufficient personal stake in a dispute to render judicial resolution appropriate." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 153 (4th Cir. 2000) (en banc); accord *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 260–61 (1977). CLF's members in the present case established their personal stake in the Defendant complying with idling limits by testifying that they live, shop, exercise, and visit family near the locations where the Defendant's idle its buses, and that they want to breathe as little of the Defendant's tailpipe exhaust as possible in the future. Their stake in the clean air of Auburndale, Boston, Braintree,

Bridgeport, and Cambridge exists at all times. Their personal stake will be extant until the Defendant stops violating the idling law.

In light of the foregoing, CLF has clearly established that its members have suffered injuries-in-fact because of the Defendant's excessive and unlawful idling. Therefore, summary judgment must be denied.

**B. CLF Members' Injuries Are Fairly Traceable to the Defendant's Unlawful Emissions.**

When determining traceability in a recent Clean Air Act case, the Fifth Circuit stated: "[t]he standard is that the injury be *fairly* traceable to the challenged conduct, not definitively so." *Env't Tex. Citizen Lobby*, 968 F.3d at 368 (citing *Laidlaw*, 528 U.S. at 180) (emphasis in the original). In fact, the plaintiff's injury need *not* be linked to exact dates that the defendant's violations occurred. *Id*. at 369; *Texans United*, 207 F.3d at 793; *WildEarth Guardians v. Colorado Springs Utilities Bd*., No. 17-CV-00357-CMA-MLC, 2018 WL 317469, at *7 (D. Colo. Jan. 8, 2018) (the argument that members must trace injuries to the time of a violation "has been squarely rejected by courts"); *Murphy Oil USA, Inc*., 686 F. Supp. 2d at 671. Nor does the plaintiff have to "'show to a scientific certainty that defendant's [actions], and defendant's [actions] alone, caused the precise harm suffered by the plaintiffs.'" *Am. Recycled Materials, Inc*., 2017 WL 2622737, at *3 (D. Mass. June 6, 2017) (citing *Interfaith Cmty. Org. v. Honeywell Int'l, Inc*., 399 F.3d 248, 257 (3d Cir. 2005); *Pub. Interest Res. Group of N.J., Inc. v. Powell Duffryn Terminals, Inc*., 913 F.2d 64, 72 (3rd Cir. 1990) ("The fairly traceable requirement ... is not equivalent to a requirement of tort causation.")).

Instead, the plaintiff must demonstrate that an injury-in-fact is "fairly traceable" to the defendant by "show[ing] that a defendant discharges a pollutant that causes or contributes to the kind of injuries alleged." *Clean Water Action v. Searles Auto Recycling, Corp*., 268 F.Supp.3d

276, 281 (D. Mass. 2017); quoting *Maine People's Alliance v. Holtrachem Mfg. Co., LLC.*, 211 F.Supp.2d 237, 253 (D. Me. 2002). According to the Fifth Circuit, “a violation will satisfy that standard if it (1) created flaring, smoke, or haze; (2) released pollutants with chemical odors; or (3) released pollutants that cause respiratory or allergy-like symptoms.” *Env't Tex. Citizen Lobby*, 968 F.3d at 370; *see also Utah Physicians*, 374 F.Supp.3d at 1133-35 (“fairly traceable” standard met where defendants' alleged violations contributed nitrous oxides (NOx) and particulate matter (PM) to the air in geographic area and evidence showed that NOx and PM pollution contributed to health and environmental effects that organization's members complained of).

As stated above and in the pleadings, the pollutants emitted from the Defendant’s tailpipes (fine particulates, nitrogen oxides ($NO_x$), sulfur dioxide ($SO_2$), benzene, and formaldehyde) cause respiratory or allergy-like symptoms. *See* ECF No. 29 (Amended Complaint) at 58-71; Ex. 12 (ATSDR Fact Sheets); Ex. 13 (EPA, Particulate Matter); Ex. 1 (Durant Decl.) ¶¶ 12, 14; Ex. 2 (Rice Decl.) ¶ ¶ 10, 11, 13; Ex. 3 (St. Denis Decl.) ¶¶ 11, 13. In addition, Plaintiff’s experts will testify to the fact that pollutants in diesel exhaust fumes have a chemical odor. *See* Ex. 12 (ATSDR Fact Sheets).

Some courts, when assessing whether an injury is fairly traceable to a defendant’s conduct, consider whether there is a “specific geographic or other causative nexus.” *Env't Tex. Citizen Lobby*, 968 F.3d at 368, citing *Cedar Point*, 73 F.3d at 558, n. 24. *See also Gaston Copper Recycling Corp.*, 204 F.3d at 161 (“Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographical area of concern”) (internal

quotes and citation omitted); *Nw. Env't. Def. Ctr. v. Owens Corning Corp.*, 434 F. Supp. 2d 957, 968-69 (D. Or. 2006).

In *Utah Physicians*, a case that specifically addressed emissions from mobile sources, the court found a geographic nexus where the plaintiff's members were injured by air pollutants emitted by vehicles in a metropolitan region of Utah spanning 120 miles in length and 5-18 miles in width. *Utah Physicians*, 374 F.Supp.3d at 1131 n. 10, 1133-35.

Indeed, injuries from pollutants spanning over large geographic areas of concern often meet the "fairly traceable" standard. *See Cedar Point*, 73 F.3d at 557-58, n.24 (finding evidence of a geographic nexus where affiant stated he canoed and participated in educational trips "in the vicinity of [defendant's] discharge"); *Am. Recycled Materials, Inc.*, 2017 WL 2622737, at *3 (traceability established where the defendants' discharge of pollutants into a brook contributed to aesthetic injuries the plaintiffs suffered on a river two miles downstream); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 900 F.Supp. 67, 75 (E.D.Tex.1995) (finding a two-to-four-mile distance sufficient to show causation). As the Fifth Circuit pointed out, "[plaintiffs] need not offer direct evidence that their members actually inhaled pollutants from each emission." *Env't Tex. Citizen Lobby*, 968 F.3d at 370.

In *Maine People's Alliance v. Holtrachem Mfg. Co., LLC*, the court determined that traceability was met where the plaintiff's members "lived on or near" the Penobscot River and defendants discharged pollution three miles upstream. *Holtrachem Mfg. Co., LLC.*, F.Supp.2d 237 at 253. Traceability was established by: 1) the members' diminished use and enjoyment of the river due to their fear of harm to their health from the defendant's pollution, and 2) documented dangers of the type of pollutants discharged by the defendant. *Id.* at 253-54. In that case, the members were miles from the pollution discharge, and they had not inhaled or ingested

the defendant's pollution. *Id*. at 253. Whereas here, Plaintiff's members are often within 1-2 miles of the Defendant's bus lots. *See* Ex. 4 (Andrews Decl.) ¶¶ 2, 6-11, 13, 15; Ex. 5 (Becker Decl.) ¶¶ 6-7, 9-10; Ex. 9 (Bolduc Decl.) ¶¶ 7-8; Ex. 11 (Cahill Decl.) ¶¶ 2-3, 9-18; Ex. 6 (Kendall Decl.) ¶¶ 5-6, 8-21; Ex. 7 (Ly Decl.) ¶¶ 2, 8-11, 14-15; Ex. 10 (Morelli Decl.) ¶¶ 2, 6-10, 12-19; Ex. 8 (Wagner Decl.) ¶¶ 2, 9-14, 16-17, 20-21 (describing in detail how members live, work, recreate, and spend time near and at the locations where the Defendant excessively idles).

In addition, Dr. John L. Durant, an air pollution dispersion expert, will testify to the likelihood that pollution from Academy's buses enter the lungs of CLF's members. Ex. 1 (Durant Decl.) ¶ 13. Dr. Michael J. St. Denis, a vehicle engineering expert, and Dr. Mary Rice, a pulmonologist, will testify that the pollutants emitted from the tailpipes of Defendant's buses are highly toxic. Ex. 3 (St. Denis Decl.) ¶¶ 11-13; Ex. 2 (Rice Decl.) ¶¶ 11, 13. And as stated above, Dr. Rice, will also testify to the fact that harmful air pollution enters people's lungs whether they are aware of it or not. Ex. 2 (Rice Decl.) ¶ 12.

Finally, CLF will demonstrate that Academy's buses do not just idle on the dates and times listed in the Complaint. Those dates and times are only when CLF's investigator was sent out to observe the Defendant's buses, and *each time* caught on camera the Defendant's buses idling in excess of the five-minute limit. CLF will show through additional discovery that there is a pattern and practice or "inferred violations" of excessive idling that occurs every day the Defendant is operating the buses. *See e.g.,* Trial Transcript, Day 6 at 74:1-17, 78:15-79:24, *United States v. Paul Revere Transportation, Inc.* (No. 1:06-cv-12297-GAO) ECF No. 109; *see also* Verdict Form, *United States v. Paul Revere Transportation, Inc.* (No. 1:06-cv-12297-GAO) ECF No. 100 (returning verdict of inferred violations supported by circumstantial evidence).

Defendant's reference to the causality assessment in *Washington Envtl. Council v. Bellon,* 732 F.3d 1131, 1141 (9th Cir. 2013) is inapplicable. *See* ECF No. 42 (Def. Mem. of Law) at 11. In that case, the conduct complained of was the state and regional environmental agencies' failure to set and apply air emission control standards at oil refineries. 732 F.3d at 1140. As the court explained, "[w]hile Plaintiffs need not connect each molecule to their injuries, simply saying that the Agencies have failed to curb emission of greenhouse gases, which contribute (in some undefined way and to some undefined degree) to their injuries, relies on an 'attenuated chain of conjecture' insufficient to support standing." *Id.*, at 1142-1143 (citations omitted). Here, the conduct complained of is the Defendant's unlawful idling of a fleet of buses that are regularly pumping harmful pollutants into the neighborhoods in which CLF's members live or consistently visit. There is no attenuation or chain of events between the Defendant's pollution in the air and the harm to Plaintiff's members from breathing that pollution.

Finally, CLF does not disagree that there are other sources of air pollution in the same locations that the Defendant's buses excessively idle. *See* ECF No. 42 (Def. Mem. of Law) at 11. In fact, due to the background concentrations of air pollution in these locations, the Defendant's violations of the law are *more* serious and *more* harmful to human health. Dr. Durant, an air pollution dispersion expert, will testify to the cumulative impact of multiple sources of pollution on human health.

What CLF *disagrees* with is the Defendant's implication that other sources of pollution somehow upset the causal chain between CLF's members and the Defendant's pollution. Even seemingly small or incremental contributions from the Defendant's actions can be causally connected to Plaintiff's injuries. *See Powell Duffryn,* 913 F.2d at 72 n.8 ("In order to obtain standing, plaintiffs need not sue every discharger in one action, since the pollution of anyone

may be shown to cause some part of the injury suffered. The size of the injury is not germane to standing analysis." (citation omitted)); *Cedar Point.*, 73 F.3d at 557-58; *see also Massachusetts v. EPA*, 549 U.S. at 524 (rejecting the "assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum," and explaining steps that "whittle away" at "massive problems" satisfy the causation requirement).

In *Utah Physicians*, the defendants argued that there were "many sources contributing to air pollution in the [region], including on-road mobile sources, wildfires, and oil refineries" and the Court responded:

> To be sure, Defendants' emissions are a small fraction of total emissions in the Wasatch Front. But aside from the "meaningful contribution" language used in GHG cases, Defendants do not articulate a principled threshold requirement for causation. Further, a causation standard that precludes citizens from suing for CAA violations directly contributing pollution to the air they breathe would seriously undermine the CAA's citizen enforcement provision.

*Utah Physicians*, 374 F.Supp.3d at 1134-35.

Moreover, as discussed above, the Defendant is violating the federally approved, state limit on idling that is designed to protect human health. By specifically limiting idling to five minutes, the State is confirming that idling in excess of five minutes makes a meaningful contribution to the adverse effects motor-vehicle emissions have on environmental and human health. If the Defendant were to comply with the idling law, and cease all violations, significantly less pollutants would enter the air where Plaintiff's members live and breathe.[5] Because CLF members' harms are clearly traceable to the Defendant's actions, summary judgment must be denied.

[5] The present case is easily distinguishable from *U.S. E.P.A. ex rel. McKeown v. Port Auth. of New York & New Jersey*, 162 F. Supp. 2d 173, 184 (S.D.N.Y.), in which toll booths were accused of negatively impacting the environment because they increase motor vehicle toxic tailpipe emissions. ECF No. 42 (Def. Mem. of Law) at 11. Toll booths do not emit toxic pollution; the Defendant's buses do.

## III. CLF MEMBERS HAVE STANDING IN REGARD TO THE DEFENDANT'S VIOLATIONS AT ALL LOCATIONS ALLEGED IN THE COMPLAINT, INCLUDING THE BRAINTREE LOT, THE NEWTON GO BUS STOP, THE BRIDGEPORT LOT, AND THE AGGANIS WAY STOP.

### A. The Braintree Lot.

The Defendant's arguments that CLF does not have standing for the violations occurring at the Braintree lot misstates the "causative nexus" standard that some courts have required to establish traceability. As discussed above, Courts have found that injuries from pollutants spanning over large geographic areas of concern often meet the fairly traceable standard. *Supra* at 12.

Here, the harmful pollutants emitted by the Defendant's vehicles at the Braintree lot harm CLF members *throughout* the Metro Boston area (not just those close to the lot), including all the members CLF has identified as standing witnesses and who live, work, recreate, and otherwise spend time in Metro Boston. *Supra* at 11-16 (Plaintiff's discussion regarding traceability). The Metro Boston Region includes the communities of Saugus, Revere, Everett, Chelsea, Winthrop, Boston, Milton, Quincy, Braintree, Hingham and Weymouth and is approximately 26 miles North to South and 7 miles East to West. This is a far smaller area than the 120 miles in length and 5-18 miles in width that the Court found met the required geographic nexus in *Utah Physicians*. *Supra* at 14. CLF's expert on pollution dispersion will present scientific evidence regarding how far air pollutants travel and will establish that "air pollution from the Defendant's tailpipe emissions is likely dispersed to locations beyond the Defendant's bus stops and lots." Ex. 1 (Durant Decl.) ¶¶ 9, 11.

### B. The Newton Go Bus Stop, the Bridgeport Lot, and the Agganis Way Stop.

The Defendant also argues that CLF does not have standing for the violations at the Newton Go Bus stop, the Bridgeport lot, and the Agganis Way stop. As discussed in the previous

sections, this argument is without merit because the plaintiff's injury does not have to be linked to exact dates that the defendant's violations occurred. *Env't Tex. Citizen Lobby*, 968 F.3d at 369; *Texans United*, 207 F.3d at 793. Nor do plaintiffs need to "offer direct evidence that their members actually inhaled pollutants from each emission." *Env't Tex. Citizen Lobby*, 968 F.3d at 370. Furthermore, and as argued above, the Defendant's buses do not idle only on the dates and times listed in CLF's Complaint. Rather, the Defendant has a "pattern and practice" of excessively idling every day that it operates its buses, and CLF's members are continuously exposed to the toxic air pollution emitted from the Defendant's tailpipes. *Supra* at 14.

CLF has established standing for all of the Defendant's idling violations, including those occurring at the Newton Go Bus stop, the Bridgeport lot, and the Agganis Way stop. CLF members have suffered injuries specifically and fairly traceable to the Defendant's idling at these locations, currently and when the Complaints were filed:

- Tommaso Wagner, a CLF member at the time the initial Complaint was filed, has suffered and is suffering from harms traceable to the Defendant's idling at the Newton Go Bus Stop. *See* Ex. 8 (Wagner Decl.); Ex. 14 (Wagner Dep.).

- Mary Katherine Andrews and Robert Kendall, CLF members at the time the initial Complaint was filed, have suffered and are suffering from harms traceable to the Defendant's idling at the Agganis Way stop. *See* Ex. 4 (Andrews Decl.); Ex. 6 (Kendall Decl.); Ex. 15 (Kendall Dep.).

- Sophia Ly and Georgia Bolduc, two CLF members who joined CLF since the commencement of this action, have suffered and are suffering from harms traceable to the Defendant's idling at the Newton Go Bus Stop and the Agganis Way stop. *See* Ex. 7 (Ly Decl.); Ex. 9 (Bolduc Decl.); Ex. 16 (Ly Dep.).

- Sabrina Morelli, a CLF member at the time the initial Complaint was filed, has suffered and is suffering from harms traceable to the Defendant's idling at the Bridgeport lot. *See* Ex. 10 (Morelli Decl.).

- Kathleen Becker, who became a CLF member following the commencement of this action, has suffered and is suffering from harms traceable to the Defendant's idling at the Bridgeport lot. *See* Ex. 5 (Becker Decl.).

In light of the foregoing, CLF has established that it has standing for all of the Defendant's alleged violations, including those at the Braintree lot, the Newton Go Bus stop, the Bridgeport lot, and the Agganis Way stop, and summary judgment must be denied.

## IV. CLF SATISFIED THE CLEAN AIR ACT'S NOTICE REQUIREMENT.

Section 7604(b)(1)(A) of the Clean Air Act provides that "[n]o [citizen suit] action may be commenced prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order."[6] This section of the statute addresses *notice* requirements, not *standing* requirements. *See Garcia v. Cecos Int'l, Inc.*, 762 F.2d 76, 82 (1st Cir. 1985) (The purpose of the notice requirement is to "give[] the EPA and the state and opportunity to investigate the alleged violation," allow the violator "to resolve the problem," and to "facilitate[] extrajudicial settlement of disputes"). *See also Friends of the Earth v. Carey,* 535 F.2d 165, 175 (2d Cir. 1976) (internal citations omitted) ("Courts have consistently echoed the theme that the 60-day notice requirement is to be construed flexibly and realistically in order to further its essential purpose of providing 'administrative agencies time to investigate and act on an alleged violation' rather than to hinder citizen participation."); *see also Communities For A Better Env't v. Cenco Ref. Co.*, 180 F.Supp.2d 1062, 1086 (C.D. Cal. 2001) (internal citation omitted) (the notice requirements under section 7604 are to "(a) allow the alleged violator to come into compliance with the law; (b) provide an opportunity to negotiate a settlement of the dispute short

---

[6] The Defendant does not allege that CLF failed to satisfy the Act's notice requirements, either in the manner in which the notice was served or in the contents of the notice. CLF has fully complied with the notice requirements and served the Defendant, the Defendant's agent, and the required Massachusetts and federal administrators with the Massachusetts Notice Letter on November 8, 2019, prior to filing its Complaint on January 8, 2020. ECF No. 1-1; 1-2. Additionally, CLF served the Connecticut Notice Letter to all required entities on July 6, 2020, prior to filing its Amended Complaint on October 29, 2020. ECF No. 29-3; 29-4.

of a lawsuit; and (c) give state and federal environmental agencies an opportunity to step in and enforce their laws and regulations").

The Defendant could not be more wrong in its assertion that the CAA (or any other environmental statute, for that matter) requires that standing be established at the notice stage or when the violations occur.[7] *See* ECF No. 42 (Def. Mem. of Law) at 13-15.

The filing of the complaint in a citizen action is the moment when the plaintiff must have standing. *See Lujan*, 504 U.S. at 569-70 n.4, n.5 ("Standing is to be determined as of the commencement of suit"). "The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." *Id*. at 569 n.4, quoting *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 830 (1989).

CLF had standing when it filed its complaints. Three of CLF's standing witnesses were members of CLF prior to January 8, 2020, when the initial Complaint was filed. Tommaso Wagner became a member on September 9, 2019, Ex. 17 (Wagner Member Profile), Robert Kendall became a member on December 20, 2019, Ex. 18 (Kendall Member Profile), and Mary Katherine Andrews became a member on January 8, 2020, Ex. 19 (Andrews Member Profile). Additionally, Sabrina Morelli, a CLF member who has been harmed by the Defendant's excessive idling at its Bridgeport lot, became a member on May 18, 2020—before CLF filed its Amended Complaint on October 29, 2020 alleging Connecticut violations. Ex. 19 (Morelli Member Profile). As discussed above, these members have all suffered injuries-in-fact that can be traced to the Defendant's idling violations, *see supra* Section II, and that were ongoing at the time the Complaints were filed. CLF has satisfied the notice requirement of the Clean Air Act.

[7] Accordingly, the Defendant offers no case law in support of this position and CLF, an organization that has been bringing citizen suits since its establishment in 1966, is unaware of any caselaw to support such a proposition.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment should be denied.

Dated: March 5, 2021

Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.,

By its attorneys:

*/s/ Erica Kyzmir-McKeon*
Erica Kyzmir-McKeon, Esq., *admitted pro hac vice*
Heather A. Govern, Esq. (BBO No. 688482)
Chelsea E. Kendell, Esq. (BBO No. 705513)
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
(617) 850-1763
ekyzmir-mckeon@clf.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2021, the foregoing document was filed through the ECF system, by which means a copy of the filing will be sent electronically to all parties registered with the ECF system.

*/s/ Erica Kyzmir-McKeon*
Erica Kyzmir-McKeon