UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| Conservation Law Foundation, Inc., | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:20-cv-10032-DPW |
| Academy Express, LLC, | ) | |
| Defendant. | ) | |

**PLAINTIFF CONSERVATION LAW FOUNDATION'S SUPPLEMENTAL BRIEF ON THE ISSUE OF STANDING**

CLF submits this supplemental brief opposing the Motion for Summary Judgment on the Issue of Standing (ECF No. 41) filed by the Defendant Academy Express, LLC ("Academy"), to address: 1) relevant decisions issued after the briefing closed; and 2) relevant information obtained through fact and expert discovery after the briefing closed, including evidence concerning CLF's additional standing witness members. The case law and new information will aid this Court in its review of the motion for summary judgment, as well as its review of Defendant's Motion to Exclude the Testimony of Plaintiff's Expert Witnesses (ECF No. 89).

**I.   *TRANSUNION* AFFIRMS WELL-ESTABLISHED PRINCIPLES OF ARTICLE III STANDING AND CONFIRMS THAT CLF'S MEMBERS HAVE SUFFERED INJURY-IN-FACT.**

After the briefing closed, the Supreme Court affirmed in *TransUnion LLC v. Ramirez* the well-established principle: "for there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." 141 S. Ct. 2190, 2203 (2021) (citation and internal quotes omitted).

1

In *TransUnion*, the Supreme Court held that any class member about whom a credit reporting agency had published false information was sufficiently harmed, even without a showing that the false information had led to a concrete adverse impact to the person. *TransUnion*, 141 S. Ct. at 2208-2209. And class members about whom false information had been gathered by the agency but *not* published were *not* sufficiently harmed for standing purposes. *Id.* at 2209-2213. The latter class is analogous to a hypothetical standing witness in this case who *fears* future illegal idling of buses, even though the buses have not yet illegally idled. But those are not the facts here. In the present case, CLF's members live, work and/or recreate in close proximity to the places where the Defendant's buses actually and repeatedly idled, and expert evidence shows the harm of such exposure. *See infra* p. 10-13. Thus, the holding in *TransUnion* supports, *a fortiori*, that CLF has standing in this matter.

Also in its decision, the Supreme Court affirmed that Article III standing can be based on a forward-looking interest in preventing future harm. *TransUnion*, 141 S. Ct. at 2210. *See also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n. 5 (2013); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 556 (5th Cir. 1996) (CWA). Here, CLF's citizen enforcement suit seeks forward-looking injunctive relief and civil penalties to deter the Defendant from future illegal idling.[1]

## II. RECENT COURT DECISIONS SUPPORT CLF'S ARGUMENTS THAT ITS MEMBERS' INJURIES ARE TRACEABLE TO THE DEFENDANT'S IDLING.

Recent court decisions support CLF's arguments that: 1) a "geographic nexus" exists between the Defendant's violations and CLF's members' injuries; and 2) CLF's members need

---

[1] The Supreme Court has held that in citizen suits "the interest of the citizen plaintiff is primarily forward-looking," as "the harm sought to be addressed by the citizen suit lies in the present or the future, not in the past." *Gwaltney*, 484 U.S. at 59.

not "trace molecules" or show they breathed pollution on the exact dates of the Defendant's violations.

*Geographic Nexus*

As discussed in CLF's Opposition to Defendant's Motion for Summary Judgment (ECF No. 46), when assessing whether an injury is fairly traceable to a defendant's conduct, courts consider whether there is a "specific geographic or other causative nexus." *Cedar Point Oil Co. Inc.,* 73 F.3d at 558 n. 24*; see also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149,  161 (4th Cir. 2000) ("Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographical area of concern") (internal quotes and citation omitted). The following court decisions, that were issued after the briefing in this case ended, assist in determining what constitutes a "geographic nexus."

First, in affirming the district court's decision in the mobile source air pollution case, *Utah Physicians for a Healthy Environment v. Diesel Power Gear*,[2] the Tenth Circuit found that an area more than 100 miles in length met the geographic nexus requirement. 21 F.4th 1229, 1241-46 (10th Cir. 2021). In other words, the injuries of the plaintiff members ("adverse health effects from elevated air pollution in the Wasatch Front or exposure to diesel exhaust" and reduced participation "in outdoor recreational activities due [to] their concerns about fine particulate matter pollution") were traceable to vehicle pollution up to 100 miles away. *UPHE I*, 374 F. Supp. 3d at 1132. While the court recognized that the 100 mile area was in nonattainment status for fine particulate matter ($PM_{2.5}$), *Utah Physicians*, 21 F.4th at 1246, the

---

[2] The *Utah Physicians* district court decision, reported at 374 F. Supp. 3d 1124, is discussed at length in CLF's Opposition to Defendant's Motion for Summary Judgment, ECF No. 46 at 13, 19, 20-24.

nonattainment status was not necessary to establish traceability.[3] Rather, the court first assessed "the view of courts in other circuits" and concluded that "[b]y showing a close geographical connection, the plaintiff has 'adequately attributed the pollution' to the source, …, and the injury is 'fairly traceable' to the polluter… ." *Id.* at 1244-1246, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Sierra Club v. EPA*, 964 F.3d at 889 (10th Cir. 2020). The court also made clear that exposure to emissions from a too-distant polluter would not meet this standard. *Id.* at 1246.

Second, in *Sierra Club v. BP Products North America, Inc.*, the court determined that the harm to three standing witnesses that lived "less than one mile," "0.5 miles," and "13 miles" from a refinery were traceable to that refinery's air pollution emissions. 2021 WL 1399805, at *10 (N.D. Ind. Apr. 14, 2021):

> The fact that Ms. Macielewicz, who is 81 years old and lives a half mile away from the refinery, spends less time outside due to her concerns about air pollution from the Whiting Refinery and the poor air quality often prevents her from enjoying her yard, going on walks, and feeding animals outside, establishes traceability. [DE 18-1 at 70-72.] As does Ms. Connolley, who likes to bike and walk around the Miller Beach community where she lives, about 13 miles from the refinery, who is worried about the negative impacts of the particulate matter on the beach, as well as it contributing to serious health problems like respiratory illnesses. [*Id.* at 82-84.]

Third, in *Center for Biological Diversity v. University of North Carolina at Chapel Hill*, the court found traceability where the defendant "discharges air pollutants that 'directly and immediately contribute to air pollution' in an area where their members maintain health,

---

[3] EPA studies have shown that there are negative health effects from air pollutants in areas of attainment. "Studies evaluated in the 2019 ISA and the ISA Supplement examine this issue, and continue to provide evidence of linear, no-threshold relationships between long-term PM2.5 exposures and all-cause and cause-specific mortality." Policy Assessment for the Reconsideration of the NAAQS for PM, US EPA (May 2022), https://www.epa.gov/system/files/documents/2022-05/Final%20Policy%20Assessment%20for%20the%20Reconsideration%20of%20the%20PM%20NAAQS_May2022_0.pdf at 3-25; *accord, e.g.*, *id.* 3-30, 3-31, 3-33, 3-51; *see also* Am. Lung Ass'n, *Lung Ass'n Responds to Proposed Updates to Nat'l Particle Pollution Standards: EPA's Proposal Falls Far Short and Must Be Strengthened* (Jan. 6, 2023), https://www.lung.org/media/press-releases/2023-pm-naaqs-proposal-statement.

4

aesthetic, and recreational interests and that the air pollution harms those interests." 2021 WL 3861388, at *6 (M.D.N.C., Aug. 30, 2021) (citing *Utah Phys.* at 1135). The court made a "reasonable and uncontroverted inference that one block is within the [emissions] discharge range of a stationary emission source." *Id.* at 5.

Finally, in the Clean Water Act case *San Francisco Baykeeper v. City of Sunnyvale*, the court found traceability where plaintiff members recreated near or downstream of receiving waters in which the defendants released pollutants. 2022 WL 4138648, at *8 (N.D.Cal., Sept. 12, 2022). "Defendants contributed to the Plaintiff's members' injuries" when they "discharge[ed] [] pollutant[s] that cause[] *or contribute[]* to the kinds of injuries alleged in the specific geographic area of concern." *Id.* (emphasis in original).

Here, CLF is not alleging harm across a 100-mile region like in *Utah Physicians*, nor across a region of many miles. This case's geographical nexus is a mere *one-mile* region. The pollution from the idling buses travels a short distance to CLF's members. In fact, CLF members spend substantial time only a half mile (800 meters) from where Defendant illegally emits fine particulate matter and other dangerous air pollutants. The current case law addressing environmental harm and traceability demonstrates that CLF's members' injuries are traceable to the Defendant's illegal bus idling.

*Plaintiff's Members Need Not Trace Molecules*

The court in *Utah Physicians* affirmed that in an air pollution case, plaintiff members need not show that they breathed specific pollution at a specific time or on a specific day. 21 F. 4th at 1245, citing to *Gaston Copper Recycling Corp.*, 204 F.3d at 161 ("Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographical

5

area of concern") (internal quotes and citation omitted). As *Utah Physicians* indicates, Congress's purpose in authorizing citizen enforcement of the Clean Air Act would be thwarted by rulings requiring that a citizen prove a virtual impossibility: that he breathed the specific emission of a violator and suffered medical harm in consequence.

Similarly, the court in *Center for Biological Diversity v. University of North Carolina at Chapel Hill,* while discussing traceability, states that the Plaintiff was not required to show with scientific evidence that the Defendant's emissions reached the witnesses. 2021 WL 3861388, at *6. The court noted that "the Court can take judicial notice that the wind can, and does, blow polluted air within and around at least several blocks." *Id.  See also San Francisco Baykeeper,* 2022 WL 4138648, at *8 ("the traceability requirement does not mean Plaintiff must show to a scientific certainty that Defendants caused the alleged harm."), citing *Nat. Res. Def. Council v. Sw. Marine*, 236 F.3d 985, 995 (9th Cir. 2000).

### III. AFTER THE BRIEFING CLOSED, THE DISCOVERY PROCESS EXPOSED ADDITIONAL FACTS DEMONSTRATING CLF'S STANDING.

At the close of the briefing on the Motion for Summary Judgment on the Issue of Standing, fact discovery was not complete and expert discovery had not yet begun. Thereafter the parties completed all discovery. Information obtained through fact discovery establishes that Defendant's buses idle, discharging harmful air pollution, both during the documented instances listed in the Complaint *and every day* the Defendant is operating its buses. As alleged in the Amended Complaint[4] and argued in CLF's Opposition to the Defendant's Motion for Summary

---

[4] CLF's initial and amended Complaints anticipated and incorporated future idling violations by the Defendant. ECF No. 1 (Complaint) at ¶ 146; ECF No. 29 (Amended Complaint) at ¶ 226 ("Plaintiff believes that additional information from other sources not yet publicly available will reveal additional violations.").

Judgment ("Opposition"),[5] the instances of idling documented by CLF are just a sample of the Defendant's regular practice and operations.

### A. Deposition Testimony and GPS Records Confirm the Defendant's Pattern and Practice of Excess Idling.

After the close of briefing, CLF deposed four Academy employees about the Defendant's operational practices and procedures, including its idling policies. All four witnesses testified that it is routine practice for drivers employed by the Defendant to idle Academy buses for periods significantly longer than allowed by the Connecticut and Massachusetts anti-idling regulations. The witnesses testified that it is *company policy* to idle excessively on two regular occasions: 1) while waiting for passengers at bus stops, and 2) during pre-trip inspections. Neither activity falls within the exemptions to the Massachusetts or Connecticut idling laws.

#### 1. *Idling at bus stops.*

Two Academy drivers testified in depositions that they routinely idle their vehicles at bus stops for periods significantly longer than the five minutes allowed under law. Varendra Chandoo, a Massachusetts-based driver employed by the Defendant for more than six years, testified that he routinely idles his vehicles between five and 15 minutes while waiting for passengers at a bus stop. Ex. 1 (Chandoo Dep.)[6] at 46:10-21; 21: 4-8; 23:20-24:12 (testifying that he waits up to 15 minutes while driving the Encore route, ten minutes for the Boston University route, and five to seven minutes for the Green Line Extension route). Kenol Hilaire, a Massachusetts-based driver employed by the Defendant for more than seven years, testified

---

[5] Specifically, CLF explained that it will "demonstrate that Academy's buses do not just idle on the dates and times listed in the Complaint. Those dates and times are only when CLF's investigator was sent out to observe the Defendant's buses, and each time caught on camera the Defendant's buses idling in excess of the five-minute limit. CLF will show through additional discovery that there is a pattern and practice or "inferred violations" of excessive idling that occurs every day the Defendant is operating the buses." ECF No. 46 (Plaintiff's Opposition) at 20.
[6] Citations to "Ex._" refer to the exhibits to the Declaration of Erica Kyzmir-McKeon filed herewith.

similarly that he often keeps his engine running for approximately ten minutes while waiting for passengers at a bus stop. Ex. 2 (Hilaire Dep.) at 34:1-23.

### 2. *Daily pre-trip inspections.*

The Defendant testified that its drivers routinely idle their vehicles for 15 minutes during the daily pre-trip inspection. Stephen Mataras, the Defendant's General Manager and 30(b)(6) witness for its Massachusetts operations, testified that pre-trip inspections "should take about 15 minutes" and that "drivers keep the engines running for the duration of the inspection." Ex.3 (Mataras Dep.) at 21:8-13. Mirsad Kraja, the Defendant's General Manager and 30(b)(6) witness for its Connecticut operations, similarly testified that a pre-trip inspection takes "15 minutes, at the minimum" and "[d]uring the entire pre-trip inspection, it [the engine]'s supposed to be running." Ex. 4 (Kraja Dep.) at 26:22-27:12. At the Bridgeport Lot, pre-trip inspections are conducted for all vehicles before they depart for trips, on up to twelve buses per day. *Id.* at 29:15-30:4. At the Braintree Lot, between 15 and 20 drivers conduct pre-trip inspections each morning before they take the bus off the lot. Ex.3 (Mataras Dep.) at 55:19-21; 56:3-5; 56:21-57:2.

Mr. Chandoo and Mr. Hilaire confirmed the Defendant's practice of idling for up to 15 minutes during pre-trip inspections. Ex. 1 (Chandoo Dep.) at 18:4-20:7; *id.* at 22:13-17; Ex. 2 (Hilaire Dep.) at 21:23-22:7. Mr. Chandoo testified that during the winter months, the vehicles at the Braintree lot are already running when he starts his shift because the mechanics turn them on every morning to "warm up the inside." Ex. 1 (Chandoo Dep.) at 17:3-18:3, 20. Mr. Chandoo testified that the mechanics do this for all "[t]he buses that are going out" to warm them up. *Id.* at 20:8-16. In fact, Mr. Chandoo sees "probably three buses" idling at the lot each morning, and he himself has frequently and routinely idled in excess of five minutes. *Id.* at 35:16-36:6, 44.

3.   *GPS Records.*

During fact discovery, the Defendant provided CLF with records generated by its Saucon GPS system for a subset of the buses and only the dates that correspond to the idling violations observed by CLF's investigators.[7] Ex. 5 (Saucon GPS Data). Where GPS data was available, the data confirmed each of the idling violations documented by CLF's investigators. Additionally, the GPS data revealed an additional three instances of idling:

- On Friday, November 1, 2019, one 12-minute instance of idling from 7:37 p.m. to 7:59 p.m. at the Braintree Lot. *Id.*
- On Thursday, December 5, 2019, one 10-minute instance of idling from 12:18 p.m. to 12:28 p.m. at the Bridgeport Lot. *Id.*
- On Tuesday, December 10, 2019, one 16-minute instance of idling from 4:20 p.m. to 4:36 p.m. at the Bridgeport Lot. *Id.*

The deposition testimony and GPS records are undisputed and show that the Defendant has a routine practice of excessive idling each and every day that its buses are in operation.

**B.   Due to Defendant's Pattern and Practice of Excess Idling, CLF Members Have Suffered Greater Harm than Discussed in CLF's Opposition.**

Because discovery has shown that the Defendant idles excessively and emits air pollutants every day its buses are in operation, CLF's members are exposed to harmful pollution from Defendant's buses any time they are in the geographic vicinity of the buses. Thus, CLF satisfies the traceability standard to an even greater degree, since the standard requires only that injury be "*fairly* traceable to the challenged conduct." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180 (2000); ECF No. 46 (Pl.'s Opp'n) at 17;

---

[7] Not all of the Defendant's buses have the Saucon GPS system installed, therefore, the Defendant did not provide Saucon data for each of the violations reported by CLF. For example, the Boston University shuttle buses contain a different TransLoc tracking system that does not record idling. Ex. 6 (Levine Dep.) at 38:11-13, 40:4-16.

*WildEarth Guardians v. Colorado Springs Utilities Bd.*, 2018 WL 317469, at *7 (D. Colo. Jan. 8, 2018) (holding that members are not required to trace injuries to the time of a violation). Also, the pattern and practice of excess idling created higher levels of air pollutants like fine particulate matter in the geographic area, which caused greater harm to CLF's members.

      **C.    CLF Identified Additional Standing Witness Members Who Have Been Harmed by the Defendant's Idling.**

After the close of the briefing, CLF identified seven additional standing witnesses who have been harmed by the Defendant's excessive idling:

*Kabbas Azhar*

Kabbas Azhar spends a significant amount of time exercising at a gym located 0.15 miles (around 260 yards) from the 33 Harry Agganis Way shuttle stop. Ex. 7 (Azhar Decl.). He commutes to the gym from his house via bike and wears a mask to avoid breathing in the polluted air while passing by the stop. *Id.* Breathing in vehicle exhaust at the stop has caused him to experience physical symptoms, including choking and watery eyes. *Id.* He worries about the harmful effects of air pollution from Academy's idling vehicles and avoids spending time outdoors near the stop. *Id.* If the air quality were better, he would feel more comfortable spending time outdoors. *Id.*

*Nancy Dimock*

Nancy Dimock lives 1.5 miles from the Braintree lot. ECF No. 93-1 (Dimock Decl.). She spends a significant amount of time outside her house in her yard and walking and running in her neighborhood. *Id.* She also substitute teaches at a school located one mile from the lot. *Id.* She has seen buses idling at the lot and avoids walking near it because of all of the exhaust. *Id.* Breathing in vehicle exhaust has caused her to experience physical symptoms, including coughing, and she is concerned about the health effects from breathing in exhaust from

Academy's idling vehicles. *Id.* If the air quality were better at the Bridgeport lot, she would spend more time walking and running in the area. *Id.*

*Colin Antaya*

Colin Antaya works 1.2 miles from the Bridgeport lot. ECF No. 93-2 (Antaya Decl.). When he is exposed to vehicle exhaust, he holds his breath to avoid breathing in the fumes. *Id.* He is very concerned about the acute and longer-term effects of breathing in exhaust, including from Academy's idling vehicles. *Id.* If the air quality near his office were better, he would spend more time outside. *Id.*

*Johnannes Epke*

At the time of the Defendant's idling violations, Johannes Epke lived 0.6 miles from the Cambridge Go Bus stop. ECF No. 81 at 13-15 (Epke Decl.). She has spent a significant amount of time near the stop and has seen Academy buses idling on numerous occasions. *Id.* Exhaust from the idling vehicles has caused her to experience numerous physical symptoms, including difficulty breathing and watery eyes. *Id.* She is very worried about the long-term health effects from exposure to air pollution from idling vehicles, including Academy's vehicles. *Id.* She avoids spending time near the bus stop as much as possible and refrains from outdoor activities because of the poor air quality. *Id.*

*Hallie St. Germain*

At the time of the Defendant's idling violations, Hallie St. Germain lived 0.4 miles from the Cambridge Go Bus stop. ECF No. 81 at 24-26 (St. Germain Decl.). She has spent a significant amount of time outside near the bus stop recreating. *Id.* She also frequently visits her grandmother, who lives 1.5 miles from the Bridgeport lot. *Id.* Vehicle exhaust has caused her to experience numerous physical symptoms, including coughing and watery eyes. *Id.* She is very

worried about the health effects from exposure to vehicle exhaust from Academy's idling vehicles. *Id.*

*Zoe Perot*

At the time of the Defendant's idling violations, Zoe Perot lived 0.8 miles from the Cambridge Go Bus stop and spent a significant amount of time outside and recreating near the stop. ECF No. 81 at 17-18 (Perot Decl.). She went for runs past the stop every day. *Id.* Breathing in vehicle exhaust at the stop has caused her to experience physical symptoms, including choking. *Id.* She worries about the long-term health effects of breathing in exhaust from Academy's idling vehicles, particularly on her lungs. *Id.* She checks the air quality daily and spends less time outdoors when the air quality is poor. *Id.*

*Jesse Caldwell*

At the time of the Defendant's idling violations, Jesse Caldwell lived 0.44 miles from the Cambridge Go Bus stop and spent a significant amount of time outside and recreating near the stop. ECF No. 81 at 20-22 (Caldwell Decl.). She often walked by the stop and noticed vehicle exhaust. *Id.* She worries about the health effects of breathing in vehicle exhaust, including from Academy's idling vehicles, particularly since she has allergies and difficulty breathing. *Id.* She checks the air quality daily and limits the time she spends outdoors when the air quality is poor. *Id.*

*Tanyaporn Nanthakijjar*

At the time of the Defendant's idling violations, Tanyaporn Nanthakijjar commuted five days a week from the Alewife train station that includes the Cambridge Go Bus stop. Ex. 8 (Nanthakijjar Decl.). She routinely waited outside the train station about 350 feet from the Cambridge Go Bus stop for up to 20 minutes. *Id.* Currently, Ms. Nanthakijjar commutes from

Alewife station two or three days a week. *Id.* She is concerned about the health effects of breathing in vehicle exhaust, including from Academy's idling vehicles. *Id.*

### D. Expert Testimony Confirms that CLF's Standing Witness Members Have Suffered Injury-In-Fact Traceable to the Defendant's Excessive Idling.

The reports of CLF's three experts underscore the direct physical and psychological harm experienced by CLF's members as a direct result of air pollution that is traceable to the Defendant's unlawful idling.

Dr. Michael St. Denis, an engineer and vehicle emissions expert, opined that emissions from the Defendant's idling vehicles contribute to elevated levels of harmful air pollutants.[8] He quantified the amount of $NO_x$, $PM_{2.5}$, $PM_{10}$, and EC emitted during the instances of idling set out in the Amended Complaint. Later in discovery, the testimony of the Defendant's witnesses showed that these volumes represent only a fraction of the ongoing, daily discharge of these air pollutants.

Dr. John Durant, an air pollution dispersion expert, opined that harmful air pollutants from the Defendant's unlawful idling are dispersed to locations where CLF's members are exposed to them.[9] Dr. Durant used the computer model AERMOD to simulate the effects of

---

[8] Dr. Michael St. Denis proffered the following opinions:
1) Emissions by the Defendant's vehicles during documented idling totaled more than 10,391 grams of NOx, 7.28 grams of PM10, 6.7 grams of PM2.5, and 2.89 grams of EC. ECF No. 94-5 (St. Denis Revised Second Supplemental) at 3-4;
2) The Defendant's 74 excessive idling violations fourteen minutes or longer resulted in much higher NOx emissions. ECF No. 71-3 (St. Denis Report) at 10-11;
3) The emissions of PM10, PM2.5, EC, and NOx from Academy's idling vehicles are significant, even when estimated conservatively. ECF No. 71-3 (St. Denis Report) at 12; ECF No. 78-4 (St. Denis Supplemental) at 3-5; and
4) Total emissions from Academy's vehicles are likely even higher since the estimate does not account for reduced catalyst efficiency due to cold starts, potential large emissions from regeneration, or plugged filters. ECF No. 71-3 (St. Denis Report) at 11-12; ECF No. 78-4 (St. Denis Supplemental) at 9-10.

[9] Dr. John Durant proffered the following opinions:
1) Air pollution from the Defendant's idling vehicles contributes to significant and elevated concentrations of pollutants (PM2.5 and PM10, EC, and NOx) both at the Defendant's bus lots and stops and at locations beyond the Defendant's bus lots and stops. ECF No. 71-4 (Durant Report) at 5-14; and
2) CLF's members are exposed to these emissions. *Id.* at 14-15.

13

dispersion on exhaust emissions from the Defendant's buses near bus lots and bus stops. He concluded that the pollutants emitted by the Defendant are present in the locations where CLF's standing witness members spend time. These findings show that CLF's standing witness members are exposed to pollutants emitted by the Defendant.

Dr. Mary Rice, a pulmonologist specializing in the health effects of breathing vehicle pollution, testified to the adverse health effects caused by the kinds of exposure documented by Drs. Denis and Durant.[10] She opined that breathing motor vehicle exhaust can result in respiratory and cardiovascular health effects and that some individuals are especially susceptible to these effects. Dr. Rice's opinions validate members' fears of harm from breathing exhaust from the Defendant's idling vehicles, including those members who already suffer from allergy-like or respiratory problems. ECF No. 46 at 15.

This post-briefing record established through expert discovery, together with the identification of eight additional members affected by the pollution at issue here, confirms that CLF members are exposed to harmful air pollution emissions and that these emissions are traceable to the Defendant's unlawful idling.

## CONCLUSION

Recent court decisions, information obtained in discovery, and CLF's additional standing witnesses provide further evidence that establish that CLF's members have been harmed by the Defendant's excessive and illegal idling, and that CLF has standing to bring this case. The Defendant's Motion for Summary Judgment on the issue of standing should be denied.

---

[10] Dr. Mary Rice proffered the following opinions:
1) Breathing motor vehicle exhaust can result in adverse health effects, even in areas that are in attainment of EPA air quality standards. ECF No. 97-12 (Rice Report) at 2-5;
2) Repeated exposure to motor vehicle exhaust can have serious, irreversible health consequences for both children and adults. *Id.* at 5-9, and;
3) Some individuals are especially susceptible to the health effects of air pollution. *Id.* at 10.

Dated: June 23, 2023

Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.,

By its attorneys:

<u>*/s/ Erica Kyzmir-McKeon*</u>
Erica Kyzmir-McKeon, Esq., *pro hac vice*
Heather A. Govern, Esq. (BBO No. 688482)
Chelsea E. Kendall, Esq. (BBO No. 705513)
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
(617) 850-1763
ekyzmir-mckeon@clf.org

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 23, 2023, the foregoing document was filed through the ECF system, by which means a copy of the filing will be sent electronically to all parties registered with the ECF system.

<u>*/s/ Erica Kyzmir-McKeon*</u>
Erica Kyzmir-McKeon