UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CONSERVATION LAW FOUNDATION, INC., )
                                   )
          Plaintiff,               )
                                   )
v.                                 )     CIVIL ACTION
                                   )     NO. 20-10032-WGY
ACADEMY EXPRESS, LLC               )
                                   )
          Defendants.              )
_____  )
CONSERVATION LAW FOUNDATION, INC., )
                                   )
          Plaintiff,               )
                                   )
v.                                 )     CIVIL ACTION
                                   )     NO. 20-10033-WGY
ACADEMY EXPRESS, LLC, DPV          )
TRANSPORTATION, INC., AND BOSTON   )
CHARTER BUS, LLC,                  )
                                   )
          Defendants.              )
_____  )

YOUNG, D.J.                                    September 14, 2023

**MEMORANDUM OF DECISION**

In these environmental actions, the Conservation Law

Foundation ("the Foundation") brings suit against companies

operating buses in Massachusetts and Connecticut, alleging that

the Defendants Academy Express, LLC; DPV Transportation, Inc.;

and Boston Charter Bus, LLC excessively idle their buses in

violation of Massachusetts and Connecticut law under the Clean

Air Act.  The Defendants move for summary judgment based on a

lack of standing under Article III of the United States

Constitution.  This Court agrees that the Foundation lacks associational standing on this record and therefore granted the pending motions for summary judgment.  Mot. Summ. J., 32 ECF No. 41; Mot. Summ. J., 33 ECF No. 40; Mot. Summ. J., 33 ECF No. 44.

I. **BACKGROUND**

    A.   **Factual Background**

Academy Express, LLC ("Academy"); DPV Transportation, Inc.("DPV"); and Boston Charter Bus, LLC ("Boston Charter") (collectively, the Defendants or the "Bus Companies") all operate fleets of buses in Massachusetts; Academy also operates buses in Connecticut.  See Compl., 33 ECF No. 1 ¶ 2; Am. Compl., 32 ECF No. 29 ¶ 2.  Academy buses stop at the Newton Go Bus stop, the Pond Street lot, the Harry Agganis Way shuttle stop, the Cambridge Go Bus stop, and the Bridgeport lot.  See Am. Compl., 32 ECF No. 29 ¶ 75-105.  On specific days from October 2019 to February 2020, an investigator for the Foundation observed and documented the length of time Academy buses idled at these bus stops in excess of the allowable time under state regulations.  See Am. Compl., 32 ECF No. 29 ¶¶ 106-225.  The observed idle times ranged from four minutes to two hours and thirty-seven minutes.  See Am. Compl., 32 ECF No. 29 ¶¶ 140-200.

DPV, Boston Charter, and Academy buses stop at the Everett Neighborhood Runner Stop, the Wellington Orange Line Station, and Mystic Street.  See Compl., 33 ECF No. 1 ¶¶ 100-13.  On

specific days from September to November 2019, an investigator for the Foundation observed and documented the length of time DPV, Boston Charter, and Academy buses idled at these bus stops. See Compl., 33 ECF No. 1 ¶¶ 114-301.  The observed idle times ranged from six minutes to two hours and thirty-six minutes. See Am. Compl., 32 ECF No. 29 ¶¶ 195-96.

The Foundation is a nonprofit organization dedicated to protecting the environment in New England.  Id. ¶ 17.  It has over 5,100 members, including 2,842 in Massachusetts and 144 in Connecticut.  Id. ¶ 19.  Its members include Mary Katherine Andrews, Kathleen Becker, Georgia Buldoc, Thomas Cahill, Robert Kendall, Sophia Ly, Sabrina Morelli, Tommaso Wagner, Staci Rubin, and Peter Shelley.  See Aff. Heather Govern, 32 ECF Nos. 47-4 to 47-11; Aff. Opp'n re Mot. Summ. J., 33 ECF Nos. 46-5 to 46-6.

Many of these members have noted the smell of exhaust around the Bus Companies' bus stops and all are concerned about effects of exhaust on their health and the health of their loved ones.  See Aff. of Heather Govern, 32 ECF Nos. 47-4 to 47-11; Aff. Opp'n re Mot. Summ. J., 33 ECF Nos. 46-5 to 46-6.  Ms. Andrews avoids certain bike routes with more exhaust, but only "when [she] can."  Andrews Decl., 32 ECF No. 47-4.  Ms. Becker would hike less if she lived in Bridgeport, where her mother resides.  Becker Decl., 32 ECF No. 47-5.  Mr. Cahill is worried

about the effects on his young son, who has a higher risk of
developing respiratory illnesses such as asthma.  Cahill Decl.,
32 ECF No. 47-11.  He is also considering whether to stop using
a bike trail, but at present he continues to make regular use of
the trail.  Id. at 3.

Mr. Kendall suffers from allergies and sleep apnea but has
not noticed his allergies getting worse.  See Kendall Decl., 32
ECF No. 47-6; Kendall Decl.,33 ECF No. 46-4; Kendall Dep., ECF
No. 47-15 at 43.  Ms. Ly had self-diagnosed asthma when she was
younger and has experienced coughing when breathing in exhaust.
See Ly Decl., 32 ECF No. 47-7.  Mr. Wagner had asthma when he
was younger and describes the smell of exhaust as "acrid."
Wagner Decl., 32 ECF No. 47-8.  He has noted that his mouth is
drier than normal and feels scratchy when running or breathing
heavily in areas with exhaust.  Id.  Mr. Wagner "would
definitely run more" if the air quality around his home
improved.  Id. at 3.  On occasion he has decided not to spend
time outdoors after smelling exhaust fumes.  Id. at 4.
Ms. Morelli would run and walk more if there was less air
pollution near the Academy bus stops in Riverside and
Bridgeport.  See Morelli Decl., 32 ECF No. 47-10.  Ms. Rubin has
on occasion found it difficult to breathe in areas with excess
vehicle exhaust.  See Rubin Decl., 33 ECF No. 46-6.  Mr. Shelley

would feel more comfortable if there was less exhaust in his neighborhood.  See Shelley Decl., 33 ECF No. 46-5.

### B.   Legal Background

The Clean Air Act contains a citizen suit provision authorizing any person to sue another who is in violation of the Act, which encompasses emissions standards and limitations in state plans approved by the EPA Administrator.  42 U.S.C. § 7604(a)(1), (f)(4).  The Massachusetts State Implementation Plan prohibits any person from unnecessarily running the engine of a vehicle when the vehicle is stopped for a foreseeable time exceeding five minutes.  310 Mass. Code Regs. § 7.11(1)(b). Connecticut has a similar regulation that prohibits excessive idling of a vehicle for more than three minutes.  Conn. Agencies Regs. § 22a-174-18(b)(3)(C).  Both state plans were approved by the EPA Administrator.  See 40 C.F.R. § 52; 37 Fed. Reg. 23,085; 42 U.S.C. § 7410; 40 C.F.R. § 52.385; 79 Fed. Reg. 41,427.  The Clean Air Act also contains a pre-suit notice requirement that mandates written notice to the EPA, state, and alleged violator sixty days prior to initiating a lawsuit.  42 U.S.C. § 7604(b).

### C.   Procedural History

On November 8, 2019, the Foundation sent letters to Academy, DPV, and Boston Charter Bus notifying them of the alleged Massachusetts violations.  See Compl., 33 ECF No. 1 ¶ 72; Am. Compl., 32 ECF No. 29 ¶ 41.  The letters were also sent

[5]

to the EPA and the Massachusetts Department of Environmental
Protection.  See Compl., 33 ECF No. 1 ¶ 74; Am. Compl., 32 ECF
No. 29 ¶ 42.  On January 8, 2020, the Foundation filed two
complaints, one against Academy (1:20-cv-10032) and one against
all three Bus Companies (1:20-cv-10033).  See Compl., 33 ECF No.
1; Am. Compl., 32 ECF No. 29.  The Complaints brought suit under
the Clean Air Act, alleging that the Bus Companies violated the
Massachusetts anti-idling regulation.  See Compl., 33 ECF No. 1;
Am. Compl., 32 ECF No. 29.  In July 2020, the Foundation sent
Academy another letter notifying it of the alleged violations in
Connecticut.  See Am. Compl., 32 ECF No. 29 ¶ 44.  Three months
later the Foundation filed an amended complaint, alleging that
Academy also violated the Connecticut anti-idling law.  See Id.[1]

     In responding to the Complaints, the Bus Companies asserted
a lack of standing.  Def.'s Answer, 33 ECF No. 10 at 14, 21 at
16, 23 at 16.  After this Court ordered discovery on the issue
of associational standing, the Bus Companies moved for summary
judgment on grounds of lack of standing.  See Def's Ans., 33 ECF
No. 41; Mem. Supp. Summ. J., 32 ECF No. 42.  The Bus Companies

---

     [1] Academy argues that the Foundation has not met the
requirements of pre-suit notice under 42 U.S.C. § 7604(b)(1)(a),
but it fails to identify any facts supporting this argument.
See Mem. Supp. Summ. J., 32 ECF No. 42 at 13-15.  Finding that
the Foundation notified all defendants of its claims in writing
sixty days prior to filing suit and shared these letters with
the EPA and relevant states, the Court concludes that the
Foundation has met the citizen suit requirement for notice.

argue that the Foundation has not identified any of its members who have suffered an injury in fact that is fairly traceable to the Bus Companies' conduct.  <u>See</u> Def's Ans., 33 ECF No. 41; Mem. Supp. Summ. J., 32 ECF No. 42.  The Foundation responds that its members have suffered various injuries, including breathing polluted air.  <u>See</u> Mem. Opp'n Summ. J., 32 ECF No. 46; Mem. Opp'n Summ. J., 33 ECF No. 48.  The Foundation also argues that standing cannot be decided on this record and requests that the matter be delayed until expert discovery has been completed. <u>See</u> Mem. Opp'n Summ. J., 32 ECF No. 46 at 7; Mem. Opp'n Summ. J., 33 ECF No. 48 at 6.  The parties have fully briefed the issues.  <u>See</u> Def.'s Reply, 32 ECF No. 51; Pl.'s Sur-Reply, 32 ECF No. 55; Def.'s Reply, 33 ECF Nos. 53-54; Pl.'s Sur-Reply, 32 ECF No. 59-60.

## II. STANDARD OF REVIEW

A movant is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment.  <u>Id.</u>

In reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  This Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151.  The moving party bears the initial burden of demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant does so, then the nonmovant must set forth specific facts sufficient to establish a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

## III. ANALYSIS

The Court concludes that the Foundation lacks associational standing for all its claims against the Bus Companies.

### A.   Associational Standing

For an association suing on behalf of its members to establish standing, it must demonstrate that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Friends of

<u>Earth</u> v. <u>Laidlaw Env't Servs. (TOC), LLC</u>, 528 U.S. 167, 181 (2000); <u>Me. People's All.</u> v. <u>Mallinckrodt</u>, 471 F.3d 277, 283 (1st Cir. 2006).  The Bus Companies do not dispute that the second and third elements have been met, so this Court instead focuses on whether the Foundation members, individually, would have standing to sue in this case.

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case -- in other words, standing." <u>TransUnion LLC</u> v. <u>Ramirez</u>, 141 S. Ct. 2190, 2203, (2021).  "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." <u>Id.</u> (citing <u>Lujan</u> v. <u>Defs. of Wildlife</u>, 504 U.S. 555, 560-61 (1992)).  The Court addresses the first two of these factors below.[2]

### 1.   Injury in Fact

The injury in fact must be "concrete and particularized"; it must also be "actual or imminent, not conjectural or

---

[2] The Court need not reach the question of redressability because there are no violations for which an injury in fact is fairly traceable to the Bus Companies' conduct.

hypothetical". Lujan, 504 U.S. at 560 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). Association members cannot be merely "concerned bystander[s]," but must demonstrate that they have a "personal stake" in the litigation. Conservation L. Found. of New England, Inc. v. Reilly, 950 F.2d 38, 42–43 (1st Cir. 1991) (quoting Allen v. Wright, 468 U.S. 737, 756 (1984), abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014)).

The plaintiff must show that "he personally has suffered some actual or threatened injury ...." Valley Forge Christian Coll. v. Am. United for Separation of Church & State, 454 U.S. 464, 472 (1982) (quotations omitted). "Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only the rights of individuals," and that federal courts exercise "their proper function in a limited and separated government." TransUnion LLC, 141 S. Ct. at 2203 (citations and quotations omitted). "Concreteness and particularity are two separate requirements." Lyman v. Baker, 954 F.3d 351, 360 (1st Cir. 2020) (citing Spokeo, Inc. v. Robins, 578 U.S. 330 (2016)). An injury is "concrete" when it "actually exist[s]." Id. (quotations omitted). An injury is "particularized" when it "affect[s] the plaintiff in a personal and individual way," Lujan, 504 U.S. at 560 n.1, that goes

beyond widely shared "generalized grievances about the conduct of government," Lyman, 954 F.3d at 361 (citing Becker v. Fed. Election Comm'n, 230 F.3d 381, 390 (1st Cir. 2000)).

In environmental cases, the question is not whether there is injury to the environment, but whether the plaintiff herself has been injured.  Laidlaw, 528 U.S. at 181.  In such cases the Supreme Court looks at physical and economic harms, but also asks whether plaintiffs are persons "for whom the aesthetic and recreational values of the area will be lessened."  See Id. at 183 (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)). If this aesthetic or recreational harm is grounded in "reasonable concerns" about a defendant's actions, it may establish injury in fact.  Id. at 183–84.  For example, refraining from boating and hunting in areas around an electric power plant would constitute an injury.  Sierra Club v. Tenn. Valley Authority, 430 F.3d 1337, 1345 (11th Cir. 2005).  A reduction in recreational value is sufficient for standing purposes; a total abstention from a formerly enjoyed activity is not necessary.  See Conservation L. Found., Inc. v. Am. Recycled Materials, Inc., No. 16-12451-RGS, 2017 WL 2622737, at 3 n.2 (D. Mass. June 16, 2017) [Stearns, J.]; see, e.g., Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 519–20 (4th Cir. 2013) (finding injury when member experienced reduction in enjoyment

of rivers when water appeared unclean with diminished fish
population).

Turning to health effects, "[p]robabilistic harms are
legally cognizable." Me. People's All. v. Mallinckrodt, 471
F.3d 277, 283 (1st Cir. 2006).  A "purely subjective fear" of an
environmental harm, however, is not sufficient to establish
standing; concerns related to recreational harms must be
"premised upon a realistic threat." Id. at 284.  "To establish
an injury in fact based on a probabilistic harm, a plaintiff
must show that there is a substantial probability that harm will
occur." Id.  Other circuits have noted that medical evidence is
not necessary, but that "realistic health concerns" may
constitute an injury. Clean Wis. v. EPA, 964 F.3d 1145, 1156
(D.C. Cir. 2020) (per curiam) (finding that exposure to
unhealthy ozone concentrations during outdoor activities
established an injury).  Examples of credible and concrete
health effects include concerns that a proposed power plant
would be detrimental to the health of members with documented
respiratory problems exacerbated by air pollution. Sierra Club
v. U.S. EPA, 762 F.3d 971, 977 (9th Cir. 2014).

Courts have considered fear of health effects not tied to
specific medical conditions only alongside more tangible harms.
See Env't Tex. Citizen Lobby v. Exxonmobile, 968 F.3d 357, 367
(5th Cir. 2020) (including fear for health in list of members'

[12]

injuries); <u>Tenn. Valley Authority</u>, 430 F.3d at 1345 (noting testimony that member found it "frightening" to breathe polluted air).  In <u>Environment Texas Citizen Lobby</u>, the plaintiff's members also "regularly saw flares, smoke, and haze coming from the complex; smelled chemical odors; suffered from allergy-like or respiratory problems; . . . refrained from outdoor activities; or moved away."  968 F.3d at 367–68.  In <u>Tennessee Valley Authority</u>, members also experienced diminished vistas, refrained from certain outdoor activities, and testified about diminished enjoyment in other activities because of emissions. <u>Tennessee Valley Authority,</u> 430 F.3d at 1345.

Some courts have found that simply breathing and smelling polluted air is an injury in and of itself.  <u>See</u> <u>Nat. Res. Def. Council</u> v. <u>EPA</u>, 507 F.2d 905, 910 (9th Cir. 1974) ("There is no doubt, however, that [plaintiff], as a resident of Arizona, will suffer injury if compelled to breathe air less pure than that mandated by the Clean Air Act.").  This Court holds, however, that the requirement of an actual injury — one that is concrete and particularized — necessitates more than just breathing in polluted air.  A smell of pollution may be sufficient if members demonstrate that they have been injured by the experience.  <u>See</u>, <u>e.g.</u>, <u>Texans United for a Safe Econ.</u> v. <u>Crown Cent. Petroleum Corp.,</u> 207 F.3d 789, 792 (5th Cir. 2000) (finding injury when members were exposed to sulfurous odors that were "overpowering

and capable of inducing physical discomfort").  Without any
associated physical side effects, recreational or aesthetic
harm, or well-grounded fear of health effects, this Court is not
satisfied that breathing may constitute an Article III injury.

The evidence the Foundation has presented as to its
members' injuries resulting from the Defendants' excessive
idling is meager at best.  The theme present in all the member
declarations is a concern regarding adverse health effects.  See
Aff. Heather Govern, 32 ECF No. 47-4 to 47-11; Aff. Opp'n re
Mot. Summ. J., 33 ECF No. 46-5 to 46-6.  These concerns,
however, are not linked to specific medical conditions.  Mr.
Kendall suffers from allergies and sleep apnea but has not
noticed his allergies getting worse.  See Kendall Decl., 32 ECF
No. 47-6; Kendall Decl., 33 ECF No. 46-4; Kendall Dep., 32 ECF
no. 47-15 at 43.  Mr. Wagner had asthma when he was younger.
See Wagner Decl., 32 ECF No. 47-8.  Ms. Ly had self-diagnosed
asthma when she was younger.  See Ly Decl., 32 ECF No. 47-7.
Mr. Cahill is worried about the effects on his young son, who
has a higher risk of developing respiratory illnesses such as
asthma.  See Cahill Decl., 32 ECF No. 47-11.  It is unclear
whether these fears of health effects from exhaust pollution are
reasonable, even for those who may have a predisposition to
respiratory illness.  The Foundation's own expert, Dr. Rice,
plans to testify that "responses to air pollution vary greatly

in people.  Some individuals are highly sensitive to exposure to air pollution and may experience symptoms or illness while others may not."  Rice Decl., 32 ECF No. 47-2 at 2.

Many of the members noted the smell of exhaust, which Mr. Wagner described as "acrid."  See Wagner Decl., 32 ECF No. 47-8; Bolduc Decl., 32 ECF No. 47-9; Rubin Decl., 33 ECF No. 46-5; Shelley Decl.,33 ECF No. 46-6.  The smell of exhaust alone appears insufficient to establish an injury.  Ms. Ly, however, has experienced coughing when breathing in exhaust and Mr. Wagner has noted that his mouth is drier than normal and feels scratchy when running or breathing heavily in areas with exhaust.  See Ly Decl., 32 ECF No. 47-7; Wagner Decl., 32 ECF No. 47-8.  Ms. Rubin has on occasion found it difficult to breathe in areas with excess vehicle exhaust.  See Rubin Decl., 33 ECF No. 46-5.  Potentially, these health effects could be sufficient to constitute an injury.

The members all seem to spend significant amounts of time outdoors and for the most part have not modified their behavior due to the exhaust levels in their communities.  Mr. Cahill is considering whether to stop using a bike trail, but at present he continues to make regular use of the trail.  See Cahill Decl., 32 ECF No. 47-11.  Ms. Becker asserts that she would hike less if she lived in Bridgeport, which she does not.  See Becker Decl., 32 ECF No. 47-5.  These are purely hypothetical

[15]

recreational harms.  Ms. Andrews avoids certain bike routes with more exhaust, but only "when [she] can."  Andrews Decl., 32 ECF No. 47-4.

The only true recreational harms are asserted by Mr. Wagner and Ms. Morelli.  Mr. Wagner asserts that he "would definitely run more" if the air quality around his home improved.  Wagner Decl., 32 ECF No. 47-8 at 3.  He also states that he has on occasion decided not to spend time outdoors after smelling exhaust fumes.  Id. at 4.  Ms. Morelli declares that she would run and walk more if there was less air pollution near the Academy bus stops in Riverside and Bridgeport.  See Morelli Decl., 32 ECF No. 47-10.  The Court finds that these recreational harms experienced by Mr. Wagner and Ms. Morelli constitute injuries in fact.

The Foundation has not, however, established injury in fact for claims against Academy relating to the Pond Street/Braintree Lot or the Agganis Way stop.  See Env't Tex. Citizen Lobby v. Exxonmobile, 968 F.3d 357, 367 (5th Cir. 2020) (requiring standing for each violation of the Clean Air Act). Environmental cases present particularly difficult standing questions, because the negative effects of pollution may not always be visible or immediately discernable.

The Supreme Court has provided guidance on the types of acceptable injuries.  This Court must operate within those parameters.

### 2.   **Traceability**

To establish standing, the asserted injuries must be fairly traceable to the alleged excessive idling by the Bus Companies. This "traceability" element, essentially a causation element of Article III standing, "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm." Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 47 (1st Cir. 2020) (quoting Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012)).  Although an indirect causal relationship is not necessarily fatal, an injury is less likely to satisfy this requirement where the causal chain between the defendant's action and the alleged harm depends on the actions of a third party.  See Id. at 48 (citing Allen v. Wright, 468 U.S. 737, 757-59, (1984); Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 42-45, (1976)).

The parties focus on Utah Physicians for a Healthy Environment v. Diesel Power Gear LLC, which provides a model causation analysis for air pollution from "mobile sources" such as buses.  See 374 F. Supp. 3d 1124, 1133-35 (D. Utah 2019). Causation is a tricky question in such a situation because

pollution comes from many different sources, of which the Defendants' contribution may only be a drop in the bucket.  The Utah Physicians court considered two criteria in such a case: either a plaintiff must show "merely that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern," or a plaintiff must demonstrate that these discharges constitute a "meaningful contribution" to the environmental harm.  Id. at 1133-35.  The Court need not resolve which of these standards, if either, is most appropriate, because the Foundation has not demonstrated any basic link between the asserted injuries and the Bus Companies' bus stops.

Ms. Ly has coughed when breathing in exhaust, but she has not stated specifically that this has occurred at Riverside station near Academy's Newton Go stop.  Ly Decl., 32 ECF No. 47-7 at 3.  Ms. Rubin has found it difficult to breathe in areas with excess vehicle exhaust, but her declaration does not specify that this has occurred around any of the Defendants' bus stops.  Rubin Decl., 33 ECF No. 46-5.  In addition, Ms. Rubin only occasionally uses the Wellington Orange Line stop when there are train diversions, and she visits areas near the bus stops once every month or two for shopping, twice a month for meetings, and once a year to visit the restaurants and spa at

the casino.  Id.  She also bikes near the bus stops every two
weeks over the summer.  Id. at 3.

Ms. Morelli's declaration pertains to the Academy bus stops
in Riverside (over two miles from where she runs and attends
school) and Bridgeport (where she visits her brother's
girlfriend five to six times per year).  Morelli Decl., 32 ECF
No. 47-10.  These connections are too tenuous to conclude that
her spending less time outside than she prefers is caused by or
related to the Bus Companies' idling buses.  Though Mr. Wagner
has experienced a dry throat around his home, that home is over
two miles from Academy and DPV's Wellington Orange Line stop.
Wagner Decl., 32 ECF No. 47-8.  He also refrains from running,
but it appears that the closest Mr. Wagner runs or walks to one
of the bus stops is a mile and a half away.  Id. at 2.  Wagner
asserts that he has on occasion refrained from spending time
outdoors after smelling exhaust fumes, but he does not specify
that this has ever occurred near any of the Bus Companies' bus
stops.  Id. at 4.

These connections between the members' injuries and the Bus
Companies' conduct are just too attenuated to satisfy the second
prong of the standing inquiry.  In an urban environment, a span
of a mile or two contains numerous vehicles and bus stops.  In
such an environment, the injuries alleged cannot be conclusively
linked to the excessive idling by the Defendants.  Allowing suit

against the Defendants for anyone suffering the most minor of injuries who has occasionally traveled within two miles of any bus stop could mean that every resident of the greater Boston area has standing to sue the Bus companies.  This Court cannot find that this aligns with the Supreme Court's guidance on standing.[3]

The Court also notes that the expert testimony offered by the Foundation would not affect this analysis, and thus rejects the Foundation's argument under Rule 56(d) that summary judgment on the issue of standing is premature before the close of expert discovery.  Mem. Opp'n Mot. Summ. J., 32 ECF No. 46 at 20, 7-9.

The Court therefore holds that the Foundation has not met the traceability requirement for its claims against Academy, DPV, or Boston Charter, and it therefore lacks standing to proceed.

---

[3] The Foundation points to the large geographic area of roughly 120 miles approved in Utah Physicians for a Healthy Environment v. Diesel Power Gear LLC, 374 F. Supp. 3d 1124, 1131 n.10 (D. Utah 2019).  Mem. Opp'n Mot. Summ. J.,32 ECF No. 46 at 19.  There are two important distinctions, however, between this case and Utah Physicians.  First, as the Bus Companies note, the members in Utah Physicians suffered much more concrete injuries than the Foundation has identified here.  See id. at 1132-33. Reply Resp. Mot. Summ. J., 33 ECF No. 53 at 3.  Second, perhaps more importantly, the emissions in that case were of the "mobile source" variety, with defendant's trucks contributing to emissions while moving throughout the region.  Id. at 1131. Here, while buses are a mobile source, the alleged violations only occurred while the buses were idling in place.  The geographic scope of the emissions is thus more relevant in this case.

## IV. CONCLUSION

For the reasons set forth above, Academy's, DPV's, and Boston Charter's motions for summary judgment were granted. Mot. Summ. J., 32 ECF No. 41; Mot. Summ. J., 33 ECF No. 40; Mot. Summ. J., 33 ECF No. 44.

**SO ORDERED.**

/s/ William G. Young

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[4]

---

[4] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 45 years.