# United States Court of Appeals
## For the First Circuit

No. 23-1832

CONSERVATION LAW FOUNDATION, INC.,

Plaintiff, Appellant,

v.

ACADEMY EXPRESS, LLC,

Defendant, Appellee,

DPV TRANSPORTATION, INC.; BOSTON CHARTER BUS, LLC; ACADEMY BUS, LLC; WYNN RESORTS, LTD.; WYNN MA, LLC; WYNN RESORTS HOLDINGS, LLC; WYNN AMERICA GROUP, LLC; WYNN RESORTS FINANCE, LLC,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Gelpí, Howard, and Kayatta,
Circuit Judges.

Heather A. Govern, with whom Chelsea E. Kendall, Erica Kyzmir-McKeon, and Conservation Law Foundation were on brief, for appellant.
Jared E. Knicley, Elizabeth MeLampy, and Natural Resources Defense Council on brief for Natural Resources Defense Council, amicus curiae.
Ian Cogill and Earthjustice on brief for Massachusetts Public Health Association, amicus curiae.
Jon C. Cowen, with whom Thomas D. Duquette, Jr. and Donovan

Hatem LLP were on brief, for appellee.

Linda L. Morkan, Megan E. Baroni, and Robinson & Cole LLP on brief for American Bus Association, Inc., amicus curiae.

February 20, 2025

**KAYATTA, _Circuit Judge_**.   Environmental group Conservation Law Foundation (CLF) sued Academy Express, LLC ("Academy"), a transportation company that operates buses up and down the East Coast.  CLF alleged that Academy violated the Clean Air Act (CAA) by idling its vehicles in excess of state limits in Massachusetts and Connecticut.  Academy moved for summary judgment, arguing that CLF could not demonstrate associational standing.  The district court agreed and granted Academy's motion. _Conservation L. Found., Inc._ v. _Acad. Express, LLC_, 693 F. Supp. 3d 41, 47 (D. Mass. 2023) [hereinafter, _Cons. L. Found._].

CLF now appeals, arguing among other things that the district court erred by holding that breathing polluted air is not an injury-in-fact and by requiring tort-like causation to establish traceability.  We agree with CLF that the district court failed to recognize established forms of cognizable injury and applied a traceability standard unsupported by case law.  That said, we cannot determine the extent to which CLF can meet its standing burden because we lack (1) findings on the cognizability and traceability of injuries asserted by one batch of CLF members and (2) a determination of whether the record includes the declarations of additional CLF members and expert witnesses.  We therefore vacate the district court's grant of summary judgment and remand for further development of the record and application of the legal standards described in this opinion.

- 3 -

## I.

For over fifty years, the CAA has helped "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."   42 U.S.C. § 7401(b)(1).   To further this stated purpose, the CAA divides responsibilities among state and federal governments.  The Environmental Protection Agency (EPA) identifies air pollutants that "may reasonably be anticipated to endanger public health or welfare," and promulgates air-quality standards limiting concentrations of those pollutants.   Id. §§ 7408(a), 7409.   States, in turn, bear the "primary responsibility" for ensuring compliance with EPA limits.   Id. § 7401(a)(3).   To that end, each state must prepare and submit to the EPA a state implementation plan (SIP) "provid[ing] for implementation, maintenance, and enforcement" of EPA pollution limits.   Id. § 7410(a)(1).

Once the EPA has approved a SIP, it becomes enforceable as part of the CAA.  See Sierra Club v. EPA, 60 F.4th 1008, 1013 (6th Cir. 2023).  Private citizens have a role in this enforcement process by way of a citizen-suit provision, which enables citizen plaintiffs to seek penalties (payable to the U.S. government) for each day of an ongoing or repeated SIP violation.   42 U.S.C. §§ 7604(a)(1), 7413(e)(2).  Though the CAA creates a private right of action, any citizen suing under these provisions must

demonstrate constitutional standing, including an injury in connection with the alleged CAA violation.  See Spokeo, Inc. v. Robins, 578 U.S. 330, 341 (2016) ("Article III standing requires a concrete injury even in the context of a statutory violation.").

As part of their approved SIPs, Massachusetts and Connecticut each limit vehicle idling.  Massachusetts prohibits any person from running "the engine of a motor vehicle while said vehicle is stopped for a foreseeable period of time in excess of five minutes," 310 Mass. Code Regs. 7.11(1)(b) (2025), and Connecticut prohibits unnecessary idling for more than three minutes, Conn. Agencies Regs. § 22a-174-18(b)(3)(C) (2025).

Seeking declaratory and injunctive relief and civil penalties, CLF sued Academy[1] for alleged repeated violations of the Massachusetts and Connecticut idling limits.  Specifically, CLF claimed that it deployed investigators on twenty-six days between September 2019 and September 2020, and that on every one of those days, its investigators observed at least one Academy

---

[1]  On January 8, 2020, CLF simultaneously filed two lawsuits, one against Academy and its affiliate, Academy Bus, LLC ("Academy Bus"), and the other against Academy, Academy Bus, two other bus companies, and a group of hotel/casino companies with which all the bus companies allegedly worked.  CLF voluntarily dismissed its claims against Academy Bus and the hotel/casino companies in 2020. The district court consolidated the two cases in August 2023 and entered summary judgment for the bus companies the following month. CLF appealed as to all three bus companies, two of which later settled with CLF through this court's Case Appeals Management Plan. As a result, Academy is the sole remaining appellee.

idling violation, totaling 109 violations across five Massachusetts locations and thirty idling violations at one Connecticut lot.[2]  From these observations, CLF alleged that Academy had a practice of illegal idling and consequently "that additional information from other sources not yet publicly available w[ould] reveal additional violations."  CLF further asserted that its members "include individuals who live and recreate near" the Massachusetts and Connecticut bus stops and lots, "where vehicles owned, operated and/or managed by Academy idle in excess" of state limits.  Academy's buses, CLF claimed, include diesel-fuel vehicles, which "emit diesel fuel exhaust including fine particulates, nitrogen oxides ('$NO_x$'), sulfur dioxide ('$SO_2$'), benzene, formaldehyde, and forty other kinds of toxic air contaminants."  As a result, CLF alleged, Academy "causes, suffers, allows, and/or permits the emission of" those pollutants into the air when its buses idle.

CLF alleged injuries on behalf of its members, including: (1) "breath[ing] the emissions and air pollutants" emitted by Academy's buses as they idle in excess of applicable limits; (2) adverse physical reactions related to breathing the

---

[2]  The Massachusetts locations were the Newton Go bus stop (also known as the Riverside Green Line station), Pond Street lot (also known as the Braintree lot), Harry Agganis Way shuttle stop, Cambridge Go bus stop, and Wellington station.  The Connecticut lot was the Bridgeport lot.  CLF alleges three additional violations at the Bridgeport lot on November 24, 2021.

air pollutants; and (3) "reasonabl[e] concern[]" about inhaling pollutants and that such pollutants may adversely affect their health.    Discovery commenced, and CLF submitted affidavits and deposition testimony of its members aimed at connecting their alleged injuries to the six locations where CLF observed excessive idling.    To that end, CLF timely identified ten "standing" witnesses.    Shortly after the close of fact discovery, Academy moved for summary judgment, asserting that CLF could not establish standing.    CLF opposed, and once the parties had briefed the motions, the district court heard oral argument on April 14, 2021.

At this point, the record becomes less than clear.    Two years elapsed following the oral argument on Academy's summary judgment motion.    During this period, "CLF periodically supplemented its disclosures," adducing a total of ten additional standing witnesses.    CLF appears to have disclosed six of these witnesses via supplemental disclosures under Federal Rule of Civil Procedure 26.    It included the declarations of the four other witnesses as exhibits attached to two motions seeking to file supplemental briefs.    Academy moved to preclude the six witnesses whom CLF disclosed via Rule 26 supplemental disclosures and opposed both of CLF's motions to file supplemental briefs.    The district court does not appear to have ruled on Academy's motions to preclude.    It did, however, grant both of CLF's motions to file

- 7 -

supplemental briefs, albeit without explicitly addressing the declarations that CLF had attached to those motions.

In addition to disclosing additional standing witnesses following the close of fact discovery, CLF also disclosed three expert witnesses. The organization apparently sent reports by its three experts to Academy's counsel on May 28, 2021 -- the court-ordered expert-disclosure deadline. It also appears to have attached two of those expert reports as exhibits to a motion related to a separate discovery dispute between the two parties. On November 12, 2021, Academy moved to exclude the testimony of all three CLF expert witnesses. CLF opposed that motion, which the district court stayed on June 23, 2023. Just five days later, the case was reassigned to a different judge. It seems that neither judge ever ruled definitively on Academy's motion to exclude the testimony of CLF's expert witnesses.

Notwithstanding these two loose ends concerning the scope of the record, the district court granted Academy's motion for summary judgment on September 14, 2023, holding that CLF lacked associational standing. Cons. L. Found., 693 F. Supp. 3d at 44-45. In so holding, the court expressly considered only CLF's first ten standing witnesses. See id. at 45. It additionally opined "that the expert testimony offered by [CLF] would not affect" the standing analysis, but it did not formally rule on whether that testimony fell within the record. Id. at 52.

Still considering only CLF's first ten witnesses, the district court held that two -- Tommaso Wagner and Sabrina Morelli -- had alleged injuries-in-fact. See id. at 50. Wagner had testified that he would run more often if the air quality around his home improved, and Morelli had testified that she too would run more if Academy "stopped idling its buses and there was consequently less air pollution" around two locations near which she occasionally ran. While the other eight standing witnesses had alleged harms including breathing polluted air, fear of ill health effects from pollution, and diminished enjoyment of outdoor activities, the district court held that these concerns did not rise to the level of injuries-in-fact. See id. In so holding, it reasoned that (1) "[t]he smell of exhaust alone appears insufficient to establish an injury"; (2) "concern regarding adverse health effects" must be "linked to specific medical conditions" to establish injury; and (3) recreational harms were "purely hypothetical" where members had "not modified their behavior due to the exhaust levels in their communities." Id.

Turning to the cause of Wagner's and Morelli's asserted injuries, the district court held that the connection between the members' reduced recreation and Academy's excess idling was "just too attenuated to satisfy" standing's traceability requirement. Id. at 52. "In an urban environment," it explained, "a span of a mile or two contains numerous vehicles and bus stops," meaning

- 9 -

that "the injuries alleged cannot be conclusively linked to the excessive idling by the Defendants." Id. Having thus found that Wagner's and Morelli's asserted injuries were not traceable to Academy's excessive idling, the district court did not reach the standing inquiry's redressability prong. Id. at 48 n.3.

CLF timely appealed, arguing that the district court erred both factually and legally. "Factually," CLF asserts that "the district court simply did not address significant portions of the factual record that show that CLF satisfies" Article III standing. "Legally," it contends, "the district court appears to have viewed the 'injury-in-fact' and 'fair traceability' tests through the lens of tort law, imposing on them higher barriers than the Constitution or the relevant precedents permit."

## II.

We consider first a threshold matter raised by the parties: When must CLF's standing witnesses have joined CLF such that it can invoke standing on their behalf? Without any on-point case law to support its stance, Academy maintains that "CLF cannot premise its standing on individuals who were not members of the organization at the time . . . they allegedly suffered the harm." CLF, by contrast, insists that "[a]ssociational standing requires only that CLF have at least one member [with standing] at the time the latest complaint was filed" -- i.e., October 29, 2020.

- 10 -

We agree with CLF in part:  Its members upon whose standing it relies need not have joined the organization before Academy allegedly harmed them.  On the other hand, having only one member with standing does not necessarily establish standing for all claims.  "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)."  TransUnion LLC v. Ramirez, 594 U.S. 413, 431 (2021).

When assessing associational standing, the Supreme Court has not focused on membership at the time of the alleged harm. Rather, the Court has made clear that standing "must exist at the commencement of the litigation" and "must continue throughout its existence."  Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (citation omitted).  It has likewise noted that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."  Rockwell Int'l Corp. v. United States, 549 U.S. 457, 473–74 (2007).  Here, then, we look to the amended complaint filed on October 29, 2020, to determine jurisdiction:  CLF must show that it -- through its members -- had standing as of that date to bring its claims for each of its six asserted locations.

Nine of the original ten standing witnesses had joined CLF by October 29, 2020.[3]  For ease of reference, we refer to those nine individuals as the "Nine Members."  And for five of the six locations,[4] at least one of the Nine Members asserts standing to complain about Academy's excessive idling.

### III.

To sue on behalf of its Nine Members, CLF must also show that (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).  Academy does not contest -- and the record demonstrates -- that CLF meets the second and third elements of this test.  The parties thus train their attention on whether any of the Nine Members have standing to sue Academy.

"The existence of standing is a legal question, which we review de novo."  Kerin v. Titeflex Corp., 770 F.3d 978, 981 (1st Cir. 2014).  "In response to a summary judgment motion," the party invoking federal jurisdiction cannot rely on "'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific

---

[3]  Only Kathleen Becker had not.
[4]  Those five locations are the Bridgeport lot, Newton Go bus stop, Cambridge Go bus stop, Harry Agganis Way shuttle stop, and Wellington station.

facts,'" supporting the elements of standing, "which for purposes of the summary judgment motion will be taken to be true."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)).

To have individual standing to sue, a litigant "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, 578 U.S. at 338.  These three requirements aim to ensure that a plaintiff has "such a personal stake in the outcome of the controversy as to warrant . . . federal-court jurisdiction." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (quotation mark omitted) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). We address these three requirements in turn.

**A.**

To qualify as an injury-in-fact, a complained-of harm must be "concrete and particularized" and "actual or imminent."[5] Laidlaw, 528 U.S. at 180.  An injury is concrete when it is "real, and not abstract," though it need not be "tangible," Spokeo, 578 U.S. at 340 (quotation marks and citation omitted), or large, see Adams v. Watson, 10 F.3d 915, 918 (1st Cir. 1993) ("[A]n

---

[5] Because Academy does not meaningfully argue that CLF has failed to satisfy the "actual or imminent" requirement -- and because CLF has in fact satisfied it -- we focus here and elsewhere in this opinion on the "concrete and particularized" requirement.

identifiable trifle is enough . . . ." (quoting United States v. Students Challenging Regul. Agency Procs. (SCRAP), 412 U.S. 669, 689 n.14 (1973))).  It is particularized if it "affect[s] the plaintiff in a personal and individual way."  Lujan, 504 U.S. at 560 n.1.  Finally, when assessing standing, a court should consider "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."  TransUnion, 594 U.S. at 424 (quoting Spokeo, 578 U.S. at 341).

CLF alleges that its members suffer the following harms from Academy's CAA violations: "breath[ing] the emissions and air pollutants that Defendant causes"; "see[ing] air pollution coming from" Academy's vehicles; trouble breathing and respiratory symptoms near where Academy's vehicles have been seen idling; and "concern[]" that Academy's emissions "have harmed, continue to harm and threaten, and will harm and threaten their health, well-being, quality of life, and enjoyment, as well as that of their families."  Some CLF members also recount diminished recreational enjoyment.

The district court held that most of these alleged injuries are not cognizable.  See Cons. L. Found., 693 F. Supp. 3d at 50.  The court was "not satisfied" that "simply breathing and smelling polluted air is an injury" without "associated physical side effects, recreational or aesthetic harm, or well-grounded

- 14 -

fear of health effects." Id. at 49.  And even where CLF members concerned about adverse health effects note that they are especially predisposed to respiratory illness,[6] the district court treated their concerns as not "credible and concrete," because the members have not testified that their health issues have worsened and because it is "unclear whether these fears of health effects from exhaust pollution are reasonable." Id. at 49–50.  It likewise held that the CLF members' asserted recreational harms are not cognizable if the members "have not modified their behavior due to the exhaust levels in their communities." Id. at 50.  As a result, it held that only members Wagner and Morelli assert "true recreational harms" through their testimony that they would run more frequently if the air around Academy's bus stops and lots were less polluted. Id.  For the reasons that follow, we disagree with the district court's constrained view of cognizable injury.

**1.**

First, we hold that "breathing and smelling polluted air" are both injuries-in-fact, even when unaccompanied by additional associated harms.  To reach this conclusion, we follow the Supreme Court's directive to look to "harm[s] traditionally recognized as providing" bases for lawsuits "in American courts"

---

[6] For example, CLF member Robert Kendall testifies that he has "a lot of problems with allergies and with sleep apnea" and "worr[ies] that air pollutants could be making these respiratory issues worse."

to gauge whether an asserted harm is cognizable.  TransUnion, 594 U.S. at 417.  "The most obvious" of these historically cognizable harms "are traditional tangible harms, such as physical harms." Id. at 425.

Smelling unpleasant odors and breathing polluted air undoubtedly fall into this category.  At common law, courts recognized as public nuisances "a large, miscellaneous and diversified" range of offenses "interfer[ing] with the interests of the community at large -- interests that were recognized as rights of the general public entitled to protection."  Restatement (Second) of Torts § 821B cmt. b (Am. L. Inst. 1979).  These "public nuisances included interference with the public health, . . . [and] with the public comfort, as in the case of widely disseminated bad odors, dust and smoke."  Id.; see also, e.g., Commonwealth v. Kidder, 107 Mass. 188, 192 (1871) ("A nuisance at common law may consist . . . in the carrying on of any trade or business in such a manner as to emit offensive odors and stenches . . . ."); People v. Detroit White Lead Works, 46 N.W. 735, 735-37 (Mich. 1890) ("[T]he creation and emission of unwholesome, offensive, and nauseating odors, smells, vapors, and smoke . . . clearly [constitute] a nuisance . . . .").

In short, breathing polluted air is "traditionally recognized as providing a basis for a lawsuit in American courts." TransUnion, 594 U.S. at 417.  And given this longstanding

- 16 -

historical practice, we join several of our sister circuits in holding that air-pollutant exposure is an injury-in-fact, regardless of whether additional harms attend that exposure. See Sierra Club v. Franklin Cnty. Power of Ill., LLC, 546 F.3d 918, 925 (7th Cir. 2008) (explaining that "likely exposure to pollutants" satisfies the injury-in-fact requirement (cleaned up)); LaFleur v. Whitman, 300 F.3d 256, 271 (2d Cir. 2002) (providing that "[a]ctual exposure to increased levels of" a pollutant is an injury-in-fact, even if the levels still fall within federal standards); Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp., 207 F.3d 789, 792 (5th Cir. 2000) (favorably citing precedent holding that "breathing and smelling polluted air is sufficient to demonstrate injury-in-fact and thus confer standing under the CAA"); Nat. Res. Def. Council, Inc. v. EPA, 507 F.2d 905, 910 (9th Cir. 1974) ("[An individual] will suffer injury if compelled to breathe air less pure than that mandated by the Clean Air Act.").

### 2.

We also disagree with the district court's conclusion that "[t]he only true recreational harms" asserted by CLF members are those that involve members changing their behavior in response to exhaust levels. Cons. L. Found., 693 F. Supp. 3d at 50. For example, the district court found no cognizable harm alleged by CLF member Thomas Cahill, id., who avers that he might stop using

a bikeway because Academy's nearby idling "negatively impacts [his] enjoyment of and ability to recreate on the bikeway." The district court described Cahill as asserting "purely hypothetical recreational harms" since Cahill "continues to make regular use of the trail." Id.

This stringent standard for recreational harm contravenes precedent. The Supreme Court has long "held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Laidlaw, 528 U.S. at 183 (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)). It has articulated no requirement that an environmental plaintiff must abandon a polluted area in order to have suffered an injury-in-fact. Nor has this court. Indeed, we recently recognized that individuals who testified that they lived near a proposed disposal facility, "use[d] that area for recreation," and feared "that the disposal facility [would] negatively impact their use and enjoyment of the area" had "plainly" alleged injuries-in-fact. Housatonic River Initiative v. EPA, New England Region, 75 F.4th 248, 265 (1st Cir. 2023). While avoiding certain activities because of pollution -- as alleged by Wagner and Morelli -- certainly constitutes a cognizable recreational injury, so too is continuing those activities but enjoying them less.

- 18 -

**3.**

We also cannot agree with the district court's conclusion that a reasonable fear of health effects from pollution is not on its own a cognizable injury. The district court implied that to constitute injury-in-fact, such concerns must be "tied to specific medical conditions" or accompanied by "more tangible harms." Cons. L. Found., 693 F. Supp. 3d at 49. But that is not the test. Rather, Laidlaw frames the inquiry as hinging on "the reasonableness of the fear that led the affiants" in the case to avoid the polluted waterway at issue. 528 U.S. at 184 (cleaned up); see also Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 284 (1st Cir. 2006) ("[A]n individual's decision to deny herself aesthetic or recreational pleasures based on concern about pollution will constitute a cognizable injury only when the concern is premised upon a realistic threat." (citing Laidlaw, 528 U.S. at 184; City of Los Angeles v. Lyons, 461 U.S. 95, 107 n.8 (1983))).

In holding that the affiants' fears were indeed reasonable, Laidlaw explained that there was "nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would" harm recreational users of that river. 528 U.S. at 184. For purposes of determining injury-in-fact here, similar reasoning applies. Recall that the CAA directs the EPA to identify pollutants whose

- 19 -

emissions "may reasonably be anticipated to endanger public health or welfare" and for those pollutants set air quality standards "requisite to protect the public health."    42 U.S.C. §§ 7408(a)(1), 7409.    In implementing those standards, Massachusetts and Connecticut set limits on vehicle idling.  310 Mass. Code Regs. 7.11(1)(b) (2025); Conn. Agencies Regs. § 22a-174-18(b)(3)(C) (2025).

As in Laidlaw and Mallinckrodt, then, it is entirely reasonable for CLF members to believe that repeated and continuing CAA violations pose a realistic threat to those who are exposed to the excessive fumes.  We thus join several other courts of appeals in holding that these concerns alone can constitute injuries-in-fact.  See, e.g., Clean Wis. v. EPA, 964 F.3d 1145, 1156 (D.C. Cir. 2020) ("Adverse health effects . . . constitute Article III injuries, even if a petitioner merely asserts realistic health concerns instead of providing medical evidence."); N.Y. Pub. Int. Rsch. Grp. v. Whitman, 321 F.3d 316, 325 (2d Cir. 2003) ("We are persuaded that [Appellant's] members' allegations about the health effects of air pollution and of uncertainty as to whether the EPA's actions expose them to excess air pollution are sufficient to establish injury-in-fact . . . ."); see also Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp., 968 F.3d 357, 368 (5th Cir. 2020) (describing the fact that affiants "feared for their health" as "an Article III injury"), vacated on other grounds, 61 F.4th 1012,

1012-13 (5th Cir. 2023) (mem.) (per curiam), and decided en banc, 123 F.4th 309 (5th Cir. 2024) (mem.) (per curiam).

In sum, we hold that the district court erred by imposing new requirements for establishing injury-in-fact that are unsupported by case law.  On remand, the district court should apply the proper standards, as described above, to determine which CLF members -- in addition to Wagner and Morelli -- have alleged injuries-in-fact.

**B.**

We now turn to the requirement that any injury-in-fact be "fairly traceable to the challenged conduct of the defendant." Spokeo, 578 U.S. at 338.  The Supreme Court has explained that the fairly traceable standard requires "a causal connection between the injury and the conduct complained of."  Lujan, 504 U.S. at 560.  However, the standard does not require a tort-like showing of proximate causation.  See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct.").

A plaintiff can satisfy traceability by showing "that the defendant's conduct is one among multiple causes" of the alleged injury.  13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531.5 (3d ed. 2008).

- 21 -

Here, multiple parties, in addition to Academy, each allegedly contribute distinct, not mutually dependent, portions of CLF members' asserted injuries. Traceability in such a case exists where the defendant's alleged conduct, while arguably not responsible for the entire asserted injury, nevertheless causes a "concrete and particularized," Laidlaw, 528 U.S. at 180, portion of that injury. See, e.g., Nat. Res. Def. Council, Inc. v. Texaco Refining & Mktg., Inc., 2 F.3d 493, 505 (3d Cir. 1993) (finding standing where many sources contributed to river pollution and the defendant's unlawful discharge caused or contributed to the kinds of injuries alleged); Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., 73 F.3d 546, 558 (5th Cir. 1996) ("Given the number of entities discharging chemicals into Galveston Bay, it would be virtually impossible . . . to trace [the plaintiff's] injuries to Cedar Point's discharge in particular. Rather, it is sufficient . . . to show that Cedar Point's discharge . . . contributes to [the plaintiff's asserted harm]."); Texans United, 207 F.3d at 793 (finding standing in air-pollution case even where an injunction against the defendant would "not reduce pollution from other sources not before th[e c]ourt").

In applying this standard to a case with multiple alleged contributors to a cumulative harm, a court may find it helpful to engage in a counterfactual inquiry, asking whether the defendant's alleged conduct would "have been a factual cause [of a concrete

and particularized portion of the injury] if the other competing cause[s] had not been operating."  Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 27 cmt. a (Am. L. Inst. 2010); see also Walters v. Fast AC, LLC, 60 F.4th 642, 651 (11th Cir. 2023) (importing this standard into the Article III traceability analysis); Fischer v. Governor of N.J., 842 F. App'x 741, 755-56 (3d Cir. 2021) (Phipps, J., concurring in part and concurring in the judgment) (same).[7]

Here, the district court held that the "connections between the members' injuries and the Bus Companies' [unlawful] conduct are just too attenuated to satisfy" Article III's traceability requirement.  Cons. L. Found., 693 F. Supp. 3d at 52. "In an urban environment," it reasoned, "a span of a mile or two contains numerous vehicles and bus stops.  In such an environment, the injuries alleged cannot be conclusively linked to the excessive idling by the Defendants."  Id.  But the existence of other potentially culpable vehicles does not eliminate traceability. CLF need only show that Academy's unlawful conduct, standing alone, causes a "concrete and particularized," Laidlaw, 528 U.S. at 180,

---

[7] We need not decide what test would apply where the complained-of conduct would not, by itself, cause a "concrete and particularized," Laidlaw, 528 U.S. at 180, portion of the asserted injury.  Such cases, including those involving indivisible harm, see Restatement (Third) of Torts: Apportionment of Liability § A18 (Am. L. Inst. 2000), pose unique traceability questions not present here.

portion of CLF members' asserted injuries.  And CLF need not show a "conclusive[] link[]," Cons. L. Found., 693 F. Supp. 3d at 52, to prove that causal connection.

In lieu of requiring a conclusive link, we hold that a showing of geographic proximity can satisfy traceability in this type of case.  Several of our sister circuits have adopted analogous approaches in the context of alleged CAA violations.  See, e.g., LaFleur, 300 F.3d at 270 (focusing the traceability inquiry on geographic proximity to the air-pollution source); Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC, 21 F.4th 1229, 1248 (10th Cir. 2021) ("If the [defendants'] vehicle was driven, however little, in the Salt Lake City area, [the plaintiff organization] has established that its members' injuries from excessive pollution can be fairly traced to the CAA violation . . . ."); Sierra Club v. Tenn. Valley Auth., 430 F.3d 1337, 1345 (11th Cir. 2005) (similar to LaFleur).[8]  Thus, upon a requisite showing of geographic proximity, a CAA plaintiff can satisfy traceability -- even if "other sources" may have "contributed to" the complained-of pollution.  Utah Physicians, 21 F.4th at 1244 (citation omitted).

---

    [8]  A Fifth Circuit panel held similarly in Environment Texas Citizen Lobby, 968 F.3d at 370, but the en banc court vacated that decision, 61 F.4th at 1012-13, deadlocked, and summarily affirmed the district court's judgment (which found standing) without substantive comment, 123 F.4th at 310-11.

But what is that geographic proximity? Surely a plaintiff in Providence, Rhode Island, could not claim injury from an idling bus in Portland, Maine; indeed, "appellate courts have recognized that a plaintiff may lack standing to challenge actions by a too-distant polluter." Id. at 1246. And equally surely, a plaintiff just a few yards from the tailpipe of an unlawfully idling bus satisfies traceability for an injury like smelling that bus's fumes, even if other buses also idle nearby. See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 162 (4th Cir. 2000) (providing that plaintiffs can satisfy traceability merely by showing that they "sit[] squarely in the discharge zone of a polluting facility").

CLF urges us to hold that that the requisite geographic vicinity is "under a few miles," noting that some courts "have taken judicial notice of the fact that air pollution travels." But without expert testimony, how are we to know how far and in what concentration it travels? And with what effects? CLF suggests that these exactitudes are beside the point, gesturing to a standard initially deployed in a Clean Water Act case: "Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." Id. at 161 (quotation marks and citation omitted). This might arguably be enough to establish

traceability in the context of water pollution, where a toxin entering a river at point A reliably reaches a point B downstream. But, as Academy points out, "air is different than water," and the traceability analysis must be different as well.

Common sense tells us that traceability may be simple at very close range. For example, some CLF members regularly use the same transportation centers where Academy's buses idle often. Another spends "significant amounts of time" on a bikeway "directly by" one of the stops. While these individuals seem to be "squarely in the discharge zone" such that expert analysis may not be necessary to establish traceability, see Gaston Copper Recycling, 204 F.3d at 162, we leave it to the district court to engage in the requisite factfinding and apply the proper legal standards to these facts. As for CLF members whose testimony does not place them at or near the commuter stations, we think it likely that CLF can only establish traceability by adducing expert testimony explaining how the pollution travels to, and ultimately affects, those members. Again, however, we leave it to the district court to adjudicate these issues in the first instance.

Finally, Academy argues that CLF must place its members in the geographic vicinity of the bus stops and lots during the "isolated instances of bus idling alleged in the complaints." But CLF has not merely alleged injuries stemming from "isolated instances." Instead, CLF argues that the pattern of violations

- 26 -

that its investigators observed across twenty-six days -- at least one violation (and often more) per day of observation -- demonstrates Academy's "routine practice of excessive idling each and every day that its buses are in operation."  Notably, Academy does not meaningfully dispute that CLF's complaint is best read as alleging a pattern or practice of unlawful idling, rather than a series of isolated incidents.

This alleged pattern easily supports traceability vis-à-vis CLF members' allegations that they avoid certain areas because of Academy's idling -- after all, an individual could reasonably choose to avoid an area on a given day purely based on knowledge that Academy often illegally idles in that area.  And this alleged pattern also supports traceability vis-à-vis CLF members' other asserted injuries:  Evidence of twenty-six days of daily violations substantiates CLF's inference that Academy illegally idles "each and every day that its buses are in operation," and Academy's buses have operated throughout the period for which CLF members allege injuries.  Accordingly, we see no need to show exposure to each individual emission in order to establish standing to complain of the general and repeated practice of unlawful idling.  Cf. Havens Realty Corp. v. Coleman, 455 U.S. 363, 381 (1982) ("Plainly the claims, as currently alleged, are based not solely on isolated incidents . . . , but a continuing violation manifested in a number of incidents . . . ."); see also

Laidlaw, 528 U.S. at 184-85 (not requiring the plaintiffs to tie their injuries to individual discharges of pollutants when the plaintiffs had alleged "continuous and pervasive" violations); Int'l Union of Bricklayers & Allied Craftsmen v. Meese, 761 F.2d 798, 803 (D.C. Cir. 1985) ("Appellants need not be omniscient and pinpoint precisely when and where the next infraction will occur. The requirement is only that the injury be 'fairly' traceable to [the complained-of conduct.]"); Texans United, 207 F.3d at 793 (finding traceability for a pattern-or-practice-type claim based, among other things, on "the frequency with which Crown exceeded the federal limits on sulfur dioxide emissions at its Pasadena plant").

## IV.

Without a complete record before us, we cannot determine the extent to which CLF can fend off Academy's motion for summary judgment on standing. We thus vacate the district court's grant of summary judgment and remand for the district court, consistent with this opinion, to (1) determine which, if any, of the second batch of CLF witness declarations and expert disclosures are part of the record; (2) make the factual findings necessary to assess whether CLF's asserted injuries are fairly traceable to the alleged idling; and (3) apply the correct legal standards for determining whether CLF has alleged injuries-in-fact and traceability. We

- 28 -

leave it to the district court to determine whether and to what extent to allow further supplementation of the record.

Finally, given the open questions concerning the record's scope, the alleged injuries-in-fact, and traceability, we decline the parties' invitations to reach redressability. Should the district court hold that CLF has satisfied the injury-in-fact and traceability requirements, it should assess redressability in the first instance. Costs are awarded to CLF.