**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> ACADEMY EXPRESS, LLC., <br><br> Defendant. | Case No. 1:20-cv-10032-WGY |
| CONSERVATION LAW FOUNDATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> ACADEMY EXPRESS, LLC, DPV TRANSPORTATION, INC., and BOSTON CHARTER BUS, LLC, <br><br> Defendant. | Case No. 1:20-cv-10033-WGY |

## DEFENDANT ACADEMY EXPRESS, LLC'S BENCH MEMORANDUM

NOW COMES Defendant Academy Express, LLC ("Academy"), by and through its undersigned counsel, and files the within Bench Memorandum to address the issues raised by this Honorable Court at the start of trial on January 12, 2026. Specifically, the Court invited further briefing on the questions of how statutory and regulatory principles should be applied in analyzing plaintiff Conservation Law Foundation, Inc.'s ("CLF") claim that the engines of Academy's buses

1

operated "unnecessarily" in violation of 310 CMR 7.11 (the "Massachusetts SIP"). Accordingly, this Bench Memorandum addresses the following points:

1. how the case of *United States v. Paul Revere Transp., LLC*, 608 F. Supp. 2d 175 (D. Mass. 2009) should be applied to the evidence and legal issues presented in this case;

2. case law interpreting idling statutes that reinforces the commonsense application of operational necessity;

3. case law interpreting statutory construction similar to the Clean Air Act;

4. how federal regulatory requirements should be considered in determining when bus engine operations are ***necessary***;

5. how state regulatory requirements apply to the determination of ***necessary*** bus engine operations; and

6. how a cost-benefit analysis supports Academy's interpretation of the Massachusetts SIP; and

7. an analysis of the Clean Air Act's civil penalty factors.

Ultimately, case law authority and regulatory guidance confirm that the term "idling" cannot be divorced from the operational context in which Academy's fleet of buses operates in Massachusetts. Engine operation is often **necessary** to provide a safe and comfortable environment for passengers and to maintain a safe workplace for drivers, as required under the Occupational Safety and Health Act ("OSHA") and therefore does not constitute a violation of the Massachusetts SIP. CLF cannot satisfy its burden merely by showing that Academy's bus engines operated for more than five minutes; it must prove that such operation was **unnecessary** within the meaning of the regulation. Moreover, contrary to CLF's portrayal, Academy's buses advance, rather than undermine, environmental objectives by removing passenger vehicles from the road and reducing

overall emissions. Finally, should the Court reach the issue of civil penalties, this memorandum explains that the governing statutory framework requires a bottom-up, holistic analysis that forecloses CLF's request for maximum penalties and supports, at most, a modest and proportionate sanction.

## ARGUMENT

I.    **ACADEMY'S POSITION IS CONSISTENT WITH *UNITED STATES V. PAUL REVERE TRANSP*., *LLC*, 608 F. SUPP. 2D 175 (D. MASS. 2009).**

A.    Academy's Defenses Are Distinguishable from Paul Revere's Defenses Raised at Summary Judgment.

This Court previously addressed similar claims in *United States v. Paul Revere Transportation, LLC*, 608 F. Supp. 2d 175 (D. Mass. 2009), where the United States alleged violations of the Massachusetts SIP and the Clean Air Act by a private transportation company.

CLF is expected to argue that this Court has already addressed "unnecessary idling" in prior litigation involving Paul Revere Transportation and the Massachusetts SIP; however, that characterization oversimplifies the posture and substance of that case. Although this Court considered challenges arising under the same SIP provision, the defenses asserted there were fundamentally different from Academy's defense here, and this Court was never asked to decide the question now before it: how the term "unnecessary" must be construed when applied to real-world bus operations.

First, Paul Revere principally advanced a constitutional vagueness challenge to the SIP's prohibition on "unnecessary idling," contending that the term failed to provide adequate notice of what conduct was prohibited. This court rejected that facial vagueness argument, concluding that the term "unnecessary" is not impermissibly vague in the abstract. Second, Paul Revere argued that its idling fell within specific regulatory exceptions contained in the SIP and therefore

constituted an affirmative defense. In other words, Paul Revere attempted to justify its conduct by fitting within enumerated carve-outs to the general prohibition. On a cross motion for summary judgment, this Court determined that, "in light of the facts at hand, Paul Revere may not successfully contest the idling ordinance under the vagueness doctrine. Paul Revere's affirmative defense, it's contention that its employee's idling of the vehicles met statutory exceptions, tacitly acknowledges that Paul Revere was engaged in the restrictive conduct." *United States v. Paul Revere Transp., LLC*, 608 F. Supp. 2d 175, 177 (D. Mass. 2009). But rejecting a vagueness challenge is not the same as adopting CLF's rigid, time-based conception of "unnecessary," nor does it answer how the term should be applied in concrete operational circumstances. As a result, that case was heard before the Honorable Judge O'Toole in 2009.

Academy's defense is materially different in both form and substance. Academy does not contend that the SIP is unconstitutionally vague, nor does Academy rely on a narrow statutory exception. Instead, Academy advances a straightforward statutory-construction argument: the SIP prohibits only "unnecessary" idling, and idling that is operationally required for safety, mechanical integrity, emissions-system function, or compliance with other legal obligations is, by definition, not unnecessary.

B. *Paul Revere* is Factually and Legally Distinguishable from CLF's Case Against Academy.

In *Paul Revere*, as further described below, the Environmental Protection Agency ("EPA") presented evidence to demonstrate that the defendants' buses operated their engines unnecessarily, based on contemporaneous inspections, certified weather data, admissions of routine violations by the Defendant, and expert testimony regarding bus operations.

In this case, CLF has presented no such evidence. Instead, CLF's case relies almost entirely on GPS timestamp data that is untethered to any operational context and unsupported by any

evidence that any particular idling event constituted the ***unnecessary*** operation of the bus engine. While CLF's legal burden is the same as was required of the EPA in *Paul Revere*, the gulf between the evidentiary records is illustrative.

    C.   The *Paul Revere* Court Correctly Framed CLF's Burden of Proof.

*Paul Revere* confirms what this Court already articulated: that CLF bears the burden of proving unnecessary operation of Academy's bus engines by a preponderance of the evidence. Specifically, in *Paul Revere*, Judge O'Toole instructed the jury that, "[a] plaintiff in a civil action carries its burden of proof if it persuades you by the greater weight of the evidence that the essential facts of the case are true…ultimately the plaintiff bears the burden of persuasion." *See Paul Revere*, 608 F. Supp. 2d at 177, Trial Tr. Day 6 at 15:22-25; 16. Judge O'Toole further clarified that, "[i]t's not enough for the plaintiff to show that something might be true…[t]he plaintiff has to show that it's probably true as alleged." *Id*. at 16:1-2. Applying that standard to the Massachusetts SIP, Judge O'Toole charged the jury that "no person shall…permit the unnecessary operation of the engine…in excess of five minutes," and explained that the jury would be required to determine whether idling was "unnecessary" within the meaning of the regulation. *Id*. at 14:1-5.

This Court has correctly concluded that this same standard applies in the present case. As the Court stated unequivocally: "the burden of proof is proof by a fair preponderance of the evidence…it's whether you have persuaded me." *See* Academy Trial Tr. at 63:4-10. The Court expressly rejected CLF's attempts to invoke jury-style framing, stating: "You're using the jury standard, and the jury standard is wrong…am I persuaded?" *Id*. at 63:17-19. The Court also properly emphasized that the dispositive legal inquiry is, most fundamentally, "what is unnecessary?" *Id*. at 70:15-16. Thus, as in *Paul Revere*, CLF bears the affirmative burden to prove

that any idling by Academy buses exceeding five minutes was ***unnecessary*** under real-world operational conditions.

D. The Government in *Paul Revere* Met its Burden; CLF Has Not Done So Here.

This case is distinguishable from *Paul Revere* by substantive and procedural differences in evidence, the strength and nature of explanations for idling, absence of third-party contemporaneous complaints, consistent company position and lack of admissions, and unique operational and regulatory circumstances. These differences, drawn from the trial records, present the strongest and most helpful distinguishing points for this Court to find in Academy's favor.

In the case of *Paul Revere*, factual evidence of idling events was grounded in direct observational testimony of a nearby resident (Dr. Mary Jane Fay) and trained EPA inspectors (Mohamoud and Christine Sansevero), each of whom prepared contemporaneous and detailed notes specifying the time of day, the number of vehicles idling, the duration of the idling, visible activity at the time of the events, and observed circumstances surrounding the idling. *See* Paul Revere Trial Tr. Day 3 at 26-27. Dr. Fay lived directly adjacent to the Paul Revere lot and could see and hear the buses from her window, providing specific details about repeated and lengthy idling, documenting conversations with company representatives, and specifying the impact of the idling on her and her family's daily life. *Id.* at 40-44. EPA inspector Ms. Sansevero testified that she conducted multiple unannounced site visits using a standard EPA protocol – timing each bus's idling, documenting vehicle and plate numbers, noting whether mechanics or drivers were present, and noting the circumstances and context for each event recorded. *See Paul Revere* Trial Tr. Day 3 at 26-27.

The evidence presented in *Paul Revere* consisted of contemporaneously logged, event-based documentation that considered exceptions to the Mass SIP (such as active repairs or loading

and unloading) and which detailed why each bus was presumed to be idling unnecessarily. *See Paul Revere* Trial Tr. Day 2 at 45-48. The factual record in *Paul Revere*, unlike the present case, consisted of direct, eyewitness testimony with respect to each alleged violation that called for minimal reliance on inference or interpretation.

Additionally, the government in *Paul Revere* presented detailed expert testimony from William Parsley, a transit professional with nearly thirty (30) years of experience at the New York City Transit Authority. Mr. Parsley testified that he had served as a mechanic, supervisor, instructor, garage manager, and ultimately Director of Research and Development, where he was responsible for fleet readiness in cold weather and for implementing anti-idling policies. In preparing his opinions, Mr. Parsley reviewed manufacturer operating manuals for Paul Revere's buses, EPA inspection data, and contemporaneous weather records, as well as technical literature on bus engines and air systems. Mr. Parsley also reviewed the Massachusetts Commercial Driver License Manual and relevant federal safety requirements. Based on that review and decades of hands-on experience, Mr. Parsley competently opined that Paul Revere had unnecessarily operated its bus engines on the occasions alleged by the Government.

In stark contrast to *Paul Revere*, CLF has presented no competent factual testimony, and no expert testimony whatsoever, to demonstrate that Academy's buses idled unnecessarily on any of the occasions alleged in its Complaint. As Academy noted in its opening statement, "it is not simply enough for CLF to show that Academy's engines were running. CLF must prove…that operation [of the bus engines] was unnecessary." Academy Trial Tr. at 51:14-18. During its case in chief, CLF offered no onsite inspections, no weather data, no expert testimony, and no operational evidence concerning brake systems, air pressure, passenger safety, or mechanical warm-up requirements. Instead, CLF relies on GPS timestamps alone and invites the Court to infer

illegality based solely on duration. CLF's requested inference highlights the absence of any direct evidence of a violation of the Massachusetts SIP. The regulation does not prohibit idling *per se*; it prohibits unnecessary idling. Yet CLF has presented **no** evidence to establish that Academy bus engines operated unnecessarily.

E. <u>Academy's Saucon Reports Cannot Be Used to Infer Unnecessary Idling.</u>

CLF has repeatedly attempted to invert the burden of proof by arguing that Academy must provide an explanation for why the engines of its buses were operating for more than five (5) minutes when stopped, but that position ignores the explicit language of the Massachusetts SIP and is directly contrary to this Court's position. The burden rests on the *plaintiff* to establish a violation by a preponderance of the evidence. As stated by Judge O'Toole in *Paul Revere*:

> [S]ome level of, call it direct evidence of a day and circumstance – particular day, particular circumstance – is necessary for the jury to find a liability-producing violation. And the vague evidence of 'they must have also been doing it on other days when we don't have observations'… should not be sufficient to support a violation on those unidentified occasions – or unobserved occasions, if you want to call it that.

*Paul Revere Transp.,* Trial Tr. (day 2) at 27:8-17. Judge O'Toole cemented this point during jury instructions, when he instructed the jury as follows:

> [Y]ou may not go beyond the evidence by speculating or guessing what else might have been in evidence but was not. Your responsibility is to resolve the evidence – the questions presented based on the evidence that has been put before you in the course of the case leads you to draw. So if there are questions you can't answer because you think the evidence is in some way inadequate, you must leave those questions unanswered…but **I just point out that you can't fill gaps in the evidence by guessing or supposing things that have not been put into evidence**.

*Id*. at 66:12-25 (emphasis added).

CLF urges the Court to infer that at least some of Academy's idling must have been unnecessary based solely on the volume of GPS (Saucon) data, which identifies idling events over multiple years. But the standard of proof defined by the court in *Paul Revere* demonstrates why

this approach is legally insufficient. In *Paul Revere*, the government did not ask the jury to infer illegality from frequency or volume alone. Instead, Judge O'Toole recognized that the government's *prima facie* case required observational evidence of idling on identified occasions coupled with "no observed or apparent necessity," and that, "without observational evidence of a violation on a particular occasion, the plaintiff would not satisfy the *prima facie* part of the test." Paul Revere Trial Tr. Day 2 at 19:4-7. Judge O'Toole likewise rejected the vague proof, untethered to particular days and circumstances, that CLF relies on here: a private investigator whose summaries log durations but do not supply any context to rule out necessary bus engine operations. Nor can the vague testimony of CLF's witnesses, none of whom could recall specific dates or times of idling by Academy buses, be used to "fill gaps in the evidence by guessing or supposing things that have not been put into evidence." *Id.* at 66:12-25. Generalized testimony about alleged idling cannot substitute for evidence that the engine operation in the specific instances was unnecessary.

*Paul Revere* also makes clear that while circumstantial evidence may support a *prima facie* inference within tightly defined parameters, that inference "does not mean ... the [plaintiff]'s carried its burden of proof as to the entire claim;" the plaintiff still bears the burden on all elements for both "observed and unobserved dates." *Paul Revere* Trial Tr. Day 4 at 55:16:20. By contrast, CLF's reliance on aggregated Saucon data and idling summaries shows counts and durations but doesn't provide any information whatsoever about contemporaneous operational needs—loading or unloading, HVAC for defrosting or passenger safety, kneeling or lift operation, air-brake pressurization, or repairs—leaving the record at best evenly balanced, and therefore insufficient under the preponderance standard required for the Court to find in CLF's favor.

Accepting CLF's "pattern or practice" theory would improperly convert the Massachusetts SIP into a form of strict liability, allowing the Court to presume unlawfulness without any evidence regarding contextual data for any specific event. That is exactly what *Paul Revere* forbids. There, even with government inspectors, weather data, expert testimony, and admissions from the Defendant of routine idling practices, the jury was still required to determine whether idling was unnecessary on particular occasions. The government did not argue, and the Court did not accept the premise that a percentage of violations must exist simply because many events occurred. CLF's approach in this case would require the Court to draw a far more speculative inference from GPS data that is wholly without context and which does not establish that any particular recorded event proves the unnecessary operation of the bus engines This data does not relieve CLF of its burden to prove that, on any of the individual instances there was no operational necessity for the bus engines to be operating. Without such evidence, the Court cannot infer liability.

F.  Academy's Evidentiary Showing Regarding the Necessity of Engine Operations is Materially Stronger than the Defense Presented in *Paul Revere.*

The defense in *Paul Revere* largely relied on generalized testimony about weather operations and routine practices, which the government rebutted with its own expert. By contrast, during plaintiff's case-in-chief, Academy presented direct, site-specific, and operationally grounded testimonial evidence to explain why the operation of its bus engines is necessary under the real word conditions in which it operates. Academy's witnesses testified in detail about actual bus operations, including the need to maintain air pressure for brakes and safety systems, the requirements of passenger boarding, driver scheduling, and operational constraints imposed by terminal locations. At trial, this Court recognized that the record here contains "time, place, vehicle, [and] location" data, but that the dispositive issue is "whether that was unnecessary – which is their burden of proof." Academy met that issue head-on, providing the Court with detailed

accounts of why Academy idling occurs and why it is operationally necessary, rather than asking the Court to infer necessity from assumptions.

## II.    RELEVANT CASE LAW UNDERSCORES CLF'S FAILURE TO PROVE THAT ACADEMY OPERATED ITS BUS ENGINES UNNECESSARILY

### A.    Courts Recognize That Idling May Be Necessary for Safe and Effective Operations

In *Smith v. CSX Transportation, Inc*., 247 F. Supp. 3d 952 (N.D. Ill. 2017), property owners sued a railroad company alleging personal injury and property damage caused by locomotives idling near their property. In considering whether the claims were preempted by the Interstate Commerce Commission Termination Act, the Court explained that idling of trains was a ***necessary*** operation:

> Here, CSX has presented uncontroverted evidence that it parks and idles trains near the Smiths' property for operational reasons, not to harass the Smiths or any other landowners who abutted the railroad tracks. Specifically, trains stop on the tracks near the Smiths' property while waiting for signal clearance to cross nearby interchanges or to load or unload containers at the intermodal yard. **CSX typically idles locomotives instead of shutting engines off because, at least when temperatures fall below forty degrees Fahrenheit, CSX policy requires engines to continue running to avoid freeze-ups or engine damage. Additionally, CSX usually keeps engines running to avoid operational delays if the air brake system loses pressure, which would require an air test before operating the train again. These operational concerns establish that the parking and idling of trains for extended periods of time on tracks adjacent to the Smiths' property is necessary to the operation of CSX's railroad business**. As a result, the ICCTA preempts the Smiths' claims regarding property damage and personal injury caused by exposure to the idling locomotives.

247 F. Supp. at 957 (emphasis added). Thus, the court expressly recognized that idling *can* serve a multitude of legitimate operational and safety purposes, including maintaining brake pressure and preventing equipment damage in cold temperatures.

Academy also directs the Court's attention to the case of *In Metro Produce Distributors, Inc. v. City of Minneapolis*, 473 F. Supp. 2d 955 (D. Minn. 2007), in which Plaintiffs challenged a state regulation, Section 389.100(7), which prohibited the "idling" of various motor vehicles

while stopped, standing, or parked in a residentially used area between 10:00 p.m. and 6:00 a.m,

as unconstitutionally vague. The Court ultimately agreed, finding that, "the ordinance fails to

provide quantitative parameters that define the duration of prohibited idling or the amount of time

between when the vehicle stops and when idling becomes prohibited."   473 F. Supp. 2d at 962.

Of particular relevance to the present case is the Court's conclusion that certain engine operations

constituted necessary idling:

> **[I]dling is allowed if** done so in compliance with traffic signals or signs, at the
> directions of a police officer, or while buses are in the act of loading or unloading
> passengers," and "emergency vehicles, ambulances, public works and public utility
> vehicles, and government vehicles are excluded from the provision.

473 F. Supp. 2d 955 at n.2 (emphasis added). Significantly, the Court concluded that certain

operations, such as compliance with traffic signals and loading or unloading passengers were

necessary instances of idling not subject to the state regulation.

 As outlined above, relevant case law uncontrovertibly demonstrates that courts do not treat

"idling" as an inherently unlawful act. Instead, these cases give relevant insight into what is

considered necessary engine operation within real world contexts. This is precisely the inquiry

required under the Massachusetts SIP. When engine operation serves safety, equipment protection,

or passenger service functions, it falls outside the scope of prohibited conduct. Academy has

consistently maintained that engine operation during passenger boarding, kneeling, wheelchair lift

deployment, HVAC operation, and other essential service-related functions, is operationally

required, not discretionary. *See e.g.*, Trial Brief of Academy Express Dkt. 236 at 5.

 B. <u>Anti-Idling Laws That Interfere with Transportation Operations Have Been Deemed
Unlawful</u>

In *Delaware v. Surface Transportation Board*, the D.C. federal circuit court considered a

challenge to a state statute regulating "nonessential idling" on the grounds that it was preempted

by federal law. While the court declined to find the statute was preempted, it did recognize the

necessity for certain train operations:

> The ICCTA preempts state or local statutes that regulate rail transportation, which
> is defined broadly to include locomotives and equipment "related to the movement
> of passengers or property." 49 U.S.C. § 10102(9)(A); *Norfolk S. Ry. Co.*,
> 608 F.3d at 157. SB 135 directly regulates rail transportation by prohibiting
> locomotives from idling in certain places at certain times, in essence requiring that
> at night, in residential neighborhoods, they either shut down or keep moving (unless
> one of the exceptions in Chapter 85 of Delaware Code Title 21 applies). This is a
> regulation of rail transportation under the ICCTA, and Delaware's challenges to the
> Board's determination that SB 135 is categorically preempted by the ICCTA are
> unpersuasive.

859 F.3d 16, 21 (2017) (emphasis added); *See also Guckenberg v. Wis. Cent. Ltd.*, 178 F. Supp.

2d 954, 956 (E.D. Wis. 2001) (on a motion for summary judgment, finding nuisance claim for,

among other things, "idling locomotive diesel engines" that lasted "as long as several hours per

episode" preempted because it "*would* interfere directly with day-to-day railway operations" and

"seeks to proscribe activity undertaken by [railway] employees while conducting and facilitating

traffic on their side track"); *Norfolk S. Ry. Co. v. Goldthwaite*, 176 So.3d 1209, 1211–12 (Ala.

2015) (finding plaintiff's nuisance claims preempted by ICCTA where railroad presented evidence

explaining reasons for storing and idling trains on tracks of its choosing); *Jones v. Union Pac. R.R.

Co.*, 79 Cal. App. 4th 1053, 1060 (2000) ("If the tooting of train horns and idling of train engines

for long periods of time in front of plaintiffs' house was necessary to reduce congestion and operate

Union Pacific's railroad business safely and efficiently, then plaintiffs' claim is federally

preempted.").

Taken together, these cases establish a consistent and highly instructive principle that

courts repeatedly refuse to second-guess transportation operators' idling practices when those

practices are grounded in safety, logistics, or operational necessity. In the *Delaware v. Surface

Transportation Board* case, the D.C. Circuit court made clear that even a statute expressly targeting

only "nonessential" idling impermissibly intruded into railroad operations because it required regulators to dictate when locomotives must shut down or keep moving. 859 F.3d at 23–24. The court recognized that such determinations are inseparable from core transportation functions, which depend on real-time judgments about safety, scheduling, equipment performance, and network coordination. In other words, even when a law purports to carve out "essential" idling, courts understand that drawing that line requires precisely the type of operational decision-making that rests with the best judgment of the defendant transportation entity, not *post hoc* regulatory enforcement.

That same logic informs the decisions in *Guckenberg*, *Goldthwaite*, and *Jones*. In *Guckenberg*, the court rejected nuisance claims based on prolonged locomotive idling because such claims would "interfere directly with day-to-day railway operations" and sought to prohibit conduct undertaken by employees "while conducting and facilitating traffic." 178 F. Supp. 2d at 956. The court recognized that idling decisions are not arbitrary but arise from operational demands, such as traffic flow, staging, and equipment readiness. Similarly, in *Goldthwaite*, the Alabama Supreme Court credited the railroad's evidence explaining why trains were stored and idled at particular locations, holding that those decisions were operational in nature and therefore insulated from state-law interference. 176 So. 3d at 1211–12. And in *Jones*, the California Court of Appeal squarely held that if idling and horn use were necessary to operate the railroad "safely and efficiently," then state-law claims were preempted. 79 Cal. App. 4th at 1070. Each of these courts focused not on *how long* engines were running, but on *why* they were running underscoring that necessity, not duration, is the legally relevant inquiry.

Collectively, these cases demonstrate that labels like "nonessential" or "unnecessary" engine operation cannot be applied mechanically or in the abstract. Courts recognize that whether

idling is "necessary" or "unnecessary" depends on the specific operational context, including safety requirements, equipment functionality, traffic management, and employee responsibilities. As in *Delaware* and its progeny, CLF's effort to impose a rigid, time-based prohibition divorces the regulation from operational realities. By focusing solely on the duration of engine operations— while ignoring passenger activity, accessibility needs, safety system operations, or workplace conditions— CLF asks this Court to do exactly what other courts have refused to do: substitute abstract assumptions for the practical judgment of transportation professionals.

### III.   THE STATUTORY EXCEPTIONS OUTLINED IN THE MASSACHUSETTS SIP ARE ADVISORY, NOT EXHAUSTIVE.

CLF's interpretation of the Massachusetts SIP rests on the premise that once CLF proves engine operation in excess of five minutes, a violation is established unless Academy proves that the idling falls within one of the specifically enumerated regulatory exceptions. That premise misreads the structure of the Massachusetts SIP and collapses the operative statutory text into a *de facto* strict time limit. The regulation does not prohibit idling in excess of five minutes. It prohibits unnecessary operation of an engine in excess of five minutes. The enumerated exceptions therefore do not define the universe of lawful engine operation; they merely identify certain circumstances in which necessity is self-evident.

CLF contends that the specific exceptions enumerated in 310 CMR 7.11 must be read as exhaustive, impliedly relying on the canon *expressio unius est exclusio alterius* or, "expressing one item of [an] associated group or series excludes another left unmentioned.'" *N.L.R.B. v. SW General, Inc*., 580 U.S. 288, 302 (U.S. 2017) (internal citations omitted). That canon, however, is not mandatory and applies only in limited circumstances. According to the U.S. Supreme Court, "the *expressio unius* canon applies only when 'circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded.'" *Id.* at 302. A "notwithstanding" clause

does not naturally give rise to such an inference; it just shows which of two or more provisions prevails in the event of a conflict. "Such a clause confirms rather than constrains breadth." *Id*. Moreover, federal courts, including the First Circuit, have repeatedly emphasized that *expressio unius* is merely an interpretive aid that must yield when contrary legislative intent appears.

A. <u>*Expressio Unius* Must Yield Whenever a Contrary Intention of the Lawmaker is Apparent</u>.

According to the First Circuit, *expressio unius* "is only an aid in the ascertainment of the meaning of the law and must yield whenever a contrary intention on the part of the lawmaker is apparent." *U.S. v. Councilman*, 418 F.3d 67, 74 (1st Cir. 2005) (*quoting Springer v. Gov. of Philippine Islands*, 277 U.S. 189, 206 (1928)). The court further observed that the canon loses force where statutory provisions (1) use non-parallel language, (2) different provisions were enacted at different times, (3) legislative history reflects incremental drafting, or (4) Congress demonstrated elsewhere in the statute that it knew how to exclude categories explicitly, but chose not to do so. *Id*. at 82–83.

Those considerations apply here. Nothing in 310 CMR 7.11 suggests that the Massachusetts DEP intended to create a comprehensive catalog of every conceivable operational necessity. To the contrary, the regulation's operative prohibition turns on whether engine operation is "unnecessary," a flexible, fact-dependent standard that requires contextual evaluation of real-world bus operations. CLF's rigid position would effectively rewrite the regulation to prohibit all idling beyond five minutes except in three listed scenarios—an interpretation that finds no support in the text or real life.

B. <u>There Is No Exclusive Statutory Exhaustion Without an Associated Group or Series.</u>

The Supreme Court's decision in *Barnhart v. Peabody Coal Co*. provides further guidance on the issue of statutory construction and interpretation of non-exhaustive language. 537 U.S. 149

(2003). There, the Court explained that *expressio unius* applies only when the listed items form an "associated group or series" and when "in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference." *Id*. at 168. The Court rejected application of the canon to a statutory construction because the respondents failed to show any reason that Congress would have considered the omitted category "to go hand in hand" with the listed ones. *Id*. Instead, the Court concluded that "since Congress apparently never thought" about the omitted scenario, "the better inference is that what we face here is nothing more than a case unprovided for." *Id*.

When considering the CMR at issue in this case, there is no basis to conclude that the regulatory exceptions cited by CLF form a cohesive associated group meant to encompass every legitimate operational need. Rather, they address discrete, anticipated scenarios. The regulation leaves all other situations to be evaluated under the governing standard—whether the engine operation was unnecessary. Academy's operational circumstances fall squarely within the category *Barnhart* describes: circumstances not specifically enumerated, but not thereby excluded.

C. <u>A Rigid Reading of the Massachusetts SIP Would Produce Impractical and Counterproductive Results.</u>

A rigid reading of the Massachusetts SIP would also produce irrational and counterproductive results that defy the intent of the Clean Air Act and the logic of those interpreting it. The Supreme Court has cautioned that courts must avoid statutory interpretations that "compel an odd result" and must search for other evidence of legislative intent when such results would follow. *See Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454 (1989). This consideration applies where literal application would defeat statutory purpose.

Here, CLF's interpretation would treat large categories of routine, safety-driven, and mechanically required engine operation as *per se* unlawful solely because they are not enumerated.

That approach would elevate form over function and convert a contextual prohibition ("unnecessary" operation) into a blunt time-based ban that the regulation does not contain.

   D.  The Purpose and Function of the Statute Confirm That the SIP's Exceptions Are Not Exhaustive.

Statutory purpose and context further confirm that the exception list cannot be exhaustive. As the Supreme Court has recognized, statutes "are not inert exercises in literary composition, but instruments of government," and "a statute's meaning is inextricably intertwined with its purpose." *United States v. Shirey*, 359 U.S. 255, 260 (1959). The purpose of the Massachusetts SIP is to reduce unnecessary emissions, not to prohibit necessary engine operations integral to safe and functional transportation.

CLF may argue that where exceptions are enumerated, additional ones should not be implied. But those cases expressly condition that principle on the absence of contrary legislative intent. The Massachusetts SIP supplies contrary intent by employing the flexible standard "unnecessary," by omitting exclusivity language such as "only" or "solely," and by structuring the rule around a qualitative judgment rather than a categorical ban. In sum, under *Barnhart*, *Councilman*, and settled principles of statutory interpretation, *expressio unius* cannot be applied mechanically to foreclose legitimate operational necessities not expressly listed. The regulation's text, purpose, and structure compel a non-exhaustive reading—one that preserves the prohibition on unnecessary idling while rejecting CLF's attempt to transform the SIP into a strict five-minute rule.

   E.  Analogous Anti Idling Regulation Distinguishes Common Sense, Necessary Idling.

The regulatory record for an analogous federal anti-idling rule illustrates the key point this Court flagged during opening statements, which is that idling restrictions should be applied with "common sense" operational flexibility, as the final regulatory text cannot account for all complex,

relevant real-world scenarios. One analogy that may be helpful to this Court is a regulation promulgated under the Mine Safety and Health Administration Act ("MSHA"), 30 C.F.R. § 75.1916, which addresses "Operation of diesel-powered equipment" and includes an anti-idling directive that is structured around operational necessity. The regulation provides, in relevant part: "Except as required in normal mining operations, mobile diesel-powered equipment shall not be idled." 30 C.F.R. § 75.1916.

Standing alone, that regulatory language could be read rigidly, because it uses a general prohibition followed by a single operational carve-out ("except as required in normal mining operations"). But the accompanying materials referenced in the *proposed* rule show that the drafters expressly understood that "there are some circumstances in which idling is necessary," and the proposed rule therefore "would permit idling in connection with 'normal mining operations.'" The drafters of the proposed rule recognized:

> **However, there are some circumstances in which idling is necessary**. The proposal would permit idling in connection with "normal mining operations". In the proposal, MSHA does not attempt to define this term, and would intend this rule to be administered with reference to **commonly understood practices** of what is **necessary** idling. For example**, idling while waiting for a load to be unhooked, or waiting in line to pick up a load, is normally part of the job**; idling while eating lunch is normally not part of the job. But **if the idling is necessary due to the very cold weather conditions, it should not be barred**. On the other hand, idling should not be permitted in other weather conditions just to keep balky older engines running; in such cases, the correct approach is better maintenance. **MSHA recognizes that to administer this provision in a commonsense manner may require the provision of examples to both MSHA inspectors and to the mining community**; accordingly, the Agency welcomes specific examples of circumstances where idling should and should not be permitted. The Agency recently implemented a similar provision for the underground coal mining sector, and MSHA will consider the experience gained under that rule in formulating a final diesel particulate rule and compliance guide.

*See* Diesel Particulate Matter Exposure of Underground Metal and Nonmetal Miners; Proposed Rule, 30 CFR Part 57, https://www.govinfo.gov/content/pkg/FR-1998-10-29/html/98-28277.htm (emphasis added).

The drafting history of this regulation is important for two reasons. First, it demonstrates that regulators frequently choose flexible operational standards (terms like "normal operations") because to enumerate every permissible idling circumstance is neither realistic nor desirable in safety-sensitive environments. Second, it shows that the apparent breadth of the final, streamlined language is not an accident; it is a deliberate choice to preserve operator discretion and common-sense line-drawing where safety and operations require it. Stated differently, the regulation should be viewed holistically with the intent and considerations of the drafters in mind.

The same interpretive logic applies here. The Massachusetts SIP is not written as a list of exhaustive, narrow exceptions, but as a functional prohibition against "unnecessary" engine operation—a standard that must take account of the operational context. The regulatory purpose of the Massachusetts SIP is to prohibit gratuitous idling while preserving the operational judgment needed to run equipment safely and effectively.

## IV.    The MassDEP FAQ Supports a Context-Driven Interpretation of "Unnecessary" Engine Operation

CLF relies heavily on selected language from the Massachusetts Department of Environmental Protection ("MassDEP") Frequently Asked Questions ("FAQ") (Trial Exhibit 44) to argue that Academy's engine operation violates 310 CMR 7.11. Properly understood, the MassDEP guidance supports Academy's position that the regulation requires a fact-specific, common-sense assessment of necessity.

CLF is misguided in its assertion that the "Massachusetts FAQ" guidance forecloses any justification for engine operation beyond "five to ten minutes on all but the coldest days." Trial Tr.

Day One (January 12, 2026) at 13:94–99. CLF contrasted this with Academy's position that interior temperature and driver safety justify engine operation, arguing that Academy's interpretation "would swallow the rule." *Id*. at 13:63–64.

But CLF mischaracterizes the purpose and structure of the MassDEP FAQ. MassDEP's guidance expressly recognizes that engine operation may be necessary in a range of real-world circumstances, including to operate defrosters, remove snow and ice, and warm the windshield and interior of the vehicle. <u>Notably and most significantly, MassDEP cites these examples as instances of necessary idling that are separate and apart from the listed exceptions in the Massachusetts SIP</u>. The FAQ further acknowledges that "some heavy vehicles… may need some additional time" to reach a safe interior temperature. *Id*. Far from imposing rigid time limits, the agency instructs drivers to use "common sense" when assessing whether continued engine operation is necessary. *Id*.

This guidance mirrors the regulatory text itself. The regulation does not prohibit idling; it prohibits "unnecessary" engine operation. 310 CMR 7.11. The FAQ does not purport to replace that standard with a bright-line rule. Instead, it provides examples of when engine operation may or may not be necessary, leaving ultimate determinations to common sense judgment.

CLF's attempt to convert this flexible guidance into a strict temporal rule contradicts both the text and the agency's intent. The FAQ ***does not*** state that engines must be shut off after five or ten minutes regardless of circumstances. Nor does it account for the operational realities of commercial transit, including passenger boarding, accessibility equipment, HVAC demands, or workplace safety obligations. The agency's acknowledgment that heavy vehicles may require additional time further undermines CLF's absolutist reading. In sum, MassDEP's own guidance confirms that necessity is contextual and that continued engine operation may be justified by

safety, operational, and weather-related considerations. Conversely, the MassDEP FAQ does not support CLF's theory of per se illegality. Compliance with 310 CMR 7.11 depends on **why** an engine is running, not merely how long it has been running.

### V.    IDLING IS NECESSARY TO COMPLY WITH FEDERAL SAFETY AND ENVIRONMENTAL STANDARDS

A. Bus Idling is Necessary for Compliance with DOT Regulations Implementing the Americans with Disabilities Act.

The Americans with Disabilities Act establishes mandatory accessibility standards for public transportation that govern Academy's bus conditions and operations. Under 42 U.S.C. § 12132, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 USCA § 12132. DOT Rule 49 CFR Part § 37.161 confirms that this ADA requirement of accessibility applies to private buses as well as public transit: "Public and private entities providing transportation services shall maintain in operative condition those features of facilities and vehicles that are required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities." *Id.* Specifically, 49 CFR § 37.161 requires:

> (a) Public and private entities providing transportation services shall maintain in operative condition those features of facilities and vehicles that are required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities. These features include, but are not limited to, lifts and other means of access to vehicles, securement devices, elevators, signage and systems to facilitate communications with persons with impaired vision or hearing.

> (b) Accessibility features shall be repaired promptly if they are damaged or out of order. When an accessibility feature is out of order, the entity shall take reasonable steps to accommodate individuals with disabilities who would otherwise use the feature.

> (c) This section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs.

49 CFR § 37.161. Not only is Academy legally required to comply with the ADA regulation, but it also actually maintains a formal ADA Complaint Policy to investigate and resolve issues related to the regulations.[1]

In a similar vein, 49 CFR 37.201 § 37.201 is a federal DOT regulation that governs intermediate and rest stops for over-the-road buses (OTRBs) to ensure accessibility for passengers with disabilities. It requires, among other things, that:

> (a) Until 100 percent of the fleet of a large or small operator uses to provide fixed-route service is composed of accessible OTRBs, the operator shall meet the following interim service requirements:
>
>> (1) Beginning one year from the date on which the requirements of this subpart begin to apply to the operator, it shall ensure that any individual with a disability that requests service in an accessible OTRB receives such service.
>>
>>> (i) The operator may require up to 48 hours' advance notice to provide this service.
>>> (ii) If the individual with a disability does not provide the advance notice the operator requires, the operator shall nevertheless provide the service if it can do so by making a reasonable effort.

Thus, as a private entity that operates over-the-road buses (OTRBs)[2], Academy must follow these federal accessibility regulations, and it does. For example, Academy states that passengers with disabilities must be allowed to leave and return to the bus at any scheduled stop on the same basis as other passengers.[3] For trips of 3 hours or longer where the onboard restroom is inaccessible to a passenger's disability, Academy allows passengers to request an unscheduled rest stop and must make a "good faith effort" to accommodate.[4]

---

[1] Academy Bus ADA Complaint Policy (on file with Academy Bus, ADA Complaint Policy), available at https://academybus.com/uploads/pdfs/ADA%20Complaint%20Policy.pdf.
[2] Over the road buses are motorcoaches with an elevated passenger deck over a baggage compartment, governed by strict ADA rules for accessibility and requiring operators to provide service for passengers with disabilities.
[3] Academy Bus ADA Complaint Policy (on file with Academy Bus, ADA Complaint Policy), available at https://academybus.com/uploads/pdfs/ADA%20Complaint%20Policy.pdf.
[4] *Id.*

B. Idling is Necessary to Comply with EPA Required Regeneration of Diesel Particulate Filters.

The Clean Air Act provides EPA with comprehensive authority to regulate heavy-duty vehicle emissions, including the power to require specific aftertreatment technologies like regeneration systems. Under 42 U.S.C. § 7521(a)(1), the Administrator has broad authority to prescribe standards applicable to emissions of any air pollutant from any class of new motor vehicles that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 USCA § 7521.

Federal law independently constrains Academy's operational decisions through the Clean Air Act's anti-tampering provisions, which make it unlawful for vehicle operators to disable, bypass, or interfere with federally required emissions-control systems. Section 203(a)(3) of the Clean Air Act provides that "no person shall remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter," and further prohibits the use of any "defeat device" designed to circumvent emissions controls. 42 U.S.C. § 7522(a)(3). This prohibition applies not only to manufacturers and repair shops, but also to fleet operators who knowingly operate vehicles in a manner that disables or defeats certified emissions systems. For heavy-duty vehicles manufactured during or after model year 1983, the statute requires that regulations "contain standards which reflect the greatest degree of emission reduction achievable through the application of technology which the Administrator determines will be available for the model year to which such standards apply."[5]

---

[5] Federal Courts have upheld EPA's technology-forcing standards for particulate matter reduction. Specifically, the D.C. Circuit has recognized that EPA is authorized to adopt technology-forcing regulations for emission control. *See e.g.* *Wilder v. Thomas*, 854 F.2d 605, 614 (2d Cir. 1988) (*referencing Council of Commuter Orgs. v. EPA*, 683 F.2d 66,670 (D.C. Cir. 1982)). The Court explained that EPA's regulatory framework establishes comprehensive requirements for heavy-duty vehicles, including trucks and buses, and that the agency has authority to mandate specific emission control technologies when necessary to achieve required emission reductions.

The regulation establishes specific malfunction criteria that engines must monitor, including diesel particulate filters ("DPF") regeneration frequency and incomplete regeneration events. DPF is considered an effective method to control particulate matter (PM) emissions from diesel engines, which is included in the mandatory installation list by more and more national/regional laws and regulations, such as CHINA VI, Euro VI, and EPA Tier3.[6] Modern diesel engines equipped with DPFs require periodic regeneration cycles to burn accumulated soot and prevent filter clogging — a process that federal emissions regulations mandate to preserve the certified emissions design. There are three main types of DPF regeneration: passive, which happens naturally at high exhaust temperatures during normal driving; **active**, an ECU-controlled process using extra fuel to raise temperatures when soot levels rise; and **forced regeneration**, a manual process initiated by a mechanic with a scan tool when the filter is heavily clogged.[7]

While passive regeneration happens frequently in long-haul trucking (because it requires continuous driving where the DPF can hit high enough temperature to turn soot to ash) active and passive regeneration **both require the engine to be on**.[8] Buses that drive local routes and rarely maintain typical highway speeds for extended periods rarely meet the conditions for passive regeneration. In these instances, an active regeneration occurs. Rather than naturally occurring when the DPF reaches the highest temperature on its own, the engine undergoes a process to increase exhaust heat that generates the temperatures needed to oxidize particulate matter. The bus engine must be on for the entire active regeneration process.[9]

---

[6] *See* Zhang Z, Dong R, Lan G, Yuan T, Tan D. *Diesel Particulate Filter Regeneration Mechanism Of Modern Automobile Engines and Methods of Reducing PM Emissions: a review*. Environ Sci Pollut Res Int. 2023, https://pmc.ncbi.nlm.nih.gov/articles/PMC9905014/.
[7] *Id.*
[8] Hot Shot's Secret, *The Science Behind Reducing DPF Regens*, Fleet Equipment Magazine (July 18, 2024), https://www.fleetequipmentmag.com/the-science-behind-reducing-dpf-regens/.
[9] *Id.*

The third type of regeneration, forced regeneration, occurs once a DPF is clogged, and requires action from the driver or mechanic to complete.[10] Often, blocked diesel particular filters are caused by short journeys at low speeds. Vehicles operating at low speeds on short journeys—such as Academy buses—are unable to meet the requirements for the filter to clean itself.[11] Therefore, when operating conditions do not allow for DPF cleaning by active or passive regeneration, the vehicle will require operator-activated parked regeneration, which occurs when the engine is idling. A DPF filter that is too full or not properly functional threatens the environment, as well as the health of the vehicle. When regeneration does not occur, it causes more emissions pollution and can leave buses undriveable. Accordingly, when Academy idles a bus to complete a forced regeneration cycle, it is not engaging in discretionary behavior, it is complying with federal law. A rigid interpretation of the Massachusetts SIP that penalizes such conduct would effectively require carriers to choose between state idling restrictions and federal emissions law. The statutory term "unnecessary" must therefore be interpreted in harmony with the Clean Air Act: idling required to maintain emissions controls is, by definition, necessary. Any contrary reading would place operators in an untenable regulatory bind and undermine the very environmental protections the Massachusetts SIP is designed to advance.

C. Idling is Necessary to Comply with OSHA Health and Safety Regulations.

The Occupational Safety and Health Administration ("OSHA") and the Department of Transportation ("DOT") regulate different aspects of transportation safety. Their jurisdictions are complementary, not mutually exclusive. DOT primarily governs vehicle operation and roadway safety, including driver qualifications, hours-of-service rules, and equipment standards applicable while vehicles are in transit. OSHA, by contrast, regulates workplace safety and health conditions

---

[10] *Id.*
[11] *Id.*

for employees while they are performing their job duties. For example, according to OSHA, "The Department of Transportation only preempts OSHA over the interstate trucking industry while traveling public roads with respect to the hazards addressed by FMCSA regulations. OSHA also has authority over all intrastate trucking (such as gravel and sand haulers, logging, agriculture, and cement and concrete mixers)."[12]  These regimes coexist, with OSHA retaining authority over working conditions that are not specifically preempted by DOT regulations. Consequently, when Academy's buses are stopped—whether at terminals, stations, or curbside locations—the regulatory framework shifts from overseeing vehicular movement to workplace conditions. At that point, the bus is no longer functioning solely as an instrument of transportation but as a fixed worksite where drivers remain on duty, interact with passengers, monitor equipment, and perform required operational tasks. OSHA therefore applies to the conditions inside the bus, including temperature, ventilation, visibility, and general safety when the buses are stationary.

        i.       Relevant OSHA Regulations

The purpose of OSHA is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions" through measures designed to reduce occupational safety and health hazards. See 29 USCA § 651. The primary federal workplace safety obligation is established by the General Duty Clause of OSHA, which requires that "each employer shall furnish to each of his employees' employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." *See* 29 USCA § 654. OSHA contemplates that the Secretary will promulgate specific safety standards to ensure safe and healthful working conditions. *See generally Bristol Steel & Iron Works v. OSHRC*, 601 F.2d 717, 721 (4th Cir. 1979). The general duty clause

---

[12] *Trucking Industry: Highway Driving*, Occupational Safety & Health Admin. (U.S. Dep't of Labor), https://www.osha.gov/trucking-industry/highway-driving (last visited Jan. 27, 2026).

applies when there are no specific standards. *Id.*; *see also Anning-Johnson v. OSHRC*, 516 F.2d 1081, 1086 (7th Cir. 1975).

OSHA does not contain an explicit definition of "workplace" or "place of employment" in its definitional section, 29 U.S.C. § 652. The Act instead references "places of employment" in the context of occupational safety and health standards, which are defined as those "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." *Id.* For the purposes of reporting occupational injuries and illness, OSHA defines a work environment as "the establishment and other locations where one or more employees are present as a condition of their employment. The work environment includes not only physical locations, but also equipment or materials used by the employee during the course of his or her work." *See* OSHA § 1904.5(b)(1) (emphasis added).

ii.    What is A "Workplace" Under OSHA?

OSHA is "remedial and should be construed liberally." *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13, (1980). Federal courts have recognized that the "**Secretary should be able to extend the Act's coverage to certain employer provided means of transportation…even though such extension exceeds the plain language of the statute**." *Frank Diehl Farms v. Sec'y of Lab.*, 696 F.2d 1325, 1332 (11th Cir. 1983) (emphasis added). In order for OSHA to be properly extended to a particular area, "the conditions to be regulated must fairly be considered working conditions, the safety and health hazards to be remedied occupational, and the injuries to be avoided work-related. The safety of the place where the employee has to be in order to work was central to Congress' concern." *Id.* at 1332.

Courts have consistently applied a functional test to determine whether a location constitutes a workplace under OSHA. The inquiry focuses on whether employees perform assigned

duties at the location and whether the employer exercises control over working conditions there. In *Frank Diehl Farms v. Secretary of Labor*, 696 F.2d 1325, 1333 (11th Cir. 1983), the Eleventh Circuit articulated the "condition of employment" test: "We find, therefore, that the condition of employment test previously used by OSHA is the essential bridge that links the residence to the workplace for the purpose of jurisdiction under the Act"). The court held that "in order for coverage under the Act to be properly extended to a particular area, the conditions to be regulated must fairly be considered working conditions, the safety and health hazards to be remedied occupational, and the injuries to be avoided work-related." 696 F.2d 1325 at 1332.

In the case of *Chao v. Mallard Bay Drilling, Inc*., the Supreme Court held that an oil and gas exploration barge anchored in state waters qualified as a workplace because the employees performed their work on the vessel and it was located within a state for purposes of OSHA jurisdiction. 534 U.S. 235 (2002). In *Chao*, the Supreme Court emphasized that OSHA coverage does not depend on whether a site is permanent or stationary, explaining that "[n]othing in the text" of the statute attaches significance to the physical nature of the worksite. *Id*. at 242. Applying that principle here, the fact that Academy's buses are not fixed office buildings or limited to one terminal does not remove them from properly qualifying as a "workplace" under OSHA.

That functional approach has been echoed by lower courts which have explicitly recognized vehicles as workplaces. In *Banovetz v. King*, the court recognized that a workplace may include "any factory, plant, foundry, construction site, farm, workplace, premises, **vehicle** or any other work environment where any employee is during the course of employment." 66 F. Supp. 2d 1076, 1082 (D. Minn. 1999) (emphasis added). This reasoning reflects a widely accepted principle that vehicles used for work are workplaces when employees perform job duties inside them.

iii.    Academy Buses Qualify as a "Workplace" Under OSHA

Under this framework, Academy's buses plainly qualify as workplaces. Drivers remain on duty, control the environment, interact with passengers, operate accessibility equipment, perform safety checks, and respond to weather conditions. The employer exercises control over these conditions through training, policies, and operational requirements. The bus therefore meets every element of a workplace under OSHA's functional test and regulatory definition: it is a location where employees perform assigned duties under the employer's control. *See Anthony Crane Rental, Inc. v. Reich*, 70 F.3d 1298, 1303 (D.C.Cir.1995) (holding that a place where an employee works is a place of employment for the purposes of the act); Cf. *Baroid Div. of NL Indus., Inc., v. Occupational Safety & Health Review Comm'n*, 660 F.2d 439, 445–46 (10th Cir.1981) (affirming a citation where employee was working at a third party's workplace).

The case of *Safeway, Inc. v. Occupational Safety & Health Review Comm'n*, 382 F.3d 1189 (10th Cir. 2004) further supports this conclusion. In *Safeway*, the defendant argued that an outdoor barbecue was a voluntary employee function and not a condition of employment and, therefore, not subject to OSHA regulations as a "workplace." The Court disagreed, concluding that Safeway's argument "ignores the factual context of this case." 382 F.3d at 1193. It found that, "Safeway does not dispute that Lewis was 'working' when he was instructed to assure the grill was functioning properly for the barbecue. Lewis was at Safeway's facility for work and was instructed by his superior to attend the grill. Those facts are sufficient to support the applicability of the Act." *Id*. at 1194.  In contrast, the Court in *Reich v. Simpson, Gumpertz & Heger, Inc*., 3 F.3d 1 (1993) held that a construction site was not a "place of employment" subject to OSHA duties where the employer's "employees were not on the job site on a daily or even weekly basis" and the employer "did not have an office or a trailer on the site." *Id*. at 5. Thus, OSHA workplace

coverage depends on factors such as regular employee presence and employer control over the work environment.

## VI.    BUS IDLING IS NECESSARY TO COMPLY WITH MASSACHUSETTS SAFETY REGULATIONS

According to Massachusetts Part I, Title XXI, Chapter 149 § 113:

> Every factory, workshop, manufacturing, mechanical and mercantile establishment, railroad freight house, railway terminal, public garages and premises used by express, trucking and transportation companies and any other building in which a person is employed, other than a building under construction, shall be well lighted, well-ventilated and kept free from unsanitary conditions, and work rooms therein in actual use shall be properly heated during the period from October fifteenth to May fifteenth, according to reasonable rules and regulations adopted by the attorney general establishing minimum requirements with reference thereto; provided, however, that the provisions of this section shall not apply to such rooms which are under the supervision of the department of public health and are subject to the provisions of section seventy-three A of chapter ninety-four. Upon determination by the attorney general that any work room in actual use is not properly heated according to rules and regulations adopted by the attorney general, the attorney general may seek a cease-and-desist order in the superior court in the county where the workroom is located.

Massachusetts law reflects a general policy that workplaces must be maintained in a manner that protects employee health and safety. *See* Mass. Gen. Laws ch. 149, § 113. While that statute does not speak specifically to motor vehicles, it underscores the Commonwealth's broader expectation that transportation spaces in which employees work be reasonably lighted, ventilated, and properly heated during colder months. In cold and inclement conditions, Academy's buses function as mobile workspaces for drivers and enclosed environments for embarking and alighting passengers. Consistent with these principles, limited engine operation may be necessary at times to power onboard HVAC systems that provide heat, ventilation, and defrosting, thereby helping to maintain safe temperatures, prevent visibility hazards caused by fogged or iced windows, and promote acceptable air quality within the cabin. Viewed in this operational context, Academy's

31

intermittent idling practices are best understood as measures undertaken to support driver safety and passenger welfare, rather than as gratuitous or purposeless engine operation.

### VII.    CLF'S INTERPRETATION OF THE MASSACHUSETTS SIP, IF ENFORCED, WOULD CAUSE MORE POLLUTION, NOT LESS.

A. Buses Produce Far Less Emissions Per Passenger than Private Passenger Vehicles.

Contrary to what CLF may claim, the bus industry helps to improve the environment and air quality by removing passenger cars from the road, producing far fewer emissions per passenger than private vehicles. According to the Massachusetts Department of Environmental Protection Agency, "more than 60% of transportation-related emissions come from gasoline-powered private passenger vehicles."[13] The Massachusetts DEP recognizes that, "even though there are a number of cleaner and more economical alternatives – from riding buses, trains, and ferries to carpooling and ridesharing – many Bay Staters still choose to drive to and from work or school alone. This can add up to traffic gridlock, longer commutes, and unnecessary air pollution."[14]  According to the U.S. Department of Energy, personal vehicles generate around 30 million tons of $CO_2$ per year just by idling. Eliminating unnecessary idling of personal vehicles would be equivalent to taking five (5) million vehicles off the roads.[15] Buses present a more environmentally friendly transportation option over other common alternatives, particularly in urban areas.

In December 2023, the American Bus Association Foundation ("ABAF") commissioned the ABA Foundation Report ("the ABAF Report") to "evaluate the environmental performance of motorcoach operations by comparing the energy use and amount of pollutants emitted during

---

[13] See Mass. Exec. Office of Energy & Env. & Mass. Dep't of Env. Prot., *Transportation & Air Quality*, Mass.gov (Jan. 10, 2026), <<https://www.mass.gov/guides/transportation-air-quality.
[14] Id.
[15] See U.S. Dep't of Energy, "Idling Reduction for Personal Vehicles"; https://afdc.energy.gov/files/u/publication/idling_personal_vehicles.pdf (last accessed January 15, 2026).

motorcoach operations to the use and emissions of other transportation modes."[16] The ABAF Report confirms that transit buses provide significant environmental advantages over passenger vehicles when emissions are evaluated on a per-passenger basis. Using nationally aggregated data, the study measures emissions in "grams per passenger mile," which directly accounts for how many people a vehicle actually transports. According to Table 1,[17] a transit bus averages 547.3 grams of $CO_2$ per passenger mile, while a single-occupancy passenger car averages 406.1 grams and a ride-hail vehicle (TNC) averages 477.8 grams.[18]

Although a transit bus emits more $CO_2$ per passenger mile than a single private car trip in isolation, the report explains that this metric is highly sensitive to passenger load. The study emphasizes that emissions from private vehicles increase dramatically when vehicles are under-occupied, noting that ride-hail services generate only "0.95 passenger miles per vehicle mile driven," meaning vehicles spend significant time driving empty.[19] Transit buses, by contrast, are designed to move large numbers of passengers simultaneously, which inherently displaces multiple single-occupancy vehicles from the roadway. As the report explains, the transportation sector is the "largest contributor to total $CO_2$ emissions in the United States," and reducing the number of individual vehicles on the road is therefore a critical environmental objective.[20] Transit buses directly advance that goal by consolidating trips that would otherwise be taken in separate vehicles.

The ABAF Report also demonstrates that transit buses offer important air-quality benefits when compared to passenger vehicles, particularly with respect to harmful pollutants such as

---

[16] *See* ABA Foundation Report at 1, available at https://www.buses.org/wp-content/uploads/2025/10/Energy-Use-and-Emissions_2023-Updated-Findings_ABA.pdf.
[17] *Id*. at 8.
[18] *Id.* at 16.
[19] *Id.*
[20] *Id*. at 18.

nitrogen oxides (NOx) and particulate matter (PM). Using EPA's MOVES emissions model, the study shows that a 2017 model-year transit bus emits only 87.79 grams of NOx per 1,000 passenger miles, compared to 101.61 grams for ride-hail vehicles and 44.61 grams for new passenger cars.[21] While newer gasoline vehicles have lower NOx rates, the report emphasizes that transit buses displace numerous individual car trips, which in aggregate would produce far greater total pollution. The report further explains that both NOx and PM are pollutants "of most significant concern" because they contribute to smog formation and are linked to "respiratory and cardiac disease" and "premature mortality."[22] Transit buses reduce overall pollution exposure by reducing vehicle miles traveled across an entire corridor, particularly in dense urban areas where they replace dozens of private cars during peak commuting hours. In short, the data show that transit buses serve a critical environmental function by moving large numbers of passengers efficiently, reducing congestion, and mitigating the cumulative emissions that would otherwise result from widespread reliance on single-occupancy vehicles.

Relevant consideration of this cost analysis appears in *South Terminal Corp. v. E.P.A.*, where the First Circuit considered these cost-benefit factors in reviewing EPA's Metropolitan Boston Air Quality Transportation Control Plan. The court recognized that EPA guidelines encourage states to identify the 'costs and benefits' of alternative control strategies. 504 F.2d 646, 676 (1974). EPA determined that "carbon monoxide emissions came almost entirely from motor vehicle sources and that most hydrocarbons which make up photochemical oxidants came from the same source." *South Terminal Corp. v. E.P.A.*, 504 F.2d 646, 656 (1974). The Administrator outlined "a policy also supported by the Governor of Massachusetts 'to discourage continued heavy reliance on the automobile' in favor of 'less-polluting modes of transit.' 504 F.2d at 656.

---

[21] *Id*. Table 1.2, at 18.
[22] *Id*. at 13.

EPA's strategy involved cutting down emissions by discouraging the use of private passenger vehicles through parking restrictions and promoting "special bus and carpool lanes." *Id.* at 655. The court found this approach legally supportable because "the plentiful existence of parking facilities creates an incentive to choose motor vehicles; by destroying this incentive, EPA weights the choice more heavily in favor of less polluting transit." *Id.*

Courts have also recognized that State Implementation Plans may lawfully incorporate transportation control measures designed to promote mass transit and reduce reliance on private automobiles. In *Council of Commuter Organizations v. Metropolitan Transportation Authority,* the Second Circuit confirmed that "mass transit improvement measures" are proper components of a SIP and are enforceable under the Clean Air Act when duly adopted. 683 F.2d 663, 666 at n.2 (2d Cir.1982) (the court upheld EPA's flexible approach to approving state plans and emphasized that the Clean Air Act's goal is to cut pollution by supporting better mass transit—not by imposing burdens that would push commuters into more polluting options).

Academy also directs this Court's attention to the EPA's Transportation Control Measures guidance which confirms that State Implementation Plans are designed to reduce transportation-related pollution by changing travel behavior—specifically by decreasing reliance on private automobiles and encouraging cleaner alternatives. EPA expressly defines transportation control measures as strategies that "reduce vehicle miles traveled" and "improv[e] roadway operations,"[23] including through "less-polluting transportation alternatives, such as public transit."[24] This guidance reflects a deliberate regulatory choice: reducing emissions should be accomplished not

---

[23] U.S. EPA, Transportation Control Measures, EPA (Nov. 6, 2025), https://www.epa.gov/statelocalenergy/transportation-control-measures; *see also* U.S. EPA, Guidance on Control Strategies for State and Local Agencies (Sept. 1990) (describing criteria for incorporating TCMs into a SIP).
[24] *Id.*

by restricting mass transit, but by expanding and incentivizing it as a cleaner substitute for private car use.

## VIII.   CIVIL PENALTY FRAMEWORK AND FACTOR-BY-FACTOR ANALYSIS

When calculating civil penalties for violations of the Clean Air Act, courts must consider seven enumerated factors—(1) the size of the business; (2) the economic impact of the penalty on the business; (3) the violators' full compliance history and good faith efforts to comply; (4) the duration of the violation as established by any credible evidence; (5) payment by the violator of penalties previously assessed for the same violation; (6) the economic benefit of noncompliance; and (7) the seriousness of the violation – as well as other factors as "justice may require." 42 U.S.C. § 7413(e)(1).[25]

Despite CLF's request that this Court implement the "maximum penalty" against Academy, courts have used a "bottom up" approach to penalty calculations wherein the economic benefit of a violator gained by noncompliance is first established and then adjusted upwards or downwards based on the enumerated statutory considerations. *See Pound v. Airosol Co. Inc*., 498 F.3d 1089, 1095 (10th Cir. 2007). As explained below, relevant decisions applying the Clean Air and Clean Water Act penalties call for a holistic, measured approach to calculating civil penalties.

A.   Economic Benefit of Noncompliance.

Economic benefit of noncompliance is the financial benefit obtained by "delaying capital expenditures and maintenance costs on pollution-control equipment*." U.S. ex. rel. Adm'r of E.P.A.*

---

[25] Because case law addressing penalty calculations under the Clean Air Act is relatively limited, courts have previously looked to the enumerated factors listed in the Clean Water Act to supplement their calculations. *See generally U.S. Midwest Suspension and Brake*, 824 F. Supp. 713 (E.D. Much. 1993), aff'd, 49 F.3d 1197 (6th Cir. 1995) (accepting lower court's use of penalty calculations based on the Clean Water Act under Sixth Circuit holding that the Clean Air Act and Clean Water Act are in *pari materia* with one another).[25] The Clean Water Act factors— seriousness of the violations, economic benefit, degree of culpability, history of prior violations, other penalties, economic impact of the penalty on the violator, and other matters as justice may require—mirror those in the Clean Air Act and confirm that penalty determinations are holistic rather than mechanical.

*v. CITGO Petroleum Corp.*, 723 F.3d 547, 552 (5th Cir. 2013). Courts repeatedly emphasize that this factor is one of the most critical when calculating civil penalties because it reflects what a defendant "receives from noncompliance—arguably the most important factor—[and] is of key importance if the penalties are to successfully … deter violations." *Envtl. Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 321 (5th Cir. 2024).

In *ExxonMobil*, the Court considered the fact that the "district court valued Exxon's benefit of noncompliance at more than fourteen million dollars ($11,746,234 at the time of Plaintiffs' expert report plus $61,066 per month after that) because Exxon delayed implementation of four emission-reducing projects mandated by a 2012 agreement between Exxon and state regulators. *Id*. at 345. The court reasoned that Plaintiffs demonstrated that the four improvement projects were "'necessary to correct the violations at issue in this suit'" and therefore affirmed the lower court's analysis of Exxon's economic benefit of noncompliance with the SIP. *Id*. at 346. Significantly, ExxonMobil did not dispute its ability to pay significant civil penalties, so the Court reasoned it would be able to withstand significant civil penalties as a future deterrent.

Conversely CLF has not shown, because it cannot show, that Academy obtained any economic benefit of the type contemplated by *CITGO* or *ExxonMobil*. There is no evidence that Academy delayed or avoided installing pollution-control equipment, deferred capital upgrades, or saved money by bypassing maintenance obligations. To the contrary, unnecessary idling is economically detrimental to Academy. Prolonged engine operation consumes fuel, accelerates engine wear, increases maintenance intervals, and shortens component life. Far from generating savings, unnecessary idling increases operating costs. The absence of any avoided capital expenditure or deferred maintenance means the economic-benefit starting point under a bottom-

up analysis is minimal or zero. That fact alone weighs strongly against any substantial civil penalty, much less a maximum one.

B.  Size of Business and Economic Impact of the Penalty

Penalties must be proportionate to a defendant's resources. Courts explicitly recognize that large multinational companies may bear higher penalties than small entities without threatening viability. *See e.g. Environment Texas Citizen Lobby, Inc. v. ExxonMobil Corp*. In the case of *United States v. Anthony Dell'Aquilla, Enters. & Subsidiaries*, 150 F.3d 329 (3d Cir. 1998), the US Court of Appeals determined that the District court abused its discretion in setting a fine under the Clean Air Act for violations by the Defendant without considering its financial condition. Specifically, the court failed to account for the developer's bankruptcy, as well as financial records demonstrating the company's inability to pay the fine of $2,975,000 imposed by the court.

Even assuming CLF's approach of beginning with the statutory maximum is correct, this Court can and should significantly reduce any awarded penalties as justice so requires. In *U.S. v. Midwest Suspension & Brake*, 824 F. Supp. 713 (E.D. Mich. 1993), aff'd, 49 F.3d 1197 (6th Cir. 1995), the court determined the penalty evidence presented weighed in favor of significantly reducing the statutory penalty under the Clean Air Act. The court concluded that the economic impact of the penalty on the defendant's business warranted a substantial reduction from the maximum statutory amount. Although the government's witness testified that the defendant could withstand a penalty exceeding $600,000, the court closely reviewed the company's financial records. 824 F. Supp. 713, 724. It considered evidence showing that the defendant had used only $1.85 million of its $2.5 million credit line, had increased its accounts receivable by approximately $334,000 from the previous year with only $36,000 deemed uncollectible, and had earned gross income of $10.819 million and net income of about $214,000 in 1992. *Id*. at 725. The court also

noted testimony that the company had weathered past financial difficulties and was generating positive cash flow. The court gave little weight to the availability of the credit line, since it was secured for purposes other than paying penalties. Concluding that the most relevant information was the company's profitability and net income in 1992, the court **reduced the civil penalty by $450,000 to $50,000**, an amount equal to about twenty-five (25) percent of the defendant's 1992 net income and deemed sufficient to punish past violations and deter future ones.

Academy operates in a highly capital-intensive, low-margin transportation industry that was devastated by the COVID-19 pandemic. As this Court will hear, passenger volumes collapsed, routes were curtailed, and revenue streams were severely disrupted for an extended period. Academy, like many transportation providers, is only now beginning to stabilize and rebuild operations. A large civil penalty imposed without regard to these realities would have a disproportionate economic impact and risk impairing Academy's ability to continue providing transportation services. Under *Midwest Suspension & Brake*, the Court should focus on proportionality and real economic capacity—not abstract notions of corporate scale—and calibrate any penalty accordingly.

C. Other Clean Air Act Penalty Factors

The remaining statutory factors—seriousness, duration, compliance history and good faith, and prior violations—are best evaluated through the same bottom-up, holistic lens, confirming that the penalty analysis weighs in Academy's favor. In *Sierra Club v. Khanjee Holding (US) Inc*., 655 F.3d 699 (7th Cir. 2011), the Seventh Circuit affirmed a civil enforcement penalty that was dramatically lower than the Clean Air Act statutory maximum after holistically considering all penalty factors together. There, despite allegations that defendants commenced construction of a $600 million coal-fired power plant without a valid PSD permit, conduct implicating large-scale

stationery-source emissions and a core preconstruction permitting requirement, the court imposed only a $100,000 penalty, emphasizing the need to balance seriousness, duration, good faith, and lack of prior violations rather than reflexively gravitating toward theoretical maximum penalty. The court considered all Clean Air Act penalty factors, including that the defendant did not profit from the violation, had no history of CAA violations, and had significant financial means before **imposing a penalty of only $100,000 in light of a potential $41.7 million maximum** to forestall future violations. *Id*. at 707.

This approach confirms that penalty determinations under § 7413(e)(1) are not driven by abstract penalty ceilings, but by an integrated assessment of how serious the conduct is in real-world terms, whether violations were shown through credible, context-specific evidence, whether the defendant demonstrated disregard for regulatory obligations, and whether there is a history of noncompliance. Applied here, these same considerations weigh heavily in Academy's favor. Academy has not benefited economically from any alleged violations and has put forth evidence of training and internal practices to combat unnecessary idling.  In contrast, CLF has put forth no proof of *any* violations, only aggregated GPS data of lawful idling. There is no evidence that Academy knowingly disregarded regulatory obligations or persisted in conduct after being advised it was unlawful, and CLF has not shown any history of prior Clean Air Act penalties assessed against Academy. Consistent with *Khanjee*, these factors confirm that a reasoned, bottom-up, holistic analysis forecloses any resort to maximum penalties, supporting, at most, a modest, carefully calibrated sanction proportionate to the nature of the alleged conduct and sufficient only to serve the purpose of deterrence—not punishment.

## CONCLUSION

Because CLF has not proven that any identified instance of engine operation was unnecessary under the governing legal and regulatory framework, judgment should enter in Academy's favor.

Respectfully submitted,
ACADEMY EXPRESS, LLC,

By its attorneys:

*/s/ Jon C. Cowen*
Jon C. Cowen (BBO No.: 552961)
Jennifer A. Whelan (BBO No: 631519)
Alexander C. Teschemacher (BBO No.: 695597)
Mikaela K. Barbour (BBO No.: 714864)
MG+M THE LAW FIRM
125 High Street, Oliver Street Tower
6th Floor
Boston, MA 02110
Telephone: (617) 406-4511
Facsimile: (617) 406-4501
jcowen@mgmlaw.com
jwhelan@mgmlaw.com
ateschemacher@mgmlaw.com
mbarbour@mgmlaw.com

Dated:        January 26, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2026 the foregoing document was filed through the Court's electronic case filing system, by which means a copy of the filing will be sent electronically to all parties registered with the ECF system.

*/s/ Alexander C. Teschemacher*
Alexander C. Teschemacher