UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> ACADEMY EXPRESS, LLC, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION <br> NO. 20-10032-WGY |

YOUNG, D.J.                                                    May 18, 2026

**FINDINGS OF FACT AND RULING OF LAW
AND ENTRY OF JUDGMENT ON ISSUE OF LIABILITY**

### I.    BACKGROUND

Section 16A of chapter 90 of the Massachusetts General Laws

provides:

> No person shall cause, suffer, allow or permit the
> unnecessary operation of the engine of a motor vehicle
> while said vehicle is stopped for a foreseeable period
> of time in excess of five minutes. This section shall
> not apply to (a) vehicles being serviced, provided that
> operation of the engine is essential to the proper repair
> thereof, or (b) vehicles engaged in the delivery or
> acceptance of goods, wares, or merchandise for which
> engine assisted power is necessary and substitute
> alternate means cannot be made available, or (c)
> vehicles engaged in an operation for which the engine
> power is necessary for an associated power need other
> than movement and substitute alternate power means
> cannot be made available provided that such operation
> does not cause or contribute to a condition of air
> pollution.

[1]

Massachusetts regulations implement and explicate this statute. 310 Mass. Code Regs. § 7.11(1)(b).  These regulations are incorporated in the EPA's Massachusetts State Implementation Plan.  Thus, a violation of these regulations becomes a violation of the United States Clean Air Act ("the Clean Air Act"), 142 U.S.C. 7604(2)(1), (f)(4) enforceable through a citizen suit.[1]

While a number of enforcement actions have been commenced which necessitate interpretation of the Massachusetts stature and its regulations[2], apparently only two have gone to trial: United States v. Paul Revere Transp., LLC, 608 F. Supp. 2d 175 (D. Mass. 2009) (O'Toole, J.)[3], and this action.  Both resulted in a liability finding followed by settlement rather than

---

[1] As summarized by this Court previously, see Mem. Decision 5, ECF No. 131., "[t]he Clean Air Act contains a citizen suit provision authorizing any person to sue another who is in violation of the Act, which encompasses emissions standards and limitations in state plans approved by the EPA Administrator. 42 U.S.C. § 7604(a)(1), (f)(4)."  The EPA's Massachusetts State Implementation Plan has been approved by the EPA Administrator. See 40 C.F.R. § 52; 37 Fed. Reg. 23,085; 42 U.S.C. § 7410; 40 C.F.R. § 52.385; 79 Fed. Reg. 41,427.

[2] The Conservation Law Foundation ("the Foundation"), the Plaintiff here, has been aggressive in giving effect to the Anti Idling Law. See, e.g., Conservation L. Found. v. Paul Revere Transp., No. 20-cv-10035-MBB, 2022 WL 1913970 (D. Mass. Apr. 7, 2022); Conservation L. Found. v. Transdev N. Am., Inc. et al, No. 19-cv-11503-LTS (D. Mass. Dec. 18, 2020) (consent decree ordered); Conservation L. Found. v. Durham Sch. Servs. Et al, No. 22-cv-11992, 2024 WL 3718285 (D. Mass. Aug. 29, 2024).

[3] While that case also originated with this session of the Court, it was transferred to Judge O'Toole for trial.

imposition of a judicial remedy.  Paul Revere was tried to a jury and, while this Court had the benefit of Judge O'Toole's legal reasoning expressed in his jury charge, it seems appropriate to detail the reasoning upon which this Court made the liability determination.[4]  See Transcript of Jury Trial Day 6, June 8, 2009, 11-65, 6-cv-12297-GAO, ECF No. 109.

## II.   PRIOR PROCEEDINGS

On January 8, 2020, the Foundation filed a complaint against Academy Express, LLC ("Academy") after complying with the Notice procedure mandated by the Clean Air Act.  See Compl., ECF No. 1; Am. Compl.  ¶¶ 41-43, ECF No. 29.  The Amended Complaint alleged that Academy violated the Massachusetts anti-idling regulation.  See Am. Compl. ¶ 13.  In July 2020, the Foundation sent Academy another letter notifying it of the alleged violations in Connecticut.  See Am. Compl. ¶ 44.

Academy disputed the Foundation's Article III standing in its answer, and the Court ordered discovery on the issue. Defs.' Answer to Am. Compl., ECF No. 31.  This case was transferred to this Session of the Court on June 28, 2023.  ECF No. 121.  This Court fairly promptly botched the case by granting Academy's motion for summary judgment, dismissing the action based on a lack of Article III standing on the ground

---

[4] In view of the settlement, this Court expresses no view on remedy.

that the Foundation failed to present expert scientific evidence linking the exposure to idling pollution to a demonstrable health injury suffered by its affiants. See Memorandum of Decision, ECF No. 131. This necessitated a trip to the First Circuit, which ruled this Court's interpretation too cramped a reading of the Clean Air Act and vacated the grant of summary judgment. Conservation L. Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 92-93 (1st Cir. 2025). Following the appeal, Academy moved again for summary judgment on the issue of Article III standing. See Mem. Law Supp. Defs.' Renewed Mot. Summ. J. on the Issue of Standing, ECF No. 152. The Court heard oral argument on the traceability issue on May 29, 2025. Elec. Clerk's Notes, ECF No. 154. The Court allowed in part and denied in part the renewed motion for summary judgment. See Mem. Decision, ECF No. 156.

A bench trial commenced on January 12, 2026. See Elec. Clerk's Notes, ECF No. 238. Upon the close of the Foundation's case-in-chief, Academy moved for Judgment on Partial Findings under Federal Rule of Civil Procedure 52(c). See Mot. J. Partial Findings, ECF No. 245. The Court denied the motion. See Elec. Clerk's Notes, ECF No. 248. Upon the close of Academy's case, Academy made a renewed Motion for Judgment on Partial Findings. See Elec. Clerk's Notes, ECF No. 260. The Court made an oral partial ruling on the motion on January 29,

[4]

2026, and now addresses the motion in full.  See Trial Tr. 29:3-33:25, Jan. 29, 2026.

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 52(c), a district court may "enter judgment against the party on a claim or defense" once "a party has been fully heard on an issue and the court finds against the party on that issue."  Morales Feliciano v. Rullan, 378 F.3d 42, 59 (1st Cir. 2004) (citing Fed. R. Civ. P. 52(c)).  The First Circuit has ruled that "[i]n resolving a Rule 52(c) motion, 'the court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself in which party's favor the preponderance of the evidence lies.'"  Brotherston v. Putnam Invs., LLC, 907 F.3d 17 (1st Cir. 2018) (quoting 9C Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 2573.1 (3d ed.)).

### IV.  FINDINGS OF FACT

#### A.  The Parties and The Places

The Foundation is a nonprofit organization, with a mission to "protect and restore the natural resources . . . of New England for the benefit of the people of the communities across New England."  Trial Tr. vol. I, 28:9-12, Jan. 12, 2026; see Am. Compl. 4, ECF No. 29.  To become a member of the Foundation, individuals must have made a monetary donation to the Foundation within the last calendar year, and remain members for a

[5]

month grace period following a lapse in annual donations.  See CLE Membership Criteria, Ex. 49; Trial Tr. vol. I, 28:15-21, Jan. 12.  All current interns, staff, and fellows are considered members of the Foundation unless they sign a form opting out of membership during their administrative on-boarding, and are considered members for twelve months following their last day of employment with the organization.  Id.

Academy is a family-owned transportation company that operates approximately 59 buses in Massachusetts and has been in business here since approximately 2011.  See Trial Tr. vol. I, 16:8-10, Jan. 12, 2026.  Academy operates two categories of bus routes in Massachusetts.  The first are inter-city routes, for example from Boston to New York City, which require coach buses. See Trial Tr. vol. I, 126:21-23, Jan. 28, 2026.  These buses mostly drive on highways between cities, though they load and unload passengers at designated pickup and drop-off spots located in urban environments.  See, e.g., Am. Compl. ¶ 31; Trial Tr. vol. I, 16:8-10, Jan. 12, 2026 (citing Alewife Station in Cambridge and Riverside Station in Newton, both of which are urban locations, as examples of pickup spots).  The second route category is the intra-city category, which involves transit (sometimes of articulator buses) operating on a fixed schedule like public transportation buses.  See, e.g., Trial Tr. vol. I,

[6]

16:8-10, Jan. 12, 2026 ("Academy operates the Boston University shuttle").

Of the four bus stops at issue in this trial, two were inter-city bus stops (Alewife and Riverside) and two were intra-city bus stops (33 Agganis Way and Wellington). See id. at 8:13-18. The Alewife Stop is referred to in the Amended Complaint as the "Cambridge Go Bus Stop" located at 5D Cambridgepark Dr., Cambridge, MA 02140, and is co-located with the Alewife MBTA station. Am. Compl. ¶ 90. The Riverside stop is referred to in the Amended Complaint as the "Newton Go Bus Stop" located at 335 Grove St., Auburndale, MA 02466, and is co-located with the Riverside MBTA station. Id. ¶ 75. The 33 Agganis Way stop was referred to throughout the trial as the "BU Shuttle" stop, or some similar phraseology, because Academy contracts with Boston University to provide this shuttle service to its affiliates. See, Trial Tr. vol. I, 16:8-12, Jan. 12, 2026. The Wellington stop was occasionally referred to as the "Encore" stop because Academy operated a similar service for the Encore hotel employees for a time. Id. at 16:14-16.

## B. Timeline

The Foundation alleges violations of the Massachusetts Anti-Idling law from November 2, 2015 ongoing through January of 2020 when the initial complaint was filed, as permitted by the

[7]

five-year statute of limitations imposed by the Clean Air Act. Am. Compl. 243.  The Foundation hired a private investigator to observe individual instances of idling on various dates from October 29, 2019 through February 2, 2020.  Academy ultimately produced internal data of idling events from 2019 through 2025. See Ex. 45.

### C. Standing Witnesses

The Foundation offered eight standing witnesses to establish Article III standing at the four remaining bus stops at issue.  See Order, ECF No. 156 (ruling that the Foundation had not established Article III standing as to the proposed Braintree and Bridgeport locations).  Johanna Epke testified as to the Alewife stop.  See Trial Tr. vol. I, at 47, Jan. 12, 2026.  Varun Deshpande, Trial Tr. vol. II, at 78, Jan. 12, 2026, and Sophia Ly testified as to the Riverside stop, Dep. of Sophia Ly at 29:6-16 (Feb. 03, 2021).  Robert Kendall and Monica Pereira testified as to the Wellington stop, and Georgia Bolduc, Breanne Frank, and Azhar Kabbas testified to the Agganis Way stop.  Trial Tr. vol. I, at 5:10-14, Jan. 29, 2026.  Their testimony is addressed in more detail infra at 20-28.

### D. Pattern or Practice of Unnecessary Idling

Following the close of the liability phase of the trial, the Court ruled from the bench and reiterates here -- as proved by a fair preponderance of the evidence -- that there exists on

[8]

the part of Academy a pattern or practice of violating the Anti-Idling Statute. Trial Tr. 33:20-25, Jan. 29, 2026. The basis of this finding is described below:

## 1. The Klier Investigation

The Foundation's case in chief consisted primarily of evidence gathered by a private investigator -- Andrew Klier ("Klier") -- hired by the Foundation to observe Academy buses at the aforementioned stops. Trial Tr. vol. II, 82:5-17, Jan. 12, 2026. Klier was tasked with "going out and observing 13 instances of idling in excess of over 5 minutes." Id. at 82:12-13. Klier went to the designated bus stops at various times of the day and recorded video footage of the idling Academy buses using a camcorder. Id. at 85:15-21, 86:8-11. After his shift, he would review the footage on the camcorders and create a record based on the time stamp on the camcorder. Id. at 86:18-25, 87:9-14. Klier determined whether a bus was idling based on the sound of the bus, noting that "in some instances you could physically hear the bus idling, those buses are loud, you can hear them from a pretty good distance away." Id. at 90:11-13. Klier also observed the exhaust fumes leaving the vehicle, and saw whether the exterior lights on the bus stayed on or turned off to determine whether the engine was on while the bus was stationary. Id. at 90:13-24, 91:10-19.

[9]

Klier reviewed his videos to fill out "tracking sheets," which identify the location, duration, vehicle number, license plate number, and time of the Academy vehicles he observed. See id. at 86:20-25; Exs. 51, 52, 53, 54, 55. These tracking sheets cover various dates spanning from October 29, 2019 to January 31, 2020. Klier used these tracking sheets to generate "investigation reports." See id. at 86:20-25; 94:5-9. The Foundation submitted in evidence three reports (Exs. 59-61) generated by Klier documenting idling events from various dates between October 18, 2019 and February 11, 2020. These reports contain still-captures of Klier's videos as photographs. The Foundation also submitted, pursuant to Federal Rule of Evidence 1006, a chart that Klier reviewed against his videos, summarizing his findings. Ex. 62. The chart includes entries beginning on September 27, 2019 and ending on February 2, 2020. For the dates of September 27, October 2, and October 3, Klier had been investigating another bus company and inadvertently captured video of Academy buses, resulting in a lack of tracking sheets for those dates. Trial Tr. vol. II, 101:3-22, Jan. 12, 2026. The chart details 83 total instances of idling, with 31 instances occurring at Agganis Way, 23 occurring at Riverside, 9 occurring at Alewife, and 20 occurring at Wellington. These instances range from six idling minutes at the shortest to 49 minutes at the longest.

[10]

Klier did not note the weather in his tracking sheets or whether a given bus was unloading or loading passengers. Id. at 113:16-18, 113:19-20. He did, however, try to note "any sort of possible inspection, mechanical work going on, wheelchair accessible platforms coming down, things of that general nature." Id. at 113:13-15. The tracking sheets indicate , "possible inspection" in three instances. See Exs. 51, 54. None of the sheets indicate wheelchair lift usage. Academy did not seriously dispute during trial the accuracy of Klier's observed instances of idling. Academy focused instead on its argument that Klier could not determine whether any observed idling was necessary or unnecessary. Id. at 105:13-17.

**2. The Saucon Data**

In addition to Klier's testimony, the Foundation introduced in evidence (Ex. 45) a set of reports generated from the software system that Academy utilizes to monitor its buses – called the Saucon system. See Trial Tr. vol. I, 9:3-25, Jan. 13, 2026. The Saucon system activates when the ignition is turned on, and records data when the bus is idling. Id. at 10:2-4. Academy utilizes this data primarily for maintenance purposes, as idling can affect the mechanical upkeep of the bus. Id. at 10:9-16.

While Academy has utilized the Saucon system for about ten years, id. at 9:7-9, it only produced Saucon idling reports from

[11]

September 2019 to January 2020, Ex. 1, and June 2021 through December 2025. Ex. 45. While the Foundation timely requested the reports for the period outlined in the complaint (2015 through 2020) during the initial discovery in April of 2021, see Motion to Compel, ECF No. 60, the data had already been destroyed by third party vender Saucon. See Affidavit of Michael Deeb at 3, ECF No. 218, Ex. F. The idling reports from September 2019 to January 2020 largely corroborate Klier's observations.

For example, Klier's tracking sheet, on row 46, indicates that a bus with the ID number 6589 idled for twenty minutes on November 27, 2019 from 10:14 a.m. to 10:34 a.m. for a total of 20 minutes at Alewife Station. Ex. 62. The Saucon report for that same vehicle on that same date indicates that the bus began idling at 10:13 a.m. and stopped idling at 10:29 a.m., when the engine was shut off. The Saucon report, however, also indicates that about twenty seconds later, the engine was turned back on and the bus continued to idle until the bus began moving again at 10:34 a.m. Ex. 1. While Klier may have been unable to observe the bus operator turning the bus off and then back on again in the span of about twenty seconds, his observation as to when he bus arrived and departed, with the engine running for nearly the entire time, correlates with reasonable precision to the Saucon data.

[12]

On Klier's tracking sheet, on row 3, he recorded bus number 2143 idling at the Wellington station from 11:16 to 11:45am for a total of 29 minutes on September 27, 2019. Ex. 62. The Saucon data for the same bus and date indicated that the bus status was "Motion Stop" at 11:22 a.m., and that the status was "Motion Start" at 11:45 a.m., for a total of 23 minutes of idling. Ex 1.

On November 30, 2019, Klier recorded bus 6730 idling for 19 minutes in row 63 at Riverside Station. Ex. 62. He recorded the start time as 2:20 p.m. and the end time as 2:39 p.m. The Saucon data shows an "Idle Start" code at 2:19 p.m. and an "Idle End" code at 2:38 p.m., for a total of 19 minutes of idling. Ex. 1.

The Saucon data for the period of 2021-2025 and submitted as Exhibit 45, was summarized pursuant to Fed. R. Evid. 1006, by witness Katherine Toldorf, a Foundation paralegal, in Exhibit 66. Trial Tr, 21:18-24, Jan. 14, 2026. Academy did not contest the factual accuracy or calculations in the chart. The summary chart shows 56,303 instances of idling over 5 minutes, 12,880 instances of idling over 15 minutes, and 7,387 instances of idling over 20 minutes from the combined four stops. Ex. 66.

While the Court does not find spoliation of evidence by Academy, it is reasonable to infer -- and the Court does so --

that the instances of idling by Academy buses was comparable during the earlier period when the Saucon data was destroyed.

### 3. Academy's Practices

Academy employees testified to the circumstances that surround idling events in practice -- including the time it takes drivers to load and unload passengers, build air pressure in the brakes of the buses, complete repairs, and operate wheelchair lifts and ramps.

Stephen Mataras ("Mataras") is a General Manager at Academy, where he has served in the role for about eight years. Trial Tr. vol. II, 125:1-3, Jan. 12, 2026.  He testified that Academy policies incorporate statutory limitations on idling. Trial Tr. vol. II, 135:9-13, Jan. 12, 2026; see Ex. 38 (sticker in buses), Ex. 2 (Manual).  He also testified that he has never received or signed off on an idling violation or summons in Massachusetts.  Trial Tr. vol. II, 138:2-10, Jan. 12, 2026.

Mataras testified that "[i]f there is anyone who needs specific assistance for their wheelchair, that could add anywhere from 10 to 15 minutes to put that passenger on the vehicle."  Trial Tr. vol. I, 28:16-19, Jan. 13, 2026.  He also testified that for Wellington station, where Academy ran an employee shuttle, it would routinely take "between 5 to 10 minutes" to load and unload the bus.  Trial Tr. vol. I, 33:1-22, Jan. 13, 2026.  At the Agganis Way stop, Mataras estimated it

[14]

would take a little longer, 6 to 12 minutes, to load the students on the route due to the quantity of students and the tendency of drivers to hold the bus to ensure students are able to get on. See Trial Tr. vol. I, 34:3-25, 35:1-2, Jan. 13, 2026. For the Riverside station, Mataras testified that loading and unloading of passengers takes longer because inter-city trips involve stowing luggage under the bus. Trial Tr. vol. I, 35:3-7, Jan. 13, 2026. He estimated that these trips take 10-15 minutes to load passengers, with more time required for passengers requiring special assistance. Id. Because Academy also operates exclusively inter-city routes at the Alewife station, Mataras also testified that it would take 10 to 15 minutes to load passengers at that location as well. Id. at 36:4-6.

Kenol Hilaire, who has been a bus driver at Academy for eleven years, Trial Tr. vol. II, 39:6-7, Jan. 13, 2026, testified that he frequently idles more than five minutes while driving "when it's necessary." Id. at 120:21-25, 121:1-4. He also testified that he idles buses longer than three minutes to "build pressure" in the bus. Id. at 94:5-9. Academy buses operate an air system that requires the engine to lower and lift the bus. Trial Tr. vol. I, 27:2-5, Jan. 13, 2026. He also testified to being familiar with a sticker pasted near the driver's seat on Academy buses warning drivers not to idle the

[15]

bus in excess of three minutes "unless actively loading or unloading passengers." Trial Tr. vol. II, 9:6-12, Jan. 13, 2026; Ex. 38.

Varendra Chandoo is another bus driver, who has worked for Academy for over ten years. Trial Tr. vol. II, 113:1-6, Jan. 13, 2026. Chandoo testified that he idles his buses when he is doing his pre-trip inspections, and when picking up and dropping off passengers. Id. at 117:8-19. He also testified that he would keep his engine running to maintain air pressure and kneel his bus. Trial Tr, 15:7-18, Jan. 14, 2026. Chandoo testified that he spends a maximum of ten minutes, and sometimes a little longer than that, at the Agganis Way (Boston University shuttle) stop loading and unloading passengers. Id. at 14:6-16.

David Bolan, Academy's Safety Manager, described in detail the process for operating the wheelchair lifts and ramps for transit-style buses, estimating that the process could take 30-45 minutes depending on the device. Trial Tr, 26:2-4, Jan. 28, 2026. Bolan also testified to instances in which Saucon data "freezes" and displays a bus in the same location despite the bus actually moving. Id. at 49:19-25. When these freezing events occur, Academy mechanics will have to turn off the device and turn it back on. See id. at 50:11-16.

### 4. Mechanical Repairs and Regeneration

Eugene Conway testified as to the conditions under which Academy buses idle in excess of five minutes for the purposes of mechanical repairs.  Conway is the Maintenance Manager at the Academy bus depot in Braintree, Massachusetts and has worked for Academy for 13 years.  Trial Tr, 93:13-25, Jan. 28, 2026.  He described mechanical repairs which require engine idling to include HVAC work, heating, and ventilation.  Id. at 96:1-9.  The mechanics attempt to keep their time onsite at a road call to about an hour.  See id. at 111:22-25.  Conway testified that even after repairs are concluded, mechanics often idle the bus for about 20 minutes to ensure that the repair is effective.  Id. at 113:3-9.  Conway testified that Academy mechanics repair roadside breakdowns about three times per week at Agganis Way and Wellington Station, id. at 127:7-15, and about three times per month at the Alewife station.

Witnesses David Bolan and Eugene Conway testified about the process of "regeneration."  Regeneration is the process in which a diesel engine clears the buildup in its filters by generating an intense amount of heat via engine operation.  See id. at 100:9-17.  There are three types of regeneration -- driving regeneration, driver-initiated stationary regeneration, and forced regeneration.  Id. at 101:19-25, 102:1.  Driving regeneration occurs when a diesel bus is driving at least 50 miles per hour, and the operation of the engine burns off the

[17]

buildup in the filter.  Id. at 102:2-8.  Driving regeneration thus usually occurs during the highway portions of an inter-city trip, while intra-city buses do not achieve the speed and distance necessary for the engine to initiate driving regeneration.  Id. at 102:13-25.  Instead, intra-city routes typically rely on driver-initiated or forced regeneration. Driver-initiated stationary regeneration and forced stationary regeneration occur when a bus is stationary and the engine is on, and may appear to both observers and on Saucon data as idling.  See id. at 104:2-9.  Driver-initiated regeneration occurs when the bus signals to a driver that the filters require regeneration, and a driver parks the bus in a suitable location and initiates regeneration.  See id. at 98:10-22.  Forced regeneration occurs when the filter is so full that it slows down the bus and initiates regeneration without the driver's initiation.  Forced regeneration can take anywhere from 20-45 minutes, up to an hour and a half.  See id. at 58:9-10, 104:10-11.

The Saucon data, as well as Klier's investigative reports, do not identify instances of driver-initiated or forced regeneration, nor mechanical repairs.

This is not a case requiring disputed credibility determinations.  To be clear, this Court credits the above referenced trial testimony.  It also reasonably infers as matter

of fact that the process of regeneration, in whatever manner it occurs, spews concentrated amounts of pollutants throughout.

## V. RULINGS OF LAW

### A. Standing

Standing requires an individual to demonstrate an injury in fact, traceability of that injury to the defendant's conduct, and the availability of redressability from a court. See Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016). Associational standing, as claimed by the Foundation, requires that its members have standing to sue, that the interests it seeks to protect are germane to the Foundation's purpose. The participation of individual members is not required. See Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977). The Foundation bears the burden of establishing standing at all stages of the litigation. See Gustavsen v. Alcon Lab'ys, Inc., 903 F.3d 1, 7 (1st Cir. 2018).

Academy challenges the injury-in-fact, traceability, and redressability requirements of the individual standing witnesses, thus implicating the Foundation's associational standing. Mem. Supp. Def.'s Mot. J. on Partial Findings at 4, ECF No. 246. Academy does not contest that the litigation is germane to the Foundation's purpose, nor that the suit requires individual participation of the Foundation's members.

[19]

The Court originally addressed standing in its ruling on Summary Judgment. Mem. of Decision, ECF No. 131, which the First Circuit reversed. See Conservation L. Found., Inc. v. Acad. Express, LLC, 129 F.4th 78 (1st Cir. 2025). Applying the instruction by the First Circuit, this Court ruled at the summary judgment stage, that the Foundation had met the Article III standing threshold for the Alewife, Riverside, Wellington, and Agganis Way locations. Order, ECF No. 156 at 6-7. The Court ruled that the Foundation failed to demonstrate associational standing for the Bridgeport, Connecticut and Braintree, Massachusetts Academy locations. Id.

Academy here renews its argument that at trial the Foundation has failed to prove associational standing for the Riverside, Wellington, and Agganis Way stops. See Mem. Supp. Def.'s Renewed Mot. J. Partial Findings 4, ECF No. 261. Academy does not contest the Foundation's associational standing for Alewife station.

The three most relevant points made by the First Circuit to guide this Court's standing analysis after the close of trial evidence are as follows: First, "breathing polluted air" alone qualifies as an injury in fact. Conservation L. Found., 129 F.4th at 88. Second, traceability is satisfied when a defendant's alleged conduct constitutes a portion, rather than the entirety of an injury whenever geographic proximity is

demonstrated.  Id. at 90.  Third, the First Circuit rejected Academy's focus on the isolated instances listed in the Complaint and instead ruled that the Foundation had "no need to show exposure to each individual emission in order to establish standing to complain of the general and repeated practice of unlawful idling."  Id. at 92.[5]

Much of Academy's remaining argument centers on the question of timing.  Academy argues that the Foundation's standing witnesses must demonstrate membership in the organization prior to the date of the first Complaint being filed – October 29, 2020.  See Trial Tr, 4:16-23, Jan. 29, 2026. This argument misinterprets the First Circuit's instruction. The Foundation must indeed prove that it had standing at the time that the complaint was filed.  See Conservation L. Found., 129 F. 4th at 85, 86.  The First Circuit stated that the Foundation's "members upon whose standing it relies need not have joined the organization before Academy allegedly harmed them."  Id. at 85.  "When assessing associational standing, the Supreme Court has not focused on membership at the time of the

---

[5] The First Circuit also ruled that expert testimony may or may not be required to establish traceability.  See Conservation L. Found., 129 F.4th at 92 ("expert analysis may not be necessary"); id. ("we think it likely that CLF can only establish traceability by adducing expert testimony.").  The Foundation offered no expert testimony regarding traceability at trial.

alleged harm." Id.  Academy concedes that at least one standing witness from each of the contested locations did in fact join the organization prior to the Complaint being filed.  See Trial Tr. 5:17-20, Jan. 29, 2026.  So, this issue is not dispositive.

The following analysis is based solely on the testimony and evidence introduced at trial, which did not include any expert witness testimony or reports.

### 1. 33 Agganis Way

Academy provided the Boston University shuttle service during the relevant time period.  The buses idling at the Boston University shuttle stop may logically be inferred to be the buses operating as the Boston University shuttles.  Reasoning by analogy to other contexts, it is clear that a plaintiff does not fail the traceability requirement of standing if she did not identify the perpetrator at the time of the injury.  While air and water are different mediums, the First Circuit identified water pollution cases in which an injured party could not -- at the molecular level -- identify which harmful pollutants came from individual polluters yet still established traceability. Conservation L. Found., 129 F.4th at 91.  The same reasoning applies here.  Adopting Academy's reasoning would preclude a finding of traceability for many harms caused by environmental harm, even when significant amounts of other evidence demonstrate a pattern or practice of harm.  The evidence shows that Bolduc

was "squarely in the discharge zone" of Academy buses and has satisfied traceability.  Id. at 92, citing Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 162 (4th Cir. 2000).

Georgia Bolduc became a member of the Foundation in February 2020.  See Trial Tr., 58:13-25, Jan. 29, 2026; Written Direct Testimony of Georgia Bolduc[6].  She had previously worked as an intern at the Foundation.  Id.  Bolduc was a law student at Boston University from August 2018 though May 2021 and utilized the Boston University Fitness and Recreation Center ("Fitrec") during her time at the school.  Fitrec is located less than a quarter of a mile from the 33 Agganis Way stop, and the bike rack at which Bolduc stored her bike was located within 100 feet of the stop.  Bolduc testified that she would go for runs a few times each week near the stop, and often ran past the Agganis Way stop.  She also patronized stores like Goodwill and CVS about once a week, which are located under a quarter of a mile from the Agganis Way stop.  She also testified that she "often smelled exhaust in the vicinity of [the] gym" and is "worried that [her] health has been harmed because [she has] been exposed to the polluted air near the [Boston University]

---

[6] While not admitted as numbered exhibits, the parties agreed on the admission of written direct testimony for the standing witnesses.  See Trial Tr. 59:12-25, Jan. 12, 2026.

Shuttle Stop." Written Direct Testimony of Georgia Bolduc ¶ 10, ECF No. 47-9.

Academy seems to argue that Bolduc lacks standing because she did not identify the buses idling at the Agganis Way stop as belonging to Academy, nor timed them herself. See Written Direct Testimony of Georgia Bolduc, Mem. Sup. Renewed Mot. Parital Findings 3, ECF No. 261 ("CLF was required to prove that . . . it had at least one member with personal, first-hand knowledge of Academy's alleged conduct at each site of the four locations at issue.") Academy points to no authority to support its position that a standing plaintiff need personally identify the polluter for her injury to be traceable to its pollution. Bolduc stated that "I never paid attention to the bus company that the bus was associated with. But I did see buses idling at that stop," Trial Tr. vol. I, 60:11-13, Jan. 13, 2026, and that she "never paid attention to how long the buses were idling." Id. at 60:19-22. Since Bolduc testified that she breathed polluted air, and worries about being exposed to polluted air at the Agganis Way stop, she has satisfied the injury-in-fact requirement as articulated by the First Circuit.

In assessing traceability, the First Circuit instructed this Court that "[i]n lieu of requiring a conclusive link, we hold that a showing of geographic proximity can satisfy traceability in this type of case." Conservation L. Found., 129

F. 4th at 91.  While the First Circuit did not specify the exact distance required to meet this standard, it indicated that standing witnesses who spend significant amounts of time, regularly use transportation centers where Academy's buses often idle, and are frequently "directly by" the stops would qualify. Id. at 92.  Bolduc testified that she directly passed the Boston University shuttle stop on her recreational runs multiple times per week, while parking her bike to go to the gym, and when going to stores in the area within a quarter mile of the stop. This level of proximity satisfies the traceability requirement articulated by the First Circuit.

The First Circuit has also asked this court to consider a counterfactual[7] in aiding its traceability inquiry here: If all other idling buses vanished other than Academy buses, would Bolduc have still avoided the area due to presence of solely Academy buses idling?  Since the Foundation has produced ample

---

[7] "In applying this standard to a case with multiple alleged contributors to a cumulative harm, a court may find it helpful to engage in a counterfactual inquiry, asking whether the defendant's alleged conduct would 'have been a factual cause [of a concrete and particularized portion of the injury] if the other competing cause[s] had not been operating.'" Conservation L. Found., 129 F.4th at 90, quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 27 cmt. a (Am. L. Inst. 2010); see also Walters v. Fast AC, LLC, 60 F.4th 642, 651 (11th Cir. 2023) (importing this standard into the Article III traceability analysis); Fischer v. Governor of N.J., 842 F. App'x 741, 755–56 (3d Cir. 2021) (Phipps, J., concurring in part and concurring in the judgment) (same).

data showing that Academy buses idled at Agganis Way for long stretches of time before 2020, the Court infers the answer to the counterfactual to be "yes."

Bolduc need not have timed individual buses' idling times, nor identified the owner of buses, since the Foundation put on other evidence throughout the trial to demonstrate the pattern or practice of idling rather than the specific events identified by Klier. See Ex. 1 (Saucon data demonstrating multiple instances of idling over five minutes at the Agganis Way stop).

While Academy mentions redressability as an issue, it leaves the point undeveloped. "[F]or a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc., 528 U.S. 167, 185-86 (2000). Bolduc testified that she continues to be worried about her health and the health of her friends and family from the exposure they experienced and continues to worry about air pollution when she visits friends in the Boston area. Direct Written Testimony of Georgia Bolduc ¶¶ 10-11; Trial Tr. vol. I, 61:14-21, Jan. 13, 2026. Redressability is thus satisfied.

For substantially the same reasons outlined above, standing for the Agganis Way stop is also satisfied by standing witness

[26]

Breanne Frank.  See generally Trial Tr. vol. I, 62-69, Jan. 12, 2026.  Standing here does not depend on the testimony of Kabbas Azhar at the commencement of the action since Azhar was not present in the city of Boston prior to his arrival in 2021.  His testimony supports standing from August 2021 through May of 2024.

### 2. Riverside

The Court also admitted as part of the record deposition testimony of Sophia Ly as a standing witness.  See Trial Tr. vol. I, 51:16-52:5, Jan. 13, 2026.  Though not dispositive, Ly became a member of the Foundation in September of 2020, before the Complaint was filed and when she was hired as an unpaid intern at the Foundation.  See Testimony of Sophia Ly ¶ 5, ECF No. 47-7.  Up to November of 2020, she lived near the Riverside Station and utilized the Green Line train to commute.  Id. ¶¶ 14-16.  Ly, like Frank and Bolduc, testified to smelling fumes and being concerned about the effects on her respiratory systems of vehicle exhaust pollutants in the air.  Id. ¶¶ 18-22.  When her deposition was taken in 2021, Ly anticipated that she would resume using the Riverside station to commute to and from her classes at Northeastern University three to four times per week. Id. ¶¶ 15-16.  Ly did not log idling times, though she estimated idling up to 20 minutes based on her personal wait times.  Id. ¶ 14.  She also did not identify any idling buses as operated by

[27]

Academy.  As with Bolduc, however, the Foundation's submission of the Saucon idling data from this period, see Ex. 1, establishes a pattern or practice of excessive idling at Riverside Station.  Since Ly testified to breathing polluted air, she has satisfied the injury-in-fact requirement.  Ly utilized the Riverside station, where the Academy buses were located, so she was "squarely in the discharge zone" of Academy buses and satisfies the traceability requirement.  Academy does not contest the redressability of Ly's injury.

The Foundation also called Varun Deshpande as a standing witness for the Riverside Station.  See Trial Tr. vol. II, 78:3-80:6, Jan. 12, 2026.  Deshpande attended NYU as a student from 2018 through 2022, but returned to his family home in Newton, Massachusetts and utilized the Riverside Station during his summer breaks.  See Written Direct Testimony of Varun Deshpande ¶ 3.  He became a member of the Foundation in May of 2023 upon his employment with the organization.  Id. ¶ 4. Deshpande testified to breathing in "pungent exhaust fumes" while using Riverside Station.  Id. ¶ 7.  In 2025, Deshpande took photos of Academy buses at Riverside Station.  For substantially the same reasons as those discussed above, Deshpande also demonstrates the requirements for the Foundation to establish standing at Riverside station.

### 3. Wellington

[28]

Robert Kendall testified on January 13, 2026, via written direct testimony. See Trial Tr. vol. I, 62:14-21, Jan. 13, 2026. He is not an employee of the Foundation, but his daughter was formerly employed as an attorney at the Foundation. Kendall became a member of the Foundation in December 2019. See Written Direct Testimony of Robert Kendall ¶ 1.

Kendall testified that "[t]hroughout 2019 and March 2020," he used the Wellington station at least two times per week to visit his ex-girlfriend. Id. ¶ 7. He stated that he would wait at the station to be picked up and was often 50 feet from buses. Id. He also stated that he does not like "breathing and smelling the bus exhaust." Id. ¶ 11.

Academy argues that Kendall did not at any point identify **Academy** buses as being present at the Wellington station, or specifically avoiding the area due to Academy buses as opposed to other buses. See Mot. Part. Judgment at 5:

> But nowhere — neither in his written submission nor in his live testimony — did Mr. Kendall state that he ever observed Academy operating buses at Wellington Station. Without any testimony tying Mr. Kendall to Wellington Station, he cannot carry CLF's standing burden for that location.

The second sentence is likely a typo, because Kendall testifies extensively to his former and continuing presence at Wellington Station. Academy likely meant to say, "without any testimony tying Academy to Wellington Station." Kendall,

[29]

however, need not testify to identifying a specific Academy bus at Wellington station as a standing witness, especially when Academy's presence at the station has been proven via extensive Saucon data, Klier's investigative reports, and Monica Periera's testimony.   For substantially the same reasons described above, Kendall satisfies the standing requirement for Wellington station.

Monica Pereira, in her written testimony, does not name any time at which she utilized the Wellington stop other than a vague "up through 2022."   Written Direct Testimony of Monica Pereira ¶ 7.   As such, she has not stated with particularity that she interacted with the stop before the Complaint was amended in 2020.   Since the First Circuit instructed that "standing 'must exist at the commencement of the litigation,'" and it is not clear that Pereira had been injured or visited the stop at all prior to 2020, she lacks standing for the Wellington stop prior to 2022.   Conservation Law Found., Inc., 129 F.4th at 85 (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189 (2000)).

In sum, the Foundation has thus demonstrated the requisite standing for the Agganis Way, Riverside, and Wellington stations via its members.   True, the evidence is thin – much like the "testers" that support Americans with Disability Act lawsuits, see, e.g., Reaves v. Immediate Med. Care, P.A., 770 F. Supp. 3d

[30]

1322 (M.D. Fla. 2025); see also Acheson Hotels, LLC v. Laufer, 138 Harv. L. Rev. 285 (2024) -- but it is sufficient.

## B. Massachusetts General Laws Chapter 90, Section 16A

The Clean Air Act, 42 U.S.C. § 7401(b)(1), requires states to submit a state implementation plan ("SIP") that outlines how the state plans to comply with EPA air quality standards. 42 U.S.C. § 7410. Private citizens may then enforce violations of the plans via a private right of action under the Clean Air Act. Conservation L. Found., 129 F.4th at 83. Massachusetts' plan prevents vehicle idling and is codified in state law under Massachusetts General Law Chapter 90, Section 16A and 310 Mass. Code Regs. 7.11(1)(b).[8] The word "unnecessary" in the context of this statute has not been defined by Massachusetts courts, nor by the First Circuit. This Court has previously ruled that the statute was not void for vagueness, and that the fines were not excessive under the Eighth Amendment of the United States Constitution, in United States v. Paul Revere Transp., LLC, 608 F. Supp. 2d 175 (D. Mass. 2009).

### 1. The Burden of Proof

Judge O'Toole, in Paul Revere, ruled that the initial burden of proof falls on the plaintiff to establish a prima

---

[8] There is no substantive difference between the text of the statute and regulation.

[31]

facie violation.  He described this as a "low burden" that can be carried by idling for more than 5 minutes with no observed or apparent necessity - a test that was described throughout the litigation as "duration-plus."  Hr'g Tr. 5:2, May 20, 2009; Trial Tr., 13:3-12, Jan. 29, 2026.

The Foundation tried this case on the assumption that once this "low burden" was met, the full burden of proof (both production and persuasion) shifts to the defendant.  This goes too far.  Massachusetts law does not proscribe idling -- a necessary attribute of automotive transport -- but "unnecessary operation of the engine" idling.  This plain and ordinary meaning of the statute is confirmed by the express exceptions which cannot fairly be read as exhaustive.

A plaintiff suing under the Clean Air Act based on this statute need not prove a negative[9] but must proffer sufficient

---

[9] The Supreme Court has noted that "as a practical matter it is never easy to prove a negative." Elkins v. United States, 364 U.S. 206, 211 (1960).  Reading such a requirement into the statute would depart from Judge O'Toole's conception of the burden of proof, and represents a higher bar for plaintiffs than indicated by the text and purpose of the statute.
The Clean Air Act explicitly includes a citizen suit provision, creating a private right of action for "any person" to commence an action against any person alleged to have violated an emission standard.  42 U.S.C. 7604.  The citizen suit provision was included by Congress with the purpose of "shaming [an agency]" and "forcing it to intervene," as well as to address shortcomings of government enforcement such as "limited budgets," challenges detecting violations, political or institutional barriers, and "the potential for private enforcement to generate innovative litigation strategies."  See

[32]

credible evidence, which evidence may be direct, circumstantial, or any combination thereof, from which the fact finder can find by a fair preponderance that a pattern and practice of unnecessary idling actually existed. This burden never shifts to the defense.

This burden may, of course, be met by a more comprehensive investigation or even by an adequate investigative sampling program. Here the Foundation proved its case by the Saucon data which showed a very large number of idling instances that far exceeded any of the logical explanations to which this Court now turns.

### 2. Necessary Idling

What constitutes necessary idling? The Foundation would cabin such idling to the three statutory exceptions and nothing more. These include (a) vehicles being serviced that require the operation of the engine for such repairs, (b) vehicles engaged in the delivery of goods for which engine assisted power is necessary, or (c) vehicles engaged in an operation for which engine power is necessary. See MASS. GEN. L. Ch. 90 § 16A.

The Court ruled ore tenus at the conclusion of the Liability phase of the trial that "necessary" idling in the commercial bus context includes: loading and unloading of

---

David E. Adelman & Jori Reilly-Diakun, Environmental Citizen Suits, 92 U. COLO. L. REV. 377, 394-95 (2021) (citations omitted).

passengers, idling occurring during roadside repairs, and stationary regeneration in diesel buses.   Trial Tr. 30:20-31: Jan. 29, 2026.   The Court rules however, that stationary regeneration outside of maintenance yards and at random stops **along bus routes** is neither necessary nor acceptable.   Id. at 32:6-11.   Wherever necessary and proper to aid passengers, causing the stops to lower or to permit the wheelchair accessible attachment to deploy or retract is also necessary as matter of law.

The Court found as fact that, by a fair preponderance of the evidence, crediting the witnesses who testified before it, loading of intra-city transit-style buses reasonably takes up to 15 minutes, and the loading of inter-city long-haul buses reasonably takes up to 30 minutes as passengers gear needs to be stowed in the cargo compartment.   Id. at 31:17-25.   The Court rules that idling buses during these time frames constitutes necessary operations under the statue.

## VI.   Remedy

The parties requested mediation following the Court's oral ruling on liability.   See Elec. Clerk's Notes, ECF No. 262. Magistrate Judge Bowler held a Hearing on March 10, 2026, see ECF No. 265, and the parties ultimately settled the case.   See Report re Reference for Alternative Dispute Resolution, ECF No.

[34]

272.    As such, neither further rulings nor findings on remedy are necessary, and the Court expresses no further opinions.

### VII. Conclusion

In conclusion, the Court rules that "necessary" idling under MASS. GEN. L. Ch. 90 § 16A, in the commercial bus context, includes the loading and unloading of passengers (including any passengers with special needs), roadside repairs, and stationary regeneration occurring only at a maintenance yard.  The Court finds as fact, by a preponderance of the evidence, that Academy engaged in a pattern and practice of violating the law by idling longer than 15 and 30 minutes for intra-city and inter-city bus trips, respectively.  The Court makes no findings or rulings as to the remedy for these violations.

**SO ORDERED**

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[10]

---

[10]    This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 48 years.

[35]